# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA



DONNA LEE H. WILLIAMS, INSURANCE
COMMISSIONER OF THE STATE OF DELAWARE,
AS RECEIVER OF NATIONAL HERITAGE LIFE
INSURANCE COMPANY IN LIQUIDATION,

    Plaintiff,

  v.

MICHAEL BLUTRICH; DAVID DAVIES; PATRICK
SMYTHE; JOSEPH ROUADI; GERALD DECKER;
CAPITAL COMPARISONS, INC.; SCHOONER TRUST;
SCIENTIFIC WASTE SYSTEMS, INC.; SKYLARK
COMMUNICATIONS, INC.; CELEB CAPITAL, INC.;
HEATHMEAD DEVELOPMENT CORPORATION;
SCHECTER, LTD.; PERTH COMMERCIAL
PROPERTIES, INC.; WEBB ASSOCIATES, INC.;
CROWN REGIONAL PROPERTIES, INC.; MAXSAM
ENTERTAINMENT, INC.; HARRIN PLATZNER;
PLATZNER INTERNATIONAL GROUP, LTD.; ALAN
HIRSCH; THOMAS MARTIN; MARTIN REAL
ESTATE APPRAISERS, INC.; HENRY GRASSI; LPDA
ACQUISITION CORP.; BANSTAR, INC.; CROMWELL
BUILDING, INC.; PERFE CORPORATION; NEW
CONTENDERS, INC.; ACTUAL FUNDING
COMPANY, INC.; ANSHLU, INC.; LYLE PFEFFER;
DEBORAH ARONOW; JOSEPH ARONOW;
NULENDA, INC.; NATIONAL FINDERS CORP.;
SCORES ENTERTAINMENT, INC.; IRVING
BILZINSKY; MARK YACKOW; NATIONAL
MORTGAGE CORP.; CHARLES CONTRERAS;
FUTURE DIVERSIFIED PROJECTS, INC.; MICHAEL
OBERLANDER; T.T.T. CAPITAL CORP.; L. PFEFFER
CORP.; KEITH POUND; IAN SCHNEIDERMAN;
SOUTH STAR MANAGEMENT CO., INC.; IAN
STARR A/K/A IAN STARK A/K/A YAAKOV STERN;
SHOLAM WEISS; SOLOMON OBSTFELD; EUGENE
GRIN; SAMUEL ROTHMAN; GLOBAL EQUITIES &
REALTY, INC. F/K/A GLOBAL EQUITIES & REALTY
GROUP, INC.; N.E.S. CONSULTING CORP.; JOHN
SPEAR; DEAN KALTSAS; FDPI HOLDING, INC.;

Civil Action No.
97-1221-CIV-ORL-22B

**FIRST AMENDED
COMPLAINT**



HA-LO INVESTMENT ASSOCIATES, INC.;        )
REGENCY FINANCIAL GROUP, INC.; SOMERSET   )
PROPERTIES, INC.; MOMENTUM ENERGY         )
RESOURCES CORPORATION; CORNERSTONE OIL    )
AND GAS INC.; NATIONAL HOUSING EXCHANGE   )
INC.; APX MORTGAGE SERVICES, INC.; ROBERT )
GORSKI; NADINE GORSKI A/K/A NADINE ALLEN; )
RESOURCE ASSET MANAGEMENT, INC.; and      )
NATIONAL WORK-OUT SPECIALISTS, INC.,      )
                                          )
                  Defendants.             )
_____ )

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF CONTROVERSY ................................................................. 1

II.  JURISDICTION AND VENUE ................................................................. 2

III. PARTIES ................................................................................. 3

    A.   National Heritage Life Insurance Company in Liquidation ...................... 3

    B.   Defendants. .................................................................. 5

    C.   Other Persons and Entities. ................................................. 22

IV.  FACTUAL BACKGROUND ................................................................. 29

    A.   The Acquisition Scheme ...................................................... 30

        1.   The Trust Fund Conversion Aspect of the Acquisition
            Scheme ................................................................. 31
        2.   The Check Kiting Aspect of the Acquisition Scheme ................. 32
        3.   The Rouadi Pay-Off Aspect of the Acquisition Scheme ............. 36
        4.   The Cover-Up Aspect of the Acquisition Scheme ...................... 39
            a)   The Scientific Waste Joint Venture ................................. 40
            b)   The Skylark Communications Loan ................................. 41
            c)   The Celeb Capital Loan ............................................. 43
            d)   The Reinvestments Into the National Heritage
               Account ............................................................. 44
        5.   Interstate Wire Communications in Furtherance of the
            Acquisition Scheme ................................................... 44

    B.   The Heathmead Loan Scheme ................................................. 45

        1.   Interstate Mailings in Furtherance of the Heathmead Loan
            Scheme ................................................................. 51
        2.   Interstate Wire Communications in Furtherance of the
            Heathmead Loan Scheme ............................................. 51

    C.   The 4305 Associates Loan Scheme ........................................... 52

1.      Interstate Mailings in Furtherance of the 4305 Associates Loan Scheme ................................................................... 55

2.      Interstate Wire Communications in Furtherance of the 4305 Associates Loan Scheme ................................................ 56

D.      The Perth Loan Scheme. ......................................................................... 56

1.      Interstate Mailings in Furtherance of the Perth Loan Scheme ................................................................................. 61

2.      Interstate Wire Communications in Furtherance of the Perth Loan Scheme ................................................................ 61

E.      The Crown Regional Loan Scheme ...................................................... 62

1.      Interstate Mailings in Furtherance of the Crown Regional Loan Scheme ......................................................... 67

2.      Interstate Wire Communications in Furtherance of the Crown Regional Loan Scheme ........................................ 68

F.      The LPDA Line of Credit Scheme........................................................ 69

1.      Interstate Wire Communications in Furtherance of theLPDA Line of Credit Scheme ........................................... 80

G.      The National Mortgage Corporation Scheme ................................... 81

1.      Interstate Wire Communications in Furtherance of the National Mortgage Corporation Scheme ...................... 82

H.      The Class D Preferred Stock Scheme .................................................. 83

1.      Interstate Wire Communications in Furtherance of the Class D Preferred Stock Scheme .................................... 95

I.      The LPDA and Nulenda Credit Line of Credit Pay-Off Scheme ............ 96

1.      Interstate Wire Communications in Furtherance of the LPDA and Nulenda Credit Line Pay-Off Scheme ...................... 100

J.      The Blutrich EAB Special Escrow Payout Scheme.................................. 101

1.      Interstate Wire Communications in Furtherance of the Blutrich EAB Special Escrow Payout Scheme ........................... 108

K.      The National Mortgage Payout Scheme .................................................109

L.      The CMO to PAC Swap Scheme.............................................................117

        1.      Interstate Wire Communications in Furtherance of the
                CMO to PAC Swap Scheme.......................................................123

M.      The Scheme to Misappropriate the Proceeds of the Sale of the
        "Seven PACs" .........................................................................................124

        1.      The Misappropriation of the Proceeds from the Sale of the
                "Seven PACs" Through the Phoenix Trust Texas Bank
                Account ......................................................................................125
        2.      The Misappropriation of the Proceeds of the Sale of the
                "Seven PACs" Through the Phoenix Trust Merrill Lynch
                Account ......................................................................................129
        3.      The Diversion of the Proceeds of the Sale of the "Seven
                PACs" to Frenkel & Hershkowitz................................................131
        4.      Interstate Wire Communications in Furtherance of the
                Scheme to Misappropriate the Proceeds of the Sale of the
                "Seven PACs" .............................................................................131

N.      The Scheme to Cover Up the Misappropriation of the Proceeds of
        the Sale of the "Seven PACs" ................................................................131

        1.      Interstate Mailings in Furtherance of the Scheme to Cover
                Up the Scheme to Misappropriate the Proceeds of the Sale
                of the "Seven PACs" ..................................................................137
        2.      Interstate Wire Communications in Furtherance of the
                Scheme to Cover Up the Scheme to Misappropriate the
                Proceeds of the Sale of the "Seven PACs" .................................137

O.      The Mortgages Scheme...........................................................................138

        1.      The FIB Accounts Liquidation Aspect of the Mortgages
                Scheme.......................................................................................139
        2.      The Accumulation of $82 Million Aspect of the Mortgages
                Scheme.......................................................................................141
        3.      The RTC Mortgages ...................................................................144
        4.      The CARC Mortgages .................................................................145
        5.      The Yasuda Mortgages and Co-ops.............................................146
        6.      Interstate Wire Communications in Furtherance of the
                Mortgages Scheme.....................................................................149

P.    The Class E Preferred Stock Scheme.........................................................150

      1.    The Capital Infusion Aspect of the Class E Preferred Stock
            Scheme....................................................................................152
      2.    The Lifeco Mortgage Services Aspect of the Class E
            Preferred Stock Scheme...........................................................158
      3.    The Dividends Aspect of the Class E Preferred Stock
            Scheme....................................................................................159
      4.    Interstate Mailings in Furtherance of the Class E Preferred
            Stock Scheme...........................................................................159
      5.    Interstate Wire Communications in Furtherance of the
            Class E Preferred Stock Scheme...............................................159

Q.    The Mortgage-Backed Bond Scheme ......................................................160

      1.    Interstate Wire Communications in Furtherance of the
            Mortgage-Backed Bond Scheme ...............................................165

R.    The Mortgage Servicing Scheme.............................................................166

      1.    The Theft of the Roberts Mortgage .............................................168
      2.    The Replacement of APX with RAM..........................................170
      3.    The Diversion of Funds Through a "Servicing Fee"....................172
      4.    The Diversion of Funds to National Work-Out............................172
      5.    The Diversion of Funds to South Star Through the Laguna
            Beach Mortgages .....................................................................173
      6.    The Diversion of Funds to South Star Through the
            "Unidentified Funds" Account...................................................174
      7.    The Diversion of Interest Which Accrued Prior to
            December 28, 1993 to South Star ...............................................174
      8.    Interstate Mailings in Furtherance of the Mortgage
            Servicing Scheme.....................................................................175
      9.    Interstate Wire Communications in Furtherance of the
            Mortgage Servicing Scheme .....................................................175

# <u>COUNTS</u>

**<u>Page</u>**

COUNT I - VIOLATIONS OF 18 U.S.C. § 1962(c)......................................................176

COUNT II - VIOLATIONS OF 18 U.S.C. § 1962(d) ...................................................178

COUNT III - VIOLATIONS OF 18 U.S.C. § 1962(c) ..................................................179

COUNT IV - VIOLATIONS OF 18 U.S.C. § 1962(d) .................................................182

COUNT V - VIOLATIONS OF 18 U.S.C. § 1962(b)....................................................183

COUNT VI - VIOLATIONS OF 18 U.S.C. § 1962(d) .................................................184

COUNT VII - VIOLATIONS OF 18 U.S.C. § 1962(a) ................................................185

COUNT VIII - VIOLATIONS OF 18 U.S.C. § 1962(d) ..............................................186

COUNT IX - FRAUD....................................................................................................186

COUNT X - AIDING AND ABETTING FRAUD ........................................................189

COUNT XI - BREACH OF FIDUCIARY DUTY ........................................................190

COUNT XII - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY...........191

COUNT XIII - CONVERSION .....................................................................................193

COUNT XIV - AIDING AND ABETTING CONVERSION........................................194

COUNT XV - FRAUDULENT CONVEYANCE .........................................................196

COUNT XVI - UNJUST ENRICHMENT ....................................................................198

COUNT XVII - MONEY HAD AND RECEIVED .......................................................199

Plaintiff Donna Lee H. Williams, Insurance Commissioner of the State of Delaware (the "Commissioner"), as Receiver of National Heritage Life Insurance Company in Liquidation, by her undersigned attorneys, complains of defendants as follows:

## I.    SUMMARY OF CONTROVERSY.

1.     The Commissioner brings this action on behalf of National Heritage Life Insurance Company ("National Heritage") to recover tens of millions of dollars looted from National Heritage, principally through a massive conspiracy involving multiple fraud schemes.  Certain of the defendants fraudulently acquired control of National Heritage in September 1990 through a multi-million dollar check-kiting scheme, as alleged in detail below.  From that time until May 25, 1994, when the Commissioner obtained an order placing National Heritage in rehabilitation, defendants operated and conducted the affairs of National Heritage for their own personal use and benefit, to the direct, immediate, and substantial financial detriment of National Heritage, as alleged in detail below.

2.     During the course of the fraud schemes alleged herein, certain defendants engaged in sham transactions designed to give the appearance to National Heritage's state insurance regulators that it had sufficient regulatory capital with which to conduct its insurance business without undue risk to the public and National Heritage's policyholders.  These transactions concealed and disguised the existence of the conspiracies and schemes to loot National Heritage, gave the false and misleading appearance that National Heritage's financial condition was satisfactory, delayed and

obstructed regulatory action, and enabled the conspirators to retain control of National

Heritage and to operate it for their own personal use and benefit to the direct and

immediate financial detriment of National Heritage.

## II.   JURISDICTION AND VENUE.

3.    This Court has subject matter jurisdiction over Counts I through

VIII pursuant to 28 U.S.C. § 1331 because federal claims are stated under 18 U.S.C. §§

1961, et seq. (the "RICO Act").  This Court has supplemental jurisdiction over the claims

asserted in Counts IX through XVII and the defendants named therein pursuant to 28

U.S.C. § 1367 because the state law claims alleged therein derive from a common

nucleus of operative fact such that the plaintiff would ordinarily be expected to try them

all in one judicial proceeding.

4.    Venue is proper in the Middle District of Florida pursuant to 28

U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965.  Many of the events giving rise to this

action occurred in the Middle District of Florida; acts in furtherance of the schemes and

conspiracies alleged herein were performed in the Middle District of Florida; numerous

mailings and interstate wire communications in furtherance of the various schemes, each

of which is a violation of the federal mail and wire fraud statutes, were made in the

Middle District of Florida; National Heritage's principal place of business was in the

Middle District of Florida; and at least defendants Joseph Rouadi; Schooner Trust;

Skylark Communications, Inc.; Banstar, Inc. and South Star Management Company, Inc.

may be found in the Middle District of Florida.

III.   **PARTIES.**

A.   **National Heritage Life Insurance Company in Liquidation.**

5.     Donna Lee H. Williams is the Insurance Commissioner of the State of Delaware and the receiver for National Heritage.

6.     National Heritage was at all relevant times a Delaware domiciled life insurance company with its principal place of business in Orlando, Florida.

7.     On May 25, 1994, the Court of Chancery of the State of Delaware entered a Rehabilitation and Injunction Order (the "Rehabilitation Order"), placing National Heritage in rehabilitation.  The Rehabilitation Order charged the Commissioner with the responsibility of rehabilitating National Heritage for the benefit of its policyholders.

8.     At the time it was placed in rehabilitation on May 25, 1994, National Heritage had over 28,000 policy and annuity holders residing in 23 states.  The average age of these policy and annuity holders was approximately 65 years.

9.     On November 21, 1995, the Court of Chancery of the State of Delaware entered a Liquidation and Injunction Order (the "Liquidation Order"), placing National Heritage in liquidation.  The Liquidation Order charges the Commissioner with the responsibility of liquidating the assets of National Heritage for the benefit of its policyholders.  (Ex. A, at ¶ 4).

10.     Among other things, the Liquidation Order directs the Commissioner to:

> take . . . exclusive possession and control of and to continue or be vested with all right, title and interest in, of or to the property of National Heritage, including,

> without limitation, all of National Heritage's assets, contracts, rights of action, . . .
> books, records, bank accounts, certificates of deposit, collateral securing
> obligations to, or for the benefit of, National Heritage . . . and all real or personal
> property of any nature of National Heritage . . .

(Ex. A, at ¶ 4).  The Commissioner maintains offices for the National Heritage

receivership estate in Casselberry, Florida.

      11.     At all relevant times until National Heritage was placed in

rehabilitation, National Heritage was a wholly-owned subsidiary of Lifeco Investment

Group, Inc. ("Lifeco"), a public company with its principal offices in Orlando, Florida.

Gail Kasmir (the "National Heritage CFO") was at various times treasurer, secretary,

chief financial officer and executive vice-president of finance of National Heritage and a

member of its board of directors and investment committee.  David Williams (the

"National Heritage Controller") was at all relevant times assistant secretary, controller or

assistant controller of National Heritage.  On September 7, 1990, at least Michael

Blutrich, David Davies, Lambert Aloisi, Patrick Smythe and Joseph Rouadi, acting

through Tri-Atlantic Holdings, Ltd. ("Tri-Atlantic"), fraudulently acquired 52.3% of

Lifeco's common stock and thereby acquired control of both Lifeco and National

Heritage.

B.      **Defendants.**

12.      Michael Blutrich ("Blutrich") is a citizen of New York City, New York.  Blutrich is a lawyer who practices law in New York City.  At all relevant times, Blutrich was a director of defendant Crown Regional Properties, Inc.; the assistant secretary of defendant LPDA Acquisition Corp.; a director, officer and shareholder of defendant Nulenda, Inc.; a vice-president and shareholder of 4305 Associates, Inc.; a president and shareholder of J.W. Enterprises, Inc.; and a secretary and shareholder of defendant Celeb Capital, Inc.  At various times, Blutrich was a name partner in the following law firms:  Blutrich, Falcone & Miller; Blutrich & Miller; Blutrich, Herman & Miller; and Blutrich, Herman & Miller LLP.  On April 7, 1998, Blutrich pled guilty in the case captioned <u>United States v. Michael D. Blutrich</u>, No. 97-71-Cr-Or-22(S2), to one count of racketeering, one count of racketeering conspiracy, ten counts of wire fraud and six counts of money laundering, based on his participation in certain of the conduct alleged herein.

13.      David Davies ("Davies") is currently incarcerated.  At all relevant times, Davies was chief financial officer, secretary, and a director and shareholder of Tri-Atlantic.  On September 7, 1990, immediately upon Tri-Atlantic's acquisition of control of Lifeco, Davies was named a director and treasurer of National Heritage.  Davies resigned as a director and officer of Lifeco and National Heritage on May 8, 1991.  At all relevant times, Davies, along with defendant Patrick Smythe, controlled defendant Capital Comparisons, Inc.  Also at all relevant times, Davies was an authorized signatory on defendant Skylark Communications, Inc.'s bank account.  In September 1996, Davies

pled guilty in the case captioned <u>United States v. Davies</u>, No. 96-11-Cr.-Orl-19 (S2) (M.D. Fla.), to three counts of wire fraud and one count of income tax evasion based on his participation in certain of the conduct complained of herein. On November 25, 1996, Davies was sentenced to seven years in prison. He was ordered to pay restitution in the amount of $10,503,728.83 to National Heritage, and to pay taxes, interest and penalties in the amount of $2,163,427.32 to the Internal Revenue Service. To date, Davies has failed to pay any restitution to National Heritage.

           14.     Patrick Smythe ("Smythe") was a citizen of Orlando, Florida at all relevant times, and his last known address was in Gainesville, Georgia. Smythe was president, and a director and shareholder of Tri-Atlantic through January 8, 1991. On September 7, 1990, immediately upon Tri-Atlantic's acquisition of control of Lifeco, Smythe was named a director and secretary of National Heritage, and president and chief executive officer of Lifeco. Smythe resigned all positions he held as an officer and director of both Lifeco and National Heritage on January 8, 1991. Smythe was re-appointed as a member of National Heritage's board of directors on May 2, 1991. On May 3, 1991, Smythe was named a director of Lifeco. On May 22, 1991, Smythe was named executive vice-president and chief operating officer of National Heritage. On September 20, 1991, Smythe was named president and chief operations officer of Lifeco. At all relevant times, Smythe, along with Davies, controlled defendant Capital Comparisons, Inc. Also, at all relevant times, Smythe was an authorized signatory on defendant Skylark Communications Inc.'s bank account. On April 8, 1998, Smythe pled guilty in the case captioned <u>United States v. Patrick C. Smythe</u>, No. 97-71-Cr-Or-22(S2),

to one count of racketeering conspiracy, one count of federal income tax evasion, twelve counts of wire fraud and five counts of money laundering, based on his participation in certain of the conduct alleged herein.

15.     Joseph Rouadi ("Rouadi") is a citizen of Windermere, Florida. At the time of Tri-Atlantic's acquisition of control of Lifeco, Rouadi owned 125,000 shares of preferred stock in Tri-Atlantic. On September 7, 1990, Rouadi was named a director of Lifeco. Rouadi was also a director, chief financial officer and treasurer of defendant Skylark Communications, Inc.

16.     Gerald A. Decker ("Decker") was a citizen of Forest Park, Georgia at all relevant times. Decker was president of defendant Scientific Waste Systems, Inc. Decker was also secretary of defendant Skylark Communications, Inc.

17.     Capital Comparisons, Inc. ("Capital Comparisons") is an Arizona corporation which Smythe formed on August 6, 1990 for fraudulent purposes. Capital Comparisons maintained offices in Phoenix, Arizona at all relevant times. At all relevant times, Davies and Smythe controlled Capital Comparisons with the knowledge and agreement of Blutrich and Aloisi, and used it as a vehicle fraudulently to acquire control of Lifeco and National Heritage on September 7, 1990.

18.     Schooner Trust is a trust organized and operating under the laws of the State of Florida, with its principal place of business in Florida. The Schooner Trust was formed by Rouadi on September 4, 1990, at which time Rouadi conveyed all of his common stock in Windtree Gardens, Inc. and Windtree Professional Center, Inc. to the Schooner Trust.

19.     Scientific Waste Systems, Inc. ("Scientific Waste") is a Georgia corporation formed on December 22, 1987, with its principal place of business at 2200 Cole Court, Norcross, Georgia.  At all relevant times, Decker was president and chief executive officer of Scientific Waste.

20.     Skylark Communications, Inc. ("Skylark") is a Florida corporation formed on December 7, 1990, with its principal place of business at 280 East Highway 50, Suite 140, Winter Garden, Florida.  At all relevant times, Rouadi was a director and chief financial officer of Skylark, Decker was a director and secretary of Skylark, and Smythe and Davies were authorized signatories on Skylark's bank account.

21.     Celeb Capital, Inc. ("Celeb Capital") was a New York corporation formed for fraudulent purposes on September 11, 1990.  Celeb Capital maintained its business address at 499 South Main Street, New City, New York, a building formerly owned by defendant Alan Hirsch that also served as the business addresses for defendants Schecter, Ltd.; Perth Commercial Properties, Inc.; Webb Associates, Inc.; Maxsam Entertainment, Inc.; and Crown Regional Properties, Inc.  At all relevant times, Blutrich and Jay Bildstein were the sole shareholders of Celeb Capital.  Bildstein was the president of Celeb Capital, and Blutrich was the secretary of Celeb Capital.  The law firm of Blutrich, Falcone & Miller performed the legal work in connection with the formation of Celeb Capital.  Celeb Capital was a shareholder of J.W. Enterprises, Inc. at all relevant times.  Celeb Capital was dissolved by proclamation on September 28, 1994.

22.     Heathmead Development Corporation ("Heathmead") is a New York corporation formed by Blutrich, Davies, and Smythe on December 24, 1990, with

its principal place of business in Rockland County, New York. The law firm of Blutrich,
Falcone & Miller performed the legal work in connection with the formation of
Heathmead and is Heathmead's registered agent for service of process.

        23.     Schecter, Ltd. was a New York corporation formed on February
28, 1986. At all relevant times, Schecter, Ltd. was owned and controlled by defendant
Alan Hirsch. Schecter, Ltd. maintained its business address at 499 South Main Street,
New City, New York, a building formerly owned by Hirsch that also served as the
business address for five other defendants. Schecter, Ltd. was dissolved by proclamation
on April 15, 1993.

        24.     Perth Commercial Properties, Inc. ("Perth") was a New York
corporation formed on January 31, 1991. Blutrich, Davies and Smythe controlled Perth
at all relevant times. Perth's business address was 499 South Main Street, New City,
New York, a building formerly owned by Alan Hirsch that also served as the business
address for five other defendants. Perth was dissolved by proclamation on December 28,
1994.

        25.     Webb Associates, Inc. ("Webb Associates") was a New York
corporation formed on September 25, 1989. At all relevant times, Webb Associates was
owned and controlled by defendant Alan Hirsch. Webb Associates' business address was
499 South Main Street, New City, New York, a building formerly owned by Alan Hirsch
that also served as the business address for five other defendants. Webb Associates was
dissolved by proclamation on October 5, 1995.

26.     Crown Regional Properties, Inc. ("Crown Regional") was a New York corporation formed on March 1, 1991, which maintained its principal place of business at 499 South Main Street, New City, New York, a building formerly owned by defendant Alan Hirsch that also served as the business address for five other defendants. Blutrich and Davies controlled Crown Regional at all relevant times. Blutrich was a director of Crown Regional at all relevant times. Crown Regional was dissolved by proclamation on September 27, 1995, the same date on which Cromwell Building, Inc. and Perfe Corporation were dissolved.

27.     Maxsam Entertainment, Inc. ("Maxsam") is a New York corporation formed on February 27, 1991. Maxsam is owned and controlled by defendant Alan Hirsch and is named for his two sons, Max and Sam. Maxsam's business address was 499 South Main Street, New City, New York, a building formerly owned by Alan Hirsch that also served as the business address for five other defendants.

28.     Harrin Platzner ("Platzner") is a citizen of New Rochelle, New York, and he conducts business from an office located at 309 North Avenue, New Rochelle, New York. At all relevant times, Platzner was president of defendant Platzner International Group, Ltd.

29.     Platzner International Group, Ltd. ("Platzner International") is a New York corporation formed on February 1, 1983, with its principal place of business at 309 North Avenue, New Rochelle, New York.

30.     Alan Hirsch ("Hirsch") resides at 83 Holland Avenue, Demarest, New Jersey. Hirsch formerly owned the building at 499 South Main Street, New City,

New York which at all relevant times was the business address of defendants Crown

Regional, Webb Associates, Perth, Maxsam, and Celeb Capital.  Hirsch owned and

controlled Maxsam and Webb Associates.  Hirsch and the defendant corporations he

controlled diverted funds from National Heritage.  At all relevant times, Hirsch was a

shareholder of Crown Regional and an employee of defendant National Mortgage

Corporation.

        31.    Thomas Martin ("Martin") is a citizen of New City, New York.  At

all relevant times, Martin was the president of Martin Real Estate Appraisers, Inc.

        32.    Martin Real Estate Appraisers, Inc. d/b/a Martin-Martin, Inc.

("Martin Appraisers") is a New York corporation formed on June 21, 1990, with its

principal place of business at 274 Route 303, West Nyack, New York.  At all relevant

times, Martin was the president of Martin Appraisers.

        33.    Henry Grassi ("Grassi") is a citizen of New York City, New York.

At all relevant times, Grassi was a real estate broker who purported to act as a certified

real estate appraiser in furtherance of the schemes and conspiracies alleged herein.

        34.    LPDA Acquisition Corp. ("LPDA") is a New York corporation

formed on May 4, 1992.  At all relevant times, defendant Deborah Aronow was the

president and a director of LPDA, defendant Lyle Pfeffer was the vice-president and

secretary of LPDA, and Blutrich was the assistant secretary of LPDA.  Deborah Aronow,

Lyle Pfeffer and Blutrich were signatories on LPDA's bank accounts at all relevant times.

On April 8, 1998, LPDA pled guilty in the case captioned United States v. LPDA

Acquisitions, Inc., No. 97-71-Cr-Or-22(S2), to five counts of wire fraud and one count of money laundering, based on its participation in certain of the conduct alleged herein.

35.     Banstar, Inc. ("Banstar") is a Florida corporation formed on January 28, 1987, with its principal place of business in Winter Park, Florida. Banstar operates strip clubs known as "The Gold Club" and "Limit Up." At all relevant times, Banstar was controlled by Smythe and Lyle Pfeffer. Banstar was administratively dissolved on August 25, 1995, but, notwithstanding such dissolution, exists as a Florida corporation pursuant to Florida Stat. Ann. § 607.1421(3) (West 1996).

36.     Cromwell Building, Inc. ("Cromwell Building") was a New York corporation formed on June 18, 1991, with its principal place of business in New York City, New York. Cromwell Building was controlled by Deborah Aronow and Joseph Aronow at all relevant times. Cromwell Building was dissolved by proclamation on September 27, 1995, the same date on which defendants Crown Regional and Perfe Corporation were dissolved.

37.     Perfe Corporation ("Perfe") was a New York corporation formed on May 16, 1991, with its principal place of business in New York City, New York. Perfe was controlled by defendants Deborah Aronow and Joseph Aronow at all relevant times. Deborah Aronow was the registered agent for Perfe. Perfe was dissolved by proclamation on September 27, 1995, the same date on which Crown Regional and Cromwell Building were dissolved.

38.     New Contenders, Inc. ("New Contenders") is a New York corporation formed on March 6, 1989, with its principal place of business in Westchester

County, New York.  Blutrich controlled New Contenders and was a signatory on its bank

accounts at all relevant times.  Defendant Mark Yackow also controlled New Contenders

at all relevant times.

        39.     Actual Funding Company, Inc. ("Actual Funding") is a New York

corporation formed on October 5, 1992.  Defendant Jan Schneiderman performed the

legal work in connection with the formation of Actual Funding and also acted as the

registered agent for Actual Funding.  At all relevant times, Blutrich, Pfeffer,

Schneiderman and Weiss owned and controlled Actual Funding.

        40.     Anshlu, Inc. ("Anshlu") is a New York corporation formed on

February 27, 1987.  The law firm of Blutrich, Falcone & Miller performed the legal work

in connection with the formation of Anshlu.  At all relevant times, Blutrich owned and

controlled Anshlu.

        41.     Lyle Pfeffer ("Pfeffer") is a citizen of New York City, New York.

At all relevant times, Pfeffer was the vice-president and secretary of LPDA, the president

and chairman of the board of defendant National Mortgage Corporation, the president of

defendant Ha-Lo Investment Associates, Inc., the president of defendant Future

Diversified Projects, Inc., and Pfeffer also owned and controlled defendant FDPI

Holding, Inc.  Pfeffer was a member of the audit committee of Lifeco's board of directors

from March 3, 1993 through March 1, 1994, and was chairman of the audit committee

from March 3, 1993 through June 10, 1993.  Pfeffer was also a member of the investment

oversight committee of Lifeco's board from March 3, 1993 through March 1, 1994.  On

April 8, 1998, Pfeffer pled guilty in the case captioned United States v. Lyle K. Pfeffer,

No. 97-71-Cr-Or-22(S2), to one count of racketeering, one count of racketeering conspiracy, ten counts of wire fraud and six counts of money laundering, based on his participation in certain of the conduct alleged herein.

42.     Deborah Aronow ("D. Aronow") is a citizen of New York City, New York.  She is the wife of defendant Joseph Aronow.  At all relevant times, D. Aronow was the president and a director of LPDA, and she controlled Cromwell Building and Perfe.

43.     Joseph Aronow ("J. Aronow") is a citizen of New York City, New York.  J. Aronow is a lawyer who practices law in New York City.  He is the husband of D. Aronow and at all relevant times controlled Cromwell Building and Perfe.

44.     Nulenda, Inc. ("Nulenda") is a New York corporation formed on August 21, 1992.  At all relevant times, Blutrich was a director, secretary and a shareholder of Nulenda, and Pfeffer was president of Nulenda.  Richard Herman was the registered agent for Nulenda at all relevant times.  Blutrich and Pfeffer were signatories on Nulenda's bank accounts at all relevant times.  The law firm of Blutrich, Falcone & Miller performed the legal work in connection with the formation of Nulenda.  On April 8, 1998, Nulenda pled guilty in the case captioned United States v. Nulenda, Inc., No. 97-71-Cr-Orl FL-22(S2), to one count of money laundering and three counts of wire fraud, based on its participation in certain of the conduct alleged herein.

45.     National Finders Corporation ("National Finders") was a New York corporation formed on October 15, 1986, with its principal place of business in New York City, New York.  At all relevant times, National Finders was controlled by

Pfeffer and defendant Charles Contreras.  Pfeffer was vice-president and secretary of National Finders at all relevant times.  National Finders was dissolved by proclamation on March 24, 1993.

46.     Scores Entertainment, Inc. ("Scores") is a New York corporation formed on February 6, 1991.  The law firm of Blutrich, Falcone & Miller performed the legal work in connection with the formation of Scores and represented Scores in obtaining a loan from National Heritage.  At all relevant times, defendant Irving Bilzinsky was the sole shareholder of Scores; defendant Dean Kaltsas was an officer of Scores; and defendants Mark Yackow and Pfeffer were signatories on Scores' bank accounts.  Scores was controlled by Bilzinsky, Kaltsas, Yackow and Pfeffer at all relevant times.

47.     Irving Bilzinsky ("Bilzinsky") is a citizen of Brooklyn, New York.  At all relevant times, Bilzinsky was the sole shareholder of and controlled Scores.

48.     Mark Yackow ("Yackow") is a citizen of New York, New York.  At all relevant times, Yackow controlled Scores and was a signatory on its bank accounts.  Yackow also controlled New Contenders and shared office space with Blutrich at all relevant times.

49.     National Mortgage Corporation ("National Mortgage") is a New York corporation formed on February 19, 1987.  At all relevant times, National Mortgage maintained offices in New York City.  Pfeffer was the president and chairman of the board of National Mortgage at all relevant times.  At all relevant times, Contreras was

vice-president and secretary of National Mortgage and a signatory on certain bank accounts of National Mortgage.

50.     Charles Contreras ("Contreras") is a citizen of New York City, New York.  At all relevant times, Contreras was a vice-president and treasurer of defendant Future Diversified Projects, Inc.  At all relevant times, Contreras was vice-president and secretary of National Mortgage Corporation and a signatory on certain bank accounts of National Mortgage Corporation.

51.     Future Diversified Projects, Inc. ("Future Diversified") is a New York corporation formed on August 21, 1992.  At all relevant times, Pfeffer was the president and treasurer of Future Diversified, Bernard A. Shafran was a vice-president of Future Diversified, Contreras was also a vice-president and secretary of Future Diversified, and Richard Herman was the registered agent for Future Diversified.  The law firm of Blutrich, Falcone & Miller performed the legal work in connection with the formation of Future Diversified.  On April 8, 1998, Future Diversified pled guilty in the case captioned United States v. Future Diversified Projects, Inc., No. 97-71-Cr-Orl-22(S2), to two counts of wire fraud and one count of money laundering, based on its participation in certain of the conduct alleged herein.

52.     Michael Oberlander ("Oberlander") is a citizen of New York, New York.  At all relevant times, Oberlander controlled a bank account in the name of "Quill Management," into which proceeds of the schemes and conspiracy were deposited.

53.     T.T.T. Capital Corporation ("TTT Capital") is a New York corporation formed on November 3, 1993, with its principal place of business at Three

Park Avenue, 38th Floor, New York, New York. At all relevant times, TTT Capital was controlled by Yackow, Blutrich, Pfeffer, Schneiderman and Weiss. Yackow was president and secretary of TTT Capital and a signatory on its bank accounts, and Schneiderman acted as its registered agent at all relevant times.

54.    L. Pfeffer Corporation ("L. Pfeffer Corp.") is a New York corporation formed on October 26, 1993, with its principal place of business at Three Park Avenue, 38th Floor, New York, New York. At all relevant times, L. Pfeffer Corp. was controlled by Pfeffer. Pfeffer was the chairman of the board of L. Pfeffer Corp. at all relevant times. L. Pfeffer Corp. was dissolved by proclamation on September 24, 1997.

55.    Keith Pound ("Pound") is a citizen of Flossmoor, Illinois. From in or about August 1993 through at least December 21, 1993, Pound was president of Lifeco Mortgage Services, Inc., a wholly-owned subsidiary of Lifeco ("Lifeco Mortgage"). From at least in or about the Fall of 1992 through in or about November 30, 1994, Pound was employed by defendant APX Mortgage Services, Inc. to solicit mortgage servicing business for APX. At all relevant times since December 1, 1994, Pound was the president of defendant Resource Asset Management, Inc. Pound was the sole officer, shareholder and employee of defendant National Work-Out Specialists, Inc. at all relevant times.

56.    Jan Schneiderman ("Schneiderman") is a citizen of Flushing, New York. At all relevant times, Schneiderman was a lawyer who practiced law in New York City. At all relevant times, Schneiderman was the vice-president of defendant South Star Management Company, Inc., agent for service of process of defendant Global Equities &

-17-

Realty, Inc., and controlled Actual Funding.  Schneiderman was also an officer and director of defendant National Housing Exchange, Inc.

57.     South Star Management Company, Inc. ("South Star") was incorporated in Florida on August 20, 1993 and at all relevant times maintained its place of business at 5005 Collins Avenue, Suite 1507, Miami, Florida.  South Star was administratively dissolved on August 26, 1994, but, notwithstanding such dissolution, exists as a Florida corporation pursuant to Florida Stat. Ann. § 607.1421(3) (West 1996). At all relevant times, defendant Jan Starr was the president and treasurer of South Star; Schneiderman was the vice-president; and Bernard A. Shafran was the secretary. Defendant Samuel Rothman also acted as president of South Star at various times.  South Star was also controlled by defendants Solomon Obstfeld, Sholam Weiss, Samuel Rothman and Eugene Grin at all relevant times.  At all relevant times, Frenkel & Hershkowitz, Hershkowitz, Shafran, Schick and Simon acted as attorneys for South Star. South Star owned defendant National Housing Exchange, Inc.

58.     Jan Starr a/k/a Jan Stark a/k/a Yaakov Stern ("Starr") is a citizen of Brooklyn, New York and Miami, Florida.  At all relevant times, Starr was the president and treasurer of South Star, and the president and a director of defendant National Housing Exchange, Inc.

59.     Sholam Weiss ("Weiss") is a citizen of Monsey, New York and Miami, Florida.  On May 31, 1994, Weiss was convicted in the United States District Court for the Southern District of New York of seven counts of mail fraud in the case captioned United States v. Weiss, No. 5192 CR 890(CSH) (S.D.N.Y.).  On November 10,

1994, Weiss was sentenced to imprisonment for a term of eight months on each count, to run concurrently, and ordered to pay restitution in the amount of $175,000.00. At all relevant times, Weiss controlled South Star and defendant N.E.S. Consulting Corp.

60.    Solomon Obstfeld ("Obstfeld") is a citizen of Brooklyn, New York. At all relevant times, Obstfeld controlled South Star and defendant N.E.S. Consulting Corp., and was president of defendant Global Equities & Realty, Inc.

61.    Eugene Grin ("Grin") is a citizen of Brooklyn, New York. At all relevant times, Grin controlled South Star and defendant N.E.S. Consulting Corp., and was vice president of defendant Global Equities & Realty Group, Inc.

62.    Samuel Rothman ("Rothman") is a citizen of Monsey, New York. At all relevant times, Rothman controlled South Star and, at various times, acted as president of South Star. Rothman was also executive vice president of defendant Global Equities & Realty, Inc. at all relevant times.

63.    Global Equities & Realty, Inc. f/k/a Global Equities & Realty Group, Inc. ("Global Equities") is a New York corporation formed on October 5, 1992, with its principal place of business at 135 W. 50th Street, Ste. 1700, New York, New York. At all relevant times, Obstfeld was president of Global Equities, Rothman was executive vice president and Grin was vice president. Schneiderman was the agent for service of process of Global Equities. Global Equities was dissolved by proclamation on June 26, 1996.

64.    N.E.S. Consulting Corp. ("NES") is a New York corporation formed on September 23, 1993. At all relevant times, defendants Weiss, Obstfeld, Grin,

Blutrich, Pfeffer, Schneiderman, John Spear, Dean Kaltsas and FDPI Holding, Inc. controlled NES.

65.     On information and belief, John Spear ("Spear") is a citizen of Brooklyn, New York..  At all relevant times, Spear was assistant secretary of NES.

66.     Dean Kaltsas ("Kaltsas") is a citizen of New York, New York.  At all relevant times, Kaltsas was president of NES.

67.     FDPI Holding, Inc. ("FDPI") was a New York corporation formed on December 29, 1993, with its principal place of business at 5 E. 37th Street, New York, New York.  At all relevant times, FDPI was the sole shareholder of and controlled NES.  FDPI was owned and controlled by Pfeffer.  South Star was FDPI's registered agent for service of process.  FDPI was dissolved by proclamation on September 24, 1997.

68.     Ha-Lo Investment Associates, Inc. ("Ha-Lo") is a Delaware corporation formed on June 21, 1990.  At all relevant times, Pfeffer was the president of Ha-Lo.

69.     Regency Financial Group, Inc. ("Regency Financial") is a Georgia corporation formed on December 1, 1988, with its principal place of business in Atlanta, Georgia.  Regency Financial was purportedly a financial consulting group.

70.     Somerset Properties, Inc. ("Somerset") is a Texas corporation formed on December 20, 1984.  Clyde W. Smith, Jr. owned and/or controlled Somerset and is its registered agent.

71.     Momentum Energy Resources Corporation ("Momentum Energy") was a Texas corporation formed on December 8, 1992.  Richard M. Plato incorporated

and controlled Momentum Energy, and was its registered agent.  Momentum Energy's charter was forfeited for failure to pay franchise tax on February 13, 1996.

72.     Cornerstone Oil and Gas Inc. ("Cornerstone Oil and Gas") is a Texas corporation formed on March 10, 1992.  Richard M. Plato incorporated Cornerstone Oil and Gas and is its registered agent.  Plato is president and a director of Cornerstone Oil and Gas.

73.     National Housing Exchange Inc. ("NHE") was a North Carolina corporation formed on November 24, 1993 for the sole purpose of acting as issuer of 21 series of 1993 8.5% Registered Collateralized Mortgage Debentures purportedly secured by a pool of mortgages.  Starr was the president of NHE and Schneiderman was an officer of NHE at all relevant times.  Weiss and South Star owned and controlled NHE. NHE was administratively dissolved on March 31, 1997.

74.     APX Mortgage Services, Inc. ("APX") was an Illinois corporation formed on July 27, 1988, that engaged in the business of servicing mortgages until November 30, 1994, at which time it ceased conducting business.  APX's last principal place of business was 1585 N. Rand Road in Palatine, Illinois.  At all relevant times, defendant Robert Gorski was the president of APX, and defendant Nadine Gorski was APX's executive vice-president, secretary and treasurer.  APX employed Pound to solicit mortgage servicing business for APX.  APX was involuntarily dissolved on December 1, 1995.

75.     Robert Gorski ("Gorski") is a citizen of Crystal Lake, Illinois. At all relevant times, Gorski was the president of APX. Gorski is married to defendant Nadine Gorski a/k/a Nadine Allen.

76.     Nadine Gorski a/k/a Nadine Allen ("Allen") is a citizen of Crystal Lake, Illinois. At all relevant times, Allen was the executive vice-president, secretary and treasurer of APX. Allen is married to Gorski.

77.     Resource Asset Management, Inc. ("RAM") is an Illinois corporation which Pound incorporated on October 6, 1994 and which began conducting business on December 1, 1994. RAM held itself out as being engaged in the business of servicing mortgages at all relevant times. RAM's principal place of business was 1585 N. Rand Road, Palatine, Illinois.

78.     National Work-Out Specialists, Inc. ("National Work-Out") is an Illinois corporation which was incorporated on September 19, 1994 by Pound. Pound was the sole officer, director, shareholder and employee of National Work-Out at all relevant times. The address of National Work-Out was the same address as Pound's personal residence at all relevant times.

**C.      Other Persons and Entities.**

79.     Lambert "Larry" Aloisi ("Aloisi") was a citizen of New York City, New York or Orlando, Florida at all relevant times. Also at all relevant times, Aloisi was the chairman of the board, chief executive officer and a shareholder of Tri-Atlantic. On September 7, 1990, immediately upon Tri-Atlantic's acquisition of control of Lifeco, Aloisi was named a director, president and chairman of the board of National Heritage,

and chairman of the board of Lifeco.  On June 10, 1993, Aloisi resigned as chief

executive officer of Lifeco but remained chairman of its board of directors.  On March 1,

1994, Aloisi resigned as chairman of the board of Lifeco and as president, chief executive

officer and director of National Heritage.  On May 13, 1997, the United States District

Court for the Middle District of Florida entered judgment against Aloisi and in favor of

Donna Lee H. Williams, as receiver for National Heritage, in the amount of

$55,756,727.31, based on his participation in certain of the conduct complained of herein.

On or about February 20, 1998, Aloisi pled guilty in the case captioned United States v.

Lambert G. Aloisi, No. 98-46-Cr-Orl-18A, to one count of wire fraud and one count of

money laundering, based on his participation in certain of the conduct alleged herein.

        80.     Tri-Atlantic was a Delaware corporation formed on January 29,

1990 with its principal places of business in Phoenix, Arizona and Orlando, Florida.  Tri-

Atlantic was dissolved on June 25, 1992.  At all relevant times, Tri-Atlantic was owned

and controlled by one or more of Aloisi, Davies, Smythe and Rouadi, with the knowledge

and agreement of Blutrich.  Tri-Atlantic acquired control of 52.3% of Lifeco's issued and

outstanding common stock on September 7, 1990, and thereby acquired control of both

Lifeco and National Heritage.  Prior to December 10, 1990, Aloisi owned the majority of

Tri-Atlantic's issued and outstanding common stock.  On that date, Davies and Smythe

acquired 45% of Tri-Atlantic's issued and outstanding common stock each, and Aloisi's

holdings were reduced to 10% of Tri-Atlantic's issued and outstanding common stock.

On January 9, 1991, Davies acquired all of Smythe's Tri-Atlantic stock holdings, thereby

increasing his ownership of Tri-Atlantic's issued and outstanding common stock to 90%.

81.     Blutrich, Falcone & Miller was at all relevant times a New York partnership engaged in the practice of law, with its principal place of business at Two Park Avenue, New York City, New York.  In approximately January 1993, Blutrich, Falcone & Miller was renamed Blutrich & Miller; in approximately April 1993 Blutrich & Miller was renamed Blutrich, Herman & Miller.  Blutrich was a partner in each of them.

82.     Lucille Falcone ("Falcone") is a citizen of New York City, New York.  Falcone is a lawyer who practices law in New York City.  At all relevant times, Falcone was a name partner in the law firm of Blutrich, Falcone & Miller and a shareholder, officer and director of 4305 Associates, Inc.

83.     Nicholas Levidy ("Levidy") is a lawyer who practices law in New York City.  At all relevant times, Levidy was a partner in Blutrich, Falcone & Miller.

84.     Richard B. Herman ("Herman") is a citizen of White Plains, New York.  Herman is a lawyer who practices law in New York City.  Herman was a name partner in the law firms of Blutrich, Herman & Miller, LLP and Blutrich, Herman & Miller.  Herman was the registered agent for Nulenda and Future Diversified.

85.     4305 Associates, Inc. ("4305 Associates") is a New York corporation formed on April 12, 1988, with its principal place of business in Westchester County, New York.  At all relevant times, Blutrich and Falcone were each 50% shareholders in 4305 Associates.  Falcone was the president of 4305 Associates and Blutrich was the vice-president.

86.     Jay I. Bartz ("Bartz") is a citizen of Colorado Springs, Colorado. Bartz is a lawyer who was licensed to practice law in Arizona and California until December 1994. Bartz laundered money for clients by commingling his clients' money in offshore accounts in the names of various corporations. Each of Blutrich, Smythe and Aloisi engaged Bartz to launder money for him. On October 12, 1994, Bartz filed a bankruptcy petition in the United States District Court for the District of Arizona, case number 94-9117-PHX-RGM. On November 7, 1994, Bartz pled guilty to four counts of money laundering in the United States District Court for the District of Arizona in the case captioned United States v. Bartz, No. 94-345-PHX-SMM (D. Ariz.). On January 12, 1995, Bartz pled guilty to two counts of money laundering in the United States District Court for the Middle District of Florida in the case captioned United States v. Bartz, No. 95-12-CR-ORC-22 (M.D. Fla.), based in part on his participation in certain of the conduct complained of herein.

87.     Richard M. Plato ("Plato") is a Texas citizen, who along with Ford, formed Phoenix Trust. Plato, along with Clyde W. Smith, Jr., acted as an agent of Phoenix Trust. Plato was an attorney who practiced law in Texas at all relevant times. On November 27, 1996, Plato pled guilty to one count of conspiracy and one count of wire fraud in the case captioned United States v. Plato, No. H-96-40 (S.D. Tex.). On February 25, 1997, Plato pled guilty to one count of wire fraud and one count of money laundering in the case captioned United States v. Plato, No. 97-33-CR-Orl-22 (M.D. Fla.), based on his participation in certain of the conduct complained of herein. In or about July 1995, Plato, d/b/a Richard M. Plato, P.C., filed a Chapter 11 bankruptcy

petition in the United States Bankruptcy Court for the Southern District of Texas, case no. 95-21743.

88.     Richard M. Plato, P.C. ("Plato PC") is a professional legal corporation organized under the laws of the State of Texas and maintained its principal place of business in Texas. Plato PC filed a bankruptcy petition on December 15, 1995 in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division, and is no longer engaged in the practice of law.

89.     Phoenix Trust, Ltd. ("Phoenix Trust") is a trust organized and operating under the laws of the State of Texas, with its principal place of business in Texas. William J. Ford was the trustee of Phoenix Trust at all relevant times. Plato and Clyde W. Smith acted as agents of Phoenix Trust at all relevant times. On July 2, 1997, the United States District Court for the Middle District of Florida entered judgment against Phoenix Trust and William J. Ford and in favor of Donna Lee H. Williams, as receiver for National Heritage in the amount of $56,474,025.04, based on their participation in certain of the conduct complained of herein.

90.     William J. Ford a/k/a Jay Ford ("Ford") is a Texas citizen who, along with Plato, formed Phoenix Trust. At all relevant times, Ford was the trustee of Phoenix Trust. On January 31, 1997, Ford was found guilty of conspiracy, bank fraud, sale of stolen securities and money laundering in the United States District Court for the Western District of Texas, San Antonio Division, in the case captioned United States v. Ford, No. SA 95 CR 302 (W.D. Tex.). On July 2, 1997, the United States District Court for the Middle District of Florida entered judgment against Phoenix Trust and Ford and in

favor of Donna Lee H. Williams, as receiver for National Heritage, in the amount of $56,474,025.04.  On September 24, 1997, Ford pled guilty in the case captioned <u>United States v. Ford</u>, (M.D. Fla.), to one count of wire fraud and one count of money laundering based on his participation in certain of the conduct complained of herein.

91.     Clyde W. Smith, a/k/a Rick Smith ("Smith"), is a citizen of Texas. From October 1993 to May 1994, Smith purported to act as a financial consultant to National Heritage, and he worked on site at National Heritage's offices in Orlando, Florida.  At all relevant times, Smith acted as an agent for Phoenix Trust.  On May 5, 1997, Smith filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

92.     American Capital Business Loans, Inc. ("American Capital") was a Texas corporation formed on November 20, 1991.  American Capital was controlled by Ford.  American Capital's charter was forfeited for failure to pay franchise tax on February 15, 1994.

93.     Frenkel & Hershkowitz was at all relevant times a New York partnership engaged in the practice of law, with its principal place of business at 16 West 34th Street, New York City, New York.  At all relevant times, Bernard A. Shafran, David Schick and Joseph Hershkowitz were partners, and Neil Simon and Devorah Weinschneider were associates, in Frenkel & Hershkowitz.  Frenkel & Hershkowitz represented Weiss and South Star at all relevant times.

94.     Joseph Hershkowitz ("Hershkowitz") is a citizen of Brooklyn, New York. Hershkowitz is a lawyer who practices law in New York City. At all relevant times, Hershkowitz was a partner in the law firm of Frenkel & Hershkowitz.

95.     David Schick ("Schick") is a citizen of Brooklyn, New York. Schick was a lawyer who practiced law in New York City. At all relevant times, Schick was a partner in the law firm of Frenkel & Hershkowitz. On May 24, 1996, an involuntary petition under Chapter 11 of the Bankruptcy Code was filed against Schick in the United States District Court for the Southern District of New York. In April 1997, Schick was disbarred by the New York Supreme Court, Appellate Division. On or about November 12, 1997, Schick pled guilty in the case captioned <u>United States v. David Schick</u>, No. Cr-97-1164, to one count of mail fraud, based on his recruitment of investors in connection with the purchase of real estate mortgage portfolios.

96.     Bernard A. Shafran ("Shafran") is a citizen of Brooklyn, New York. Shafran is a lawyer who practices law in New York City. At all relevant times, Shafran was a partner in the law firm of Frenkel & Hershkowitz, a vice-president of Future Diversified, and the secretary of South Star.

97.     Neil Simon ("Simon") is a citizen of Spring Valley, New York. Simon is a lawyer who practices law in New York City. At all relevant times, Simon was an associate in the law firm of Frenkel & Hershkowitz.

98.     Devorah S. Weinschneider ("Weinschneider") is a citizen of Brooklyn, New York. Weinschneider is a lawyer who practices law in New York City.

At all relevant times, Weinschneider was an associate in the law firm of Frenkel &

Hershkowitz and assistant vice president of Future Diversified.

99.   Capital Clearing Corporation ("Capital Clearing") was a Texas

corporation formed on May 14, 1991.  At all relevant times, Ford was the president of

Capital Clearing, and Plato and Ford controlled Capital Clearing.  On March 18, 1996,

Capital Clearing filed a voluntary petition in bankruptcy under Chapter 11 of the United

States Bankruptcy Code in the United States District Court for the Southern District of

Texas.

100.   Berry J. Walker, Jr. ("Walker") is a citizen of Orlando, Florida.

Walker is a lawyer who practices law in Florida.  At various times, Walker held himself

out as general counsel to National Heritage.

## IV.   FACTUAL BACKGROUND.

101.   By May 1990, the Delaware Insurance Department, which was

responsible for regulating National Heritage, had developed serious concerns regarding

National Heritage's financial condition, including the sufficiency of National Heritage's

capital surplus.  At about this time, the Delaware Insurance Department advised National

Heritage to raise additional capital, and that if National Heritage did not do so the

Delaware Insurance Department would take regulatory action against National Heritage,

including possibly preventing National Heritage from continuing its business operations.

In response, National Heritage and its parent company, Lifeco, attempted to obtain

additional capital for National Heritage.

102.    By in or about May 1990, certain of the defendants, including at least Davies, Aloisi, Smythe and Rouadi, agreed among themselves to acquire control of National Heritage by fraudulent means, to prolong National Heritage's life beyond the time it became insolvent, to loot National Heritage through a pattern of unlawful conduct which included numerous and repeated violations of the federal mail and wire fraud statutes, and to conceal and disguise those schemes.  Blutrich joined the scheme to loot National Heritage in or about August 1990.  Each of the other defendants knowingly joined, participated, and assisted in the on-going schemes and conspiracies to loot National Heritage at the times and in the manners alleged in detail below.

A.      **The Acquisition Scheme**.

103.    From May through September 1990, Davies, Aloisi, Smythe and Rouadi agreed to implement a scheme to defraud National Heritage and Lifeco by acquiring control of Lifeco and National Heritage through the use of $3 million of National Heritage's own funds.  Blutrich and Capital Comparisons agreed to, joined in and assisted in the implementation of this scheme beginning in or about August 1990.

104.    On June 1, 1990, Davies, as a director of Tri-Atlantic and with the knowledge and agreement of Aloisi, Smythe and Rouadi, sent via facsimile a Letter of Intent dated May 29, 1990 to Lifeco proposing that Tri-Atlantic provide "$4,000,000 in liquid assets to satisfy regulatory requirements" in exchange for a controlling interest in Lifeco.

105.    On June 29, 1990, Tri-Atlantic entered into a stock purchase agreement with Lifeco pursuant to which Lifeco was to sell 2,420,789 shares of Lifeco

common stock, with associated warrants, or 52.3% of Lifeco's common stock, for $4 million.  Tri-Atlantic did not have the resources to fund this purchase.

### 1.    The Trust Fund Conversion Aspect of the Acquisition Scheme.

106.   Davies, Aloisi, Smythe, Rouadi and Capital Comparisons agreed to steal money from a trust fund Davies controlled and invest that money to acquire control of National Heritage.  Blutrich agreed to and joined in this scheme in or about August 1990.

107.   On July 11, 1990, Davies converted $540,000 from the Robert Earl Trust Fund (the "Earl Trust"), a trust fund which he controlled through Celerity Consultants, Ltd., the trustee of the Earl Trust, and wired that sum to a Tri-Atlantic bank account in Orlando, Florida.

108.   On July 17, 1990, Davies, with the knowledge and agreement of Aloisi, Smythe and Rouadi opened a securities account in the name of Tri-Atlantic, and deposited $525,000 of the $540,000 converted from the Earl Trust into that account.  Davies, with the knowledge and agreement of Aloisi, Smythe and Rouadi, then purchased $4.5 million worth of United States Treasury Notes on margin with the $525,000 in the account.

109.   On July 30, 1990, Davies, with the knowledge and agreement of Aloisi, Smythe and Rouadi, caused Tri-Atlantic falsely to represent in a filing with the Delaware Insurance Department that the purchase price for Lifeco's stock "is $4 million represented by United States Government Treasury Bonds" and that "no part of [the] consideration is to be borrowed . . . ."  Davies caused to be attached to the filing a July

17, 1990 letter on the letterhead of a securities brokerage firm which purportedly confirmed that Tri-Atlantic held $4.5 million in government bonds.

110.   Although Davies had misrepresented to the Delaware Insurance Department that the bonds were an unencumbered source of a $4 million capital infusion into National Heritage, in truth, the $4.5 million in bonds were pledged as collateral for the margin loan with which they were purchased.

### 2.   The Check Kiting Aspect of the Acquisition Scheme.

111.   On August 9, 1990, Davies opened account number 0122366602 at Bank Leumi in New York City in the name of National Heritage (the "National Heritage Account").  The purported purpose of the National Heritage Account was to serve as a repository of National Heritage funds for Tri-Atlantic to invest in foreign currencies on National Heritage's behalf.  Subsequent to August 9, 1990, Davies caused National Heritage to fund the National Heritage Account for the purported purpose of providing capital with which Tri-Atlantic would trade foreign currencies for the sole and exclusive benefit of National Heritage.

112.   On September 5, 1990, Blutrich opened a bank account in the name of Capital Comparisons, account number 0122399201, also at Bank Leumi in New York City (the "Capital Comparisons Account").

113.   On September 5, 1990, Davies caused Tri-Atlantic to wire $1,000,000 from an account at Orange Bank in Brevard, Florida to the Capital Comparisons Account.  On September 7, 1990, Davies and Blutrich caused Capital Comparisons to transfer, and Capital Comparisons did transfer, via internal Bank Leumi

memo, the $1 million from the Capital Comparisons Account to Bank Leumi account number 0119663406 in the name of "Michael D. Blutrich, Attorney at Law," which Blutrich had opened earlier that same day with a deposit of $100.00 (the "Blutrich 3406 Account").

114.    On September 7, 1990, the Blutrich 3406 Account balance was approximately $1 million, the Capital Comparisons Account balance was zero, and the National Heritage Account balance was approximately $3.3 million, consisting of funds which Davies caused National Heritage to deposit into the National Heritage Account for the purported purpose of allowing Davies to purchase and sell foreign currencies on National Heritage's behalf.

115.    On the evening of Friday, September 7, 1990, after 5:30 p.m. E.S.T., Tri-Atlantic's purchase of 2,420,789 shares of Lifeco common stock with associated warrants was closed.

116.    During the closing, Blutrich tendered check no. 93 to National Heritage in the amount of $4 million, signed by Blutrich and drawn on the Blutrich 3406 Account, even though that account had a balance of only approximately $1 million at the time.

117.    Upon receipt of the check at the closing, Lifeco issued 2,420,789 shares of its common stock, with associated warrants, to Tri-Atlantic, thereby giving Tri-Atlantic beneficial ownership of 52.3% of the common stock of Lifeco and control of National Heritage.

118.    At the closing, Tri-Atlantic immediately exercised its control of the boards of directors of both Lifeco and National Heritage, and appointed: (1) Aloisi as a director, and president and chairman of the board of National Heritage, and chairman of the board of Lifeco; (2) Smythe as a director and secretary of National Heritage, and a director, president and chief executive officer of Lifeco, (3) Davies as a director and treasurer of National Heritage, and (4) Rouadi as a director of Lifeco. Also immediately after the closing, at 10:30 p.m., Aloisi, Smythe and Davies, as the directors of National Heritage, appointed themselves to the executive and finance committees of the board of directors of National Heritage.

119.    Because the Blutrich 3406 Account contained only $1 million, Blutrich, Aloisi, Smythe, Rouadi and Davies, who now controlled Lifeco and National Heritage, delayed National Heritage's deposit of the $4 million check drawn on the Blutrich 3406 Account which had been tendered at the closing in payment for the Lifeco stock.

120.    On September 9, 1990, Aloisi, Davies and Smythe, as the directors of National Heritage, passed a resolution making themselves signatories on all bank and brokerage accounts of National Heritage.

121.    Also on September 9, 1990, Aloisi, Davies and Smythe, as the directors of National Heritage, passed a resolution authorizing National Heritage to enter into an agreement with Capital Comparisons pursuant to which Capital Comparisons purportedly was to market annuities and act as an "investment conduit" for National Heritage for a period of three months. The resolution was false and fraudulent. Aloisi,

Davies, Smythe and Capital Comparisons knew that Capital Comparisons would not be marketing annuities for National Heritage but instead would merely act as a conduit in connection with the Check Kiting Aspect of the Acquisition Scheme. Aloisi, Davies and Smythe passed the resolution for the purpose of inducing National Heritage, by and through the National Heritage CFO and the National Heritage Controller, to rely on the resolution. National Heritage, by and through the National Heritage CFO and the National Heritage Controller, relied on the resolution to its detriment by believing that the transfers to Capital Comparisons were legitimate. Had National Heritage, by and through the National Heritage CFO and the National Heritage Controller, known that the resolution was false and fraudulent, it would have reported the transfers to National Heritage's legal counsel and regulators.

122.   On September 11, 1990, Aloisi, with the knowledge and agreement of Blutrich, Davies and Smythe, entered into an agreement with Capital Comparisons, pursuant to which National Heritage was to pay Capital Comparisons a "fiduciary deposit" of $3 million. Aloisi, Smythe, Davies, Blutrich and Capital Comparisons knew of the sham nature of this agreement and that it was part of the fraudulent scheme to acquire control of and loot National Heritage.

123.   On September 10 and 11, 1990, the Monday and Tuesday immediately following the closing, Davies and Blutrich, with the knowledge and agreement of Aloisi, Smythe and Capital Comparisons, caused the $3 million to be transferred from the National Heritage Account to the Capital Comparisons Account purportedly as a "fiduciary deposit," and then Davies and Blutrich caused the $3 million

to be transferred from the Capital Comparisons Account to the Blutrich 3406 Account. These transactions increased the balance of the Blutrich 3406 Account to approximately $4 million.

124.    On September 11, 1990, Davies and Blutrich, with the knowledge and agreement of Aloisi, Smythe and Rouadi, caused National Heritage to deposit the $4 million check drawn on the Blutrich 3406 Account and issued to National Heritage in payment for the Lifeco stock.

125.    This series of transactions reduced National Heritage's assets by $3 million, the sum misappropriated from the National Heritage Account.  In effect, Blutrich, Davies, Aloisi, Rouadi and Smythe, through Tri-Atlantic, acquired control of Lifeco and National Heritage with $3 million of National Heritage's own funds.

### 3.    The Rouadi Pay-Off Aspect of the Acquisition Scheme.

126.    Prior to Tri-Atlantic's acquisition of control of Lifeco, Rouadi purchased 125,000 shares of preferred stock in Tri-Atlantic.

127.    To repay Rouadi for his investment in Tri-Atlantic, Smythe, Aloisi, Davies, Blutrich, Rouadi, the Schooner Trust and Tri-Atlantic agreed that National Heritage would make two sham loans to Rouadi and the Schooner Trust, a trust which Rouadi controlled, in the total principal amount of $312,000, which each of Smythe, Aloisi, Davies, Blutrich, Rouadi, and the Schooner Trust agreed and understood would never be repaid.

128. At the time, the Schooner Trust held all of Rouadi's common stock in Windtree Gardens, Inc. and Windtree Professional Center, Inc., each of which owned real estate in Florida.

129. On October 2, 1990, Davies, with the knowledge and agreement of Smythe, Aloisi, Rouadi, Blutrich and the Schooner Trust, caused National Heritage to "loan" $253,935.36 jointly to Rouadi and the Schooner Trust. However, the loan proceeds were disbursed to Michael J. Daly and Audreyann Daly to satisfy a personal, pre-existing debt Rouadi owed to Michael and Audreyann Daly.

130. On October 11, 1990, Davies, with the knowledge and agreement of Smythe, Aloisi and Blutrich, caused National Heritage to "loan" an additional $58,064.64 jointly to Rouadi and to the Schooner Trust. The loan proceeds were disbursed to the Schooner Trust.

131. Rouadi and the Schooner Trust executed promissory notes for the two loans received from National Heritage. These notes falsely and fraudulently represented that Rouadi and the Schooner Trust intended to repay the loans to National Heritage. The notes were prepared for the purpose of inducing National Heritage, by and through the National Heritage CFO and the National Heritage Controller, to believe that the loans were legitimate by relying on the notes as being bona fide and by failing to take appropriate action to prevent the transfers of funds from National Heritage for the loans.

132. To secure the loans from National Heritage to Rouadi and the Schooner Trust, Rouadi, as president of Windtree Gardens, Inc. and Windtree

Professional Center, Inc., executed mortgages on real property owned by Windtree

Gardens, Inc. and Windtree Professional Center, Inc. in favor of National Heritage.

133.    By letter dated May 3, 1991, to the trustee of the Schooner Trust,

Aloisi, as president of Tri-Atlantic, represented that Tri-Atlantic assumed complete

responsibility for the entire outstanding indebtedness on the two loans, in the total

principal balance of $312,000.00, National Heritage made to the Schooner Trust.

134.    On December 18, 1991, National Heritage, by and through the

National Heritage CFO, assigned the Rouadi and Schooner Trust mortgage loans to

Corporate Life Insurance Company ("Corporate Life") as part of a transaction pursuant to

which National Heritage obtained reinsurance from Corporate Life.  At the time of the

assignment, the National Heritage CFO was without knowledge that Rouadi and the

Schooner Trust were not expected to repay the loans.

135.    Because Rouadi and the Schooner Trust never intended and were

never expected to repay the loans to National Heritage, Rouadi, the Schooner Trust,

Davies, Aloisi and Smythe needed to get the Rouadi and Schooner Trust loans back from

Corporate Life.  If they did not do so, Rouadi and the Schooner Trust faced the possibility

that Corporate Life would insist on repayment of the loans.

136.    To insure that Rouadi and the Schooner Trust would not have to

repay the sham loans, Rouadi, Davies, Aloisi and Smythe caused Lifeco to enter into an

agreement with Corporate Life, pursuant to which Lifeco purchased the Rouadi and

Schooner Trust loans from Corporate Life in exchange for 40,258 shares of Lifeco class

C preferred stock.  This agreement was confirmed by a letter sent on September 4, 1992 by Corporate Life via facsimile to National Heritage.

137.    Also on September 4, 1992, Rouadi, the Schooner Trust, Davies, Aloisi and Smythe caused National Heritage to execute a Satisfaction of Mortgage, releasing the mortgages executed by Windtree Gardens, Inc. and Windtree Professional Center, Inc. which secured the Rouadi and Schooner Trust loans.

138.    On or about January 15, 1993, Aloisi and Smythe each cancelled 10,000 shares of his Lifeco common stock in exchange for which Lifeco wrote off the Rouadi and Schooner Trust loans.

139.    On January 20, 1993, the promissory notes for the Rouadi and Schooner Trust loans and the mortgages securing the loans were returned to Rouadi and the notes were marked "paid-in-full."

140.    Through the Rouadi Pay-Off Aspect of the Acquisition Scheme, National Heritage lost $312,000, Davies, Aloisi, Smythe and Blutrich paid Rouadi for his investment in Tri-Atlantic, and Lifeco received the cancellation of common stock owned by Aloisi and Smythe which they illegally obtained in the Check-Kiting Aspect of the Acquisition Scheme.

**4.      The Cover-Up Aspect of the Acquisition Scheme.**

141.    In order to conceal the $3 million they misappropriated from National Heritage through the Check Kiting Aspect of the Acquisition Scheme, Blutrich, Aloisi, Davies, Hirsch, Rouadi, Smythe, Decker, Scientific Waste, Skylark and Celeb Capital agreed to implement the Cover-Up Aspect of the Acquisition Scheme, which

created $3 million in illusory assets on National Heritage's books and records.  These

assets consisted of an $800,000.00 joint venture interest with Scientific Waste, and one

loan to each of Skylark and Celeb Capital in the respective amounts of $1 million and

$1.2 million.  Unbeknownst to National Heritage, by and through the National Heritage

CFO and the National Heritage Controller, Blutrich, Davies, Aloisi, Rouadi, Decker and

Smythe controlled each of these companies, which were front companies used to cover

up the misappropriation of the $3 million from the National Heritage Account.

### a)   The Scientific Waste Joint Venture.

142.   On December 1, 1990, Davies executed a written Joint Venture

Agreement with Scientific Waste which obligated National Heritage to invest $800,000

in exchange for a 50% joint venture interest in the Scientific Waste Systems Joint

Venture.  Scientific Waste retained the remaining 50% joint venture interest for which it

paid nothing.  Decker executed the Agreement as president of Scientific Waste.

143.   The joint venture between National Heritage and Scientific Waste

had no legitimate purpose.  The only purpose of the joint venture was to conceal monies

misappropriated from National Heritage.  Decker and Scientific Waste knew of the sham

nature of the joint venture and executed the Joint Venture Agreement with the intent to

defraud National Heritage.

144.   On December 19, 1990, Blutrich opened account number

0119711806, in the name of Michael D. Blutrich as Attorney for Capital Comparisons, at

Bank Leumi, New York City, New York (the "Blutrich-Capital Comparisons Account"),

with a deposit of $50.00.

145.    On December 20, 1990, Davies and Aloisi, with the knowledge and agreement of Blutrich, Rouadi, Smythe, Decker and Scientific Waste, caused National Heritage to wire transfer $800,000 from its account at the Bank of Scotland, Grand Cayman, account number 611020, to the account of Scientific Waste at the First National Bank of Atlanta, in Dunwoody, Georgia, account number 17-031-326 (the "Scientific Waste Account").  National Heritage recorded its purported joint venture interest on its books and records in the principal amount of $800,000 on or about December 20, 1990.

146.    On the next day, December 21, 1990, Decker, with the knowledge and agreement of Davies, Aloisi, Rouadi, Blutrich, and Smythe, caused Scientific Waste to divert the investment in the joint venture by wire transferring $800,000 from the Scientific Waste Account to the Blutrich-Capital Comparisons Account.

147.    Rouadi, Decker, Blutrich, Davies, Aloisi, Smythe, and Scientific Waste knew that National Heritage's investment in the joint venture with Scientific Waste was a sham and that the only purpose of the "investment" was to conceal fraudulently the $3 million misappropriation from National Heritage in the Check Kiting Aspect of the Acquisition Scheme.

### b)    The Skylark Communications Loan.

148.    On December 18, 1990, Davies, Smythe, Rouadi, Decker and Skylark opened an account in the name of Skylark Communications, Inc. at First Union Bank, Winter Garden, Florida, account number 14327505397 (the "Skylark Account"). Both Davies and Smythe were authorized signatories on the Skylark Account.

149.    On December 20, 1990, Davies and Aloisi, with the knowledge and agreement of Blutrich, Rouadi, Smythe and Skylark, caused National Heritage to loan Skylark $1 million.  That same day, Rouadi executed a promissory note on behalf of Skylark in favor of National Heritage in the principal amount of $1 million.

150.    Also on December 20, 1990, Davies and Aloisi, with the knowledge and agreement of Blutrich, Rouadi, Smythe and Skylark, caused National Heritage to wire transfer $1 million from its account at the Bank of Scotland, Grand Cayman, account number 611020, to the Skylark Account.  National Heritage recorded a loan to Skylark on its books and records in the principal amount of $1 million on or about December 20, 1990.

151.    By letter dated December 20, 1990, Skylark, by Rouadi and Decker, directed First Union Bank to "make an immediate wire transfer of $1,000,000 (net of all transfer charges) to:  Bank Leumi Trust Company of New York, 535 Seventh Avenue, New York City, New York 10018, ABA #026002794, Account Name of Michael D. Blutrich, as attorney for Capital Comparisons, Inc., Account #0119711806."

152.    On December 21, 1990, in accordance with Rouadi and Decker's direction, First Union Bank wired $1 million from the Skylark Account to the Blutrich-Capital Comparisons Account.

153.    Blutrich, Davies, Aloisi, Smythe, Rouadi, Decker, and Skylark knew that National Heritage's loan to Skylark was a sham and that the only purpose of the loan was to conceal fraudulently the $3 million misappropriation from National Heritage in the Acquisition Scheme.

c)      **The Celeb Capital Loan**.

154.    National Heritage recorded a loan to Celeb Capital on its books

and records in the principal amount of $1.2 million on or about December 20, 1990.  The

"loan" to Celeb Capital was secured by a lease on property located at 826 North La

Cienega Blvd., Los Angeles, California, with respect to which J.W. Enterprises, Inc. was

the lessor.  On or about January 28, 1991, Martin and Martin Appraisers, acting in

furtherance of the Acquisition Cover-Up Scheme and at the direction of Blutrich, Hirsch

and Celeb Capital, knowingly submitted a grossly inflated appraisal valuing the property

at $1,960,000 for the fraudulent purpose of lulling National Heritage into believing the

loan to Celeb Capital was adequately secured.

155.    On December 21, 1990, Davies and Aloisi, with the knowledge

and agreement of Blutrich, Smythe, Rouadi and Hirsch, caused National Heritage to wire

transfer $1.2 million from its account at the Bank of Scotland, Grand Cayman, account

number 611020, to the account of Celeb Capital at Bank Leumi, New York, account

number 0122522701 (the "Celeb Capital Account").

156.    Blutrich, Davies, Aloisi, Smythe, Rouadi, Hirsch and Celeb

Capital knew that National Heritage's loan to Celeb Capital was a sham and that the only

purpose of the loan was fraudulently to conceal the $3 million misappropriation from

National Heritage in the Acquisition Scheme.

157.    By credit memos dated December 21, 1990 and January 2, 1991,

Blutrich, with the knowledge and agreement of Celeb Capital, made two deposits in the

respective amounts of $1.1 million and $100,000.00 into the Blutrich-Capital

Comparisons Account by debiting the Celeb Capital Account.

d)     **The Reinvestments Into the National Heritage Account.**

158.    By debit memos dated December 24, 1990 and January 2, 1991,

Blutrich, with the knowledge and agreement of Davies, Aloisi, Smythe and Rouadi, made

two withdrawals from the Blutrich-Capital Comparisons Account in the respective

amounts of $2.9 million and $100,000.00, and corresponding deposits in the same

amounts by means of credit memos into the National Heritage Account in order to repay

the "fiduciary deposit." After these transactions, the balance in the Blutrich-Capital

Comparisons Account was $50.00, the amount of money Blutrich deposited into the

account on December 19, 1990, when he opened it.

159.    This series of transactions concealed and disguised the fact that the

conspirators misappropriated $3 million from the National Heritage Account in order to

fund Tri-Atlantic's purchase of Lifeco stock.

5.     **Interstate Wire Communications in Furtherance of the
       Acquisition Scheme.**

160.    In furtherance of the Acquisition Scheme,

Michael Blutrich
David Davies
Patrick Smythe
Joseph Rouadi
Gerald Decker
Alan Hirsch
Capital Comparisons, Inc.
Schooner Trust
Scientific Waste Systems, Inc.
Skylark Communications, Inc.
Celeb Capital, Inc.

-44-

defendants herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|-----------------------------------|-----|------|
| 06/01/90 | Letter of Intent faxed | Lifeco, Orlando, FL | Davies |
| 07/11/90 | $540,000.00 wire transfer | Tri-Atlantic account, Orlando, FL | Robert Earl Trust Fund |
| 09/05/90 | $1,000,000.00 wire transfer | Bank Leumi, New York, NY | Orange Bank, FL |
| 12/20/90 | $800,000.00 wire transfer | First National Bank, Atlanta, GA | Bank of Scotland, Grand Caymans |
| 12/20/90 | $1,000,000.00 wire transfer | First Union Bank, Wintergarden, FL | Bank of Scotland, Grand Caymans |
| 12/21/90 | $1,000,000.00 wire transfer | Bank Leumi, New York, NY | First Union Bank, Wintergarden, FL |
| 12/21/90 | $800,000.00 wire transfer | Bank Leumi, New York, NY | First National Bank, Atlanta, GA |
| 12/21/90 | $1,200,000.00 wire transfer | Bank Leumi, New York, NY | Bank of Scotland, Grand Caymans |
| 09/04/92 | Letter faxed re Rouadi and Schooner Trust | National Heritage, Orlando, FL | Corporate Life |

**B.**   **The Heathmead Loan Scheme**.

161.   In order to prolong National Heritage's life, to conceal and disguise the conspiracy to loot National Heritage, and to continue to loot National Heritage, Davies, Blutrich, Aloisi, Rouadi, Smythe and Heathmead agreed to conduct a scheme in which they caused National Heritage to loan money to a front company, Heathmead Development Corp. Blutrich, Davies and Smythe, with the knowledge and agreement of Aloisi and Rouadi, controlled Heathmead. The purported purpose of the Heathmead loan

-45-

was to finance a real estate transaction. The actual purpose was to provide an additional method of looting National Heritage.

162.    On or about December 24, 1990, Blutrich, Davies and Smythe formed Heathmead as a New York corporation. Blutrich, Falcone & Miller performed the legal work in connection with the formation of Heathmead.

163.    The Heathmead loan was secured by a mortgage on the real estate pledged to secure the loan, but the fair market value of the real estate securing the loan was substantially lower than the principal amount of the loan. Davies, with the knowledge and agreement of Blutrich, Aloisi, Rouadi and Smythe, caused National Heritage to carry the Heathmead loan on its books at a value corresponding to the principal amount of the loan, thus concealing both the diversion of National Heritage monies and the worsening financial condition of National Heritage.

164.    In late 1990 or early 1991, Davies, Blutrich and Smythe agreed to pay Myron Freedman a fee in exchange for Freedman's agreement to act as the nominal president of Heathmead at their direction.

165.    On January 3, 1991, Davies, with the knowledge and agreement of Blutrich, Rouadi and Smythe, caused $2.5 million to be wire transferred from National Heritage's account at Prudential-Bache, account number TEQ-954217-40 to a bank account in the name of "Blutrich, Falcone & Miller Attorney Trust Account" at Bank Leumi in New York City, account number 86000004-01 (the "BF&M Trust Account"), for the purported purpose of funding the loan to Heathmead.

166.    On January 4, 1991, Blutrich opened an account in Heathmead's name at Citibank in New York City, account number 01642478 (the "Heathmead Account").

167.    On or about January 7, 1991, Blutrich, Davies and Smythe caused National Heritage to loan $2.5 million to Heathmead for the purported purpose of financing Heathmead's purchase of a horse farm located in Middletown, New York. Blutrich, Davies and Smythe caused Myron Freedman to execute loan documents on behalf of Heathmead in order to give the appearance that the loan was a bona fide, arms-length transaction. However, the purchase price of the horse farm was $499,999.00, or $2,000,001.00 less than the amount of the loan, and the actual purpose of the loan was to misappropriate additional assets of National Heritage.

168.    Also on or about January 7, 1991, Blutrich wire transferred $2 million from the BF&M Trust Account at Bank Leumi to the Heathmead Account at Citibank that Blutrich opened only three days earlier.

169.    On or about January 8, 1991, Blutrich, Davies, Smythe and Heathmead wire transferred $1.8 million, consisting of Heathmead loan proceeds, from the Heathmead Account to an account for the benefit of Smythe, account number 116114141 in the name of "Scott H. Coombs, Arizona Bar Found Trust," at First Interstate Bank, Phoenix, Arizona.

170.    Martin and Martin Appraisers agreed to and joined in the scheme to loot National Heritage. On or about February 8, 1991, Martin and Martin Appraisers, acting in furtherance of the Heathmead Loan Scheme and at the direction of Davies,

Blutrich, Smythe and Heathmead, knowingly mailed a grossly inflated appraisal to National Heritage which valued the horse farm at $4,410,000. Martin and Martin Appraisers knowingly prepared this appraisal for the fraudulent purpose of creating the appearance that the Heathmead loan was adequately secured.

171.   Heathmead's purchase of the horse farm and National Heritage's loan to Heathmead were closed simultaneously in the offices of Blutrich, Falcone & Miller. At the time Heathmead was closing its $499,999.00 purchase of the horse farm in the offices of Blutrich, Falcone & Miller, National Heritage's $2.5 million loan to Heathmead to finance the purchase of the horse farm was being closed in Blutrich, Falcone & Miller's offices in the room literally next door to the room in which the $499,999.00 sale was being closed.

172.   During or shortly after the closing, Blutrich made additional diversions of the Heathmead loan proceeds to the indicated parties in the respectively indicated amounts:

|   | Check No. | Payee | Amount |
|---|-----------|-------|--------|
| 1. | 1087 | Schecter, Ltd. | $38,500.00 |
| 2. | 1092 | Heathmead | $116,568.97 |

173.   Blutrich prepared the closing statement for the Heathmead loan. That statement falsely reflected a wire transfer to the "Seller" of the horse farm in the amount of $2 million. In fact, the $2 million was wire transferred to the Heathmead

Account, which Blutrich controlled, as Blutrich and Heathmead knew at the time Blutrich prepared the closing statement.

174.     On May 20, 1993, in response to inquiries from National Heritage with respect to the soundness of the Heathmead loan, Herman mailed a report to the National Heritage CFO which falsely and fraudulently represented that the City of Middletown intended to acquire the Heathmead property for utilization as a municipal golf course and stated that National Heritage "could well realize a minimum of a 1.5 million dollar profit over and above its initial mortgage loan." Herman mailed the fraudulent report for the purpose of inducing National Heritage, by and through the National Heritage CFO, to rely on the report. National Heritage, by and through the National Heritage CFO, relied on the report to its detriment by believing that the Heathmead loan was adequately secured. Had National Heritage, by and through the National Heritage CFO, known that the report was fraudulent, it would have taken appropriate action to mitigate its damages, including, for example, seeking rescission of the transaction and informing National Heritage's regulators.

175.     Platzner and Platzner International agreed to and joined in the scheme to loot National Heritage through the Heathmead Loan Scheme. To mislead further National Heritage regarding the soundness of the Heathmead loan, in or around June 1993, Blutrich and Pfeffer caused Platzner and Platzner International to prepare a fraudulent appraisal of the horse farm which valued the horse farm "in excess of $3 million." On or about June 16, 1993, Platzner and Platzner International, acting in furtherance of the Heathmead Loan Scheme and at the direction of Blutrich and Pfeffer,

knowingly mailed the appraisal of the horse farm to the National Heritage CFO for the purpose of fraudulently lulling National Heritage into believing that its $2.5 million loan to Heathmead was adequately secured. National Heritage, by and through the National Heritage CFO, relied on the appraisal to its detriment by believing that the Heathmead loan was adequately secured. Had National Heritage, by and through the National Heritage CFO, known that the appraisal was fraudulent, it would have taken appropriate action to mitigate its damages, including, for example, seeking rescission of the transaction and informing National Heritage's regulators.

176.    Shortly after the Heathmead loan was closed, Heathmead defaulted on the loan by failing to make the required loan payments. Heathmead could not make the payments required under its loan because it did not have the financial ability to do so.

177.    The Heathmead loan substantially worsened National Heritage's financial condition because it was worth, at most, the fair market value of the real estate securing it. However, because the Heathmead loan was recorded on National Heritage's books and records at a value corresponding to the principal amount of the loan, the Heathmead loan inflated National Heritage's assets and concealed and disguised both the on-going conspiracy to loot National Heritage and National Heritage's worsening financial condition. This enabled Davies, Blutrich, Aloisi, Rouadi and Smythe to prolong the life of National Heritage, to retain control of National Heritage, and to continue to loot National Heritage.

1.   **Interstate Mailings in Furtherance of the Heathmead Loan Scheme.**

178.   In furtherance of the Heathmead Loan Scheme,

Michael Blutrich
David Davies
Joseph Rouadi
Patrick Smythe
Heathmead Development Corp.
Thomas Martin
Martin Real Estate Appraisers, Inc.
Harrin Platzner
Platzner International Group, Ltd.

defendants herein, knowingly caused to be mailed and delivered by the United States

Postal Service, in violation of 18 U.S.C. § 1941, the following matter:

| Date | Matter Mailed/Delivered | To | From |
|------|------------------------|-----|------|
| 02/08/91 | Appraisal from Martin and Martin Appraisers to National Heritage | National Heritage, Orlando, FL | Martin and Martin Appraisers, West Nyack, NY |
| 05/20/93 | Report from Herman to National Heritage | The National Heritage CFO, National Heritage, Orlando, FL | Offices of Richard Herman, New York, NY |
| 06/16/93 | Appraisal from Platzner and Platzner International to National Heritage | The National Heritage CFO, National Heritage, Orlando, FL | Platzner and Platzner International New Rochelle, NY |

2.   **Interstate Wire Communications in Furtherance of the Heathmead Loan Scheme.**

179.   In furtherance of the Heathmead Loan Scheme

Michael Blutrich
David Davies
Joseph Rouadi
Patrick Smythe
Heathmead Development Corp.
Thomas Martin

Martin Real Estate Appraisers, Inc.
Harrin Platzner
Platzner International Group, Ltd.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire

communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following

writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|---|---|---|---|
| 01/03/91 | $2,500,000.00 wire transfer | Bank Leumi, New York, NY | Prudential-Bache |
| 01/07/91 | $2,000,000.00 wire transfer | Citibank, New York, NY | Bank Leumi, New York, NY |
| 01/08/91 | $1,800,000.00 wire transfer | First Interstate Bank Phoenix, AZ | Citibank, New York, NY |

C.    **The 4305 Associates Loan Scheme**.

180.    In order to prolong National Heritage's life, to conceal and disguise

the conspiracy to loot National Heritage, and to continue to loot National Heritage,

Davies, Blutrich, Aloisi, Rouadi and Smythe agreed to conduct a scheme in which they

caused National Heritage to make a sham loan to 4305 Associates which was never

repaid.

181.    On or about January 10, 1991, Blutrich, with the knowledge and

agreement of Davies, Aloisi, Rouadi and Smythe, caused National Heritage to loan $1.5

million to 4305 Associates.  Blutrich was at the time a 50% shareholder in 4305

Associates and had been since 1988.  Blutrich was also the vice-president of 4305

Associates at the time.  The purpose of the loan was to refinance approximately

$1,090,000.00 in indebtedness secured by property located at 4305 Carpenter Avenue,

Bronx, New York for the benefit of Blutrich and to misappropriate additional assets of National Heritage.

182.    To induce National Heritage to make the loan to 4305 Associates, Blutrich knowingly falsely represented to National Heritage that he would personally guarantee the full amount of the loan.  National Heritage relied on Blutrich's representation in making the loan to 4305 Associates.  In fact, Blutrich only personally guaranteed $50,000.00 of the loan.

183.    Grassi agreed to and joined in the scheme to loot National Heritage through the 4305 Associates Loan Scheme.  On or before October 31, 1990, Grassi, acting in furtherance of the 4305 Associates Loan Scheme at the direction of Blutrich, Davies, Aloisi, Rouadi and Smythe, knowingly issued a grossly inflated appraisal to National Heritage that valued the property at 4305 Carpenter Avenue at $2,346,000.00. Grassi knowingly prepared this appraisal for the purpose of fraudulently inducing National Heritage to loan $1.5 million to 4305 Associates.  National Heritage relied on this appraisal in deciding to loan money to 4305 Associates.

184.    Blutrich falsely represented to National Heritage that Grassi was an MAI certified appraiser when in fact Grassi was not even a licensed appraiser in New York.  Blutrich knew that this representation was false and made it with the purpose of inducing National Heritage to loan money to 4305 Associates.  National Heritage relied on this representation in deciding to loan money to 4305 Associates.

185.    In order to facilitate the funding of the loan, on January 9, 1991, Davies, with the knowledge and agreement of Blutrich, Aloisi, Rouadi and Smythe,

caused National Heritage to wire transfer $1.5 million from its account number 0122366602 at Bank Leumi to the BF&M Trust Account.

186.    The loan to 4305 Associates was closed on January 14, 1991 in the offices of Blutrich, Falcone & Miller.  Blutrich attended the closing on behalf of 4305 Associates, and Levidy purported to represent National Heritage in connection with the closing.

187.    Of the $1.5 million in loan proceeds, approximately $1,090,000.00 was disbursed in satisfaction of prior indebtedness secured by the 4305 Carpenter Avenue property.  However, $300,000.00 was disbursed directly to 4305 Associates.

188.    Platzner and Platzner International agreed to and joined in the scheme to loot National Heritage through the 4305 Associates Loan Scheme.  In response to inquiries from National Heritage with respect to the 4305 Associates loan, Platzner and Platzner International, acting in furtherance of the 4305 Associates Loan Scheme at the direction of Blutrich, knowingly prepared a fraudulently inflated appraisal which valued the 4305 Carpenter Avenue property for $1.8 million.  On April 11, 1994, Platzner and Platzner International mailed the appraisal of the 4305 Carpenter Avenue property to the National Heritage CFO for the purpose of fraudulently lulling National Heritage into believing that its $1.5 million loan to 4305 Associates was adequately secured.  National Heritage, by and through the National Heritage CFO, relied on the appraisal to its detriment by believing that the 4305 Associates loan was adequately secured.  Had National Heritage, by and through the National Heritage CFO, known that the appraisal was fraudulent, it would have taken appropriate action to mitigate its damages, including,

for example, seeking rescission of the transaction and informing National Heritage's

regulators.

189.    Shortly after the 4305 Associates loan was closed, 4305 Associates

defaulted on the loan by failing to make the required loan payments.

190.    The 4305 Associates loan substantially worsened National

Heritage's financial condition because it was not worth the principal amount loaned.

However, because the 4305 Associates loan was recorded on National Heritage's books

and records at a value corresponding to the principal amount of the loan, the 4305

Associates loan inflated National Heritage's assets and concealed and disguised both the

on-going conspiracy to loot National Heritage and National Heritage's worsening

financial condition.  This enabled Davies, Blutrich, Aloisi, Rouadi and Smythe to prolong

the life of National Heritage, to retain control of National Heritage, and to continue to

loot National Heritage.

**1.      Interstate Mailings in Furtherance of the 4305 Associates Loan
         Scheme.**

191.    In furtherance of the 4305 Associates Loan Scheme,

Michael Blutrich
David Davies
Patrick Smythe
Joseph Rouadi
Henry Grassi
Harrin Platzner
Platzner International Group, Ltd.

defendants herein, knowingly caused to be mailed and delivered by the United States

Postal Service, in violation of 18 U.S.C. § 1941, the following matter:

| Date | Matter Mailed/Delivered | To | From |
|------|-------------------------|-----|------|
| 4/11/94 | Appraisal from Platzner and Platzner International to National Heritage | The National Heritage CFO, National Heritage, Orlando, FL | Platzner and Platzner International, New York, NY |

## 2.   Interstate Wire Communications in Furtherance of the 4305 Associates Loan Scheme.

192.   In furtherance of the 4305 Associates Loan Scheme,

Michael Blutrich
David Davies
Patrick Smythe
Joseph Rouadi
Henry Grassi
Harrin Platzner
Platzner International Group, Ltd.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|-----------------------------------|-----|------|
| 01/09/91 | $1,500,000.00 wire transfer | Bank Leumi, New York, NY | Bank Leumi, New York, NY |

## D.   The Perth Loan Scheme.

193.   In order to prolong National Heritage's life, to conceal and disguise the conspiracy to loot National Heritage, and to continue to loot National Heritage, Davies, Blutrich, Aloisi, Rouadi, Hirsch, Perth and Smythe agreed to conduct a scheme in which they caused National Heritage to make a sham loan to Perth.  Blutrich, Davies and

Smythe, with the knowledge and agreement of Aloisi, Hirsch and Rouadi, controlled Perth.

194.    Blutrich, Davies, Rouadi, Aloisi and Smythe misappropriated money from National Heritage through the Perth loan for the additional purpose of settling a lawsuit brought by Robert Earl in the Circuit Court for the Ninth Judicial Circuit for Orange County, Florida, for the return of the $540,000.00 Davies misappropriated from the Earl Trust, as alleged above in connection with the Trust Fund Conversion Aspect of the Acquisition Scheme.

195.    The Perth loan was secured by a mortgage on the real estate pledged to secure the loan, but the fair market value of the real estate securing the loan was substantially lower than the principal amount of the loan.  Davies, with the knowledge and agreement of Blutrich, Aloisi, Rouadi, Smythe and Perth, caused National Heritage to carry the Perth loan on its books at a value corresponding to the principal amount of the loan, thus inflating National Heritage's assets and concealing both the diversion of National Heritage monies and the worsening financial condition of National Heritage.

196.    On or about January 11, 1991, Grassi, acting in furtherance of the Perth Loan Scheme and at the direction of Blutrich, Davies, Rouadi, Aloisi and Smythe, knowingly mailed a grossly inflated appraisal to National Heritage which valued the property Perth was purchasing at $7,500,000.00.  Grassi prepared this appraisal for the purpose of fraudulently inducing National Heritage to lend $4,901,000.00 to Perth.

197.   On January 28, 1991, Davies, with the knowledge and agreement of Blutrich, Aloisi, Rouadi and Smythe, caused National Heritage to wire transfer $701,000.00 from its account number 1010006080 at First Florida Bank to the Blutrich 3406 Account.  On February 11, 1991, Davies and Blutrich caused National Heritage to wire transfer $4.2 million from the same account at First Florida Bank to the BF&M Trust Account.

198.   On January 29, 1991, Blutrich and Davies wire transferred $656,000.00 from the Blutrich 3406 Account, consisting of the $701,000.00 alleged above, to account number 3600583409 in the name of Foley & Lardner, Van Den Berg, Gay, Burke, Wilson & Arkin at NCNB in Orlando, Florida in settlement of the case captioned Earl, et al. v. Celerity Consultants, Inc., et al., No. 91-655  (Fla. 9th. Cir., Orange Co.) (the "Earl Litigation"), in which Robert Earl and others asserted claims for the misappropriation of funds from the Earl Trust as alleged above.

199.   On January 31, 1991, Davies, Blutrich and Hirsch caused Perth to be incorporated.  On February 11, 1991, Blutrich opened an account in the name of Perth at European American Bank, account no. 085-04363-6 (the "Perth Account").  Blutrich controlled this account for the nominal benefit of Perth, but for the ultimate benefit of Blutrich, Davies, Smythe, Rouadi and Aloisi.

200.   On February 13, 1991, Davies, with the knowledge and agreement of Blutrich, Aloisi, Rouadi, Smythe and Perth, closed the $4,901,000.00 loan from National Heritage to Perth for the purported purpose of financing Perth's purchase of 107 undeveloped acres in Orange County, New York.  However, Perth's actual purchase price

-58-

was $815,000.00, or $4,086,000.00 less than the principal amount of the loan, and the actual purpose of the loan was to misappropriate additional assets from National Heritage.

201.    In late 1990 or early 1991, Davies, Blutrich and Smythe agreed to pay Myron Freedman a fee in exchange for Freedman's agreement to act as the nominal president of Perth at their direction in order to conceal and disguise their control of Perth.

202.    Freedman, acting in furtherance of the Perth Loan Scheme at the direction of Blutrich, Davies, Aloisi, Rouadi and Smythe, executed loan documents at the closing on behalf of Perth in order to give the appearance that the loan was a bona fide, arms-length transaction.

203.    On February 14, 1991, Blutrich wire transferred $3,202,429.71 of the Perth "loan" proceeds from the BF&M Trust Account to the Perth Account. Blutrich wrote two checks against the Perth Account, one dated February 15, 1991 in the amount of $1 million, payable to Michael Blutrich, with the memo indicating "For Purchase Of Stock/JW Enterprises," and the second, check number 92 dated February 27, 1991 in the amount of $2 million payable to "Blutrich, Falcone & Miller, Escrow Account." Blutrich caused check number 91 to be deposited into account number 085-33745-9 in the name of Michael D. Blutrich at European American Bank, New York City, New York. Blutrich caused check number 92 to be deposited into account number 215021200 in the name of "Blutrich, Falcone & Miller Escrow Account for the Benefit of David Davies" at European American Bank, New York City, New York (the "Davies EAB Account").

204.    During or shortly after the closing of the Perth loan, Blutrich and

Perth made the following additional disbursements of the Perth loan proceeds to the

indicated parties in the respectively indicated amounts:

|     | Check No. | Payee | Amount |
| --- | --- | --- | --- |
| 1.  | 1137 | Webb Associates | $66,000.00 |
| 2.  | 1138 | SOE, Inc. | $50,000.00 |

205.    In connection with the loan closing, Blutrich prepared a false and

fraudulent closing statement which represented that $3,903,429.71 had been disbursed

"by wire transfers to seller at European American Bank," when in fact, as Blutrich and

Perth knew at the time, $3,202,429.71 was disbursed to Perth, consisting of the sum

purportedly disbursed to seller less the $701,000 diverted from National Heritage to fund

the settlement of the Earl Litigation.

206.    On or about March 22, 1991, Blutrich wire transferred $2 million

from the Davies EAB Account, consisting of Perth "loan" proceeds, to account number

62-6806-80-60 in the name of David Davies at LaSalle National Bank in Chicago.

207.    Shortly after the Perth loan was closed, Perth defaulted on the loan

by failing to make the required loan payments.  Perth could not make the payments

required under its loan because it did not have the financial ability to do so.

208.    The Perth loan substantially worsened National Heritage's financial

condition because it was worth, at most, the fair market value of the real estate securing

it.  However, because the Perth loan was recorded on National Heritage's books and

records at a value corresponding to the principal amount of the loan, the Perth loan

inflated National Heritage's assets and concealed and disguised both the on-going

conspiracy to loot National Heritage and National Heritage's worsening financial

condition.  This enabled Davies, Blutrich, Aloisi, Rouadi and Smythe to prolong the life

of National Heritage, to retain control of National Heritage, and to continue to loot

National Heritage.

        1.      **Interstate Mailings in Furtherance of the Perth Loan Scheme.**

        209.   In furtherance of the Perth Loan Scheme,

> Michael Blutrich
> David Davies
> Patrick Smythe
> Joseph Rouadi
> Perth Commercial Properties, Inc.
> Henry Grassi

defendants herein, knowingly caused to be mailed and delivered by the United States

Postal Service, in violation of 18 U.S.C. § 1941, the following matter:

| Date | Matter Mailed/Delivered | To | From |
|------|------------------------|-----|------|
| 01/11/91 | Appraisal from Grassi to National Heritage | National Heritage, Orlando, FL | Henry Grassi, New York, NY |

        2.      **Interstate Wire Communications in Furtherance of the Perth Loan Scheme.**

        210.   In furtherance of the Perth Loan Scheme,

> Michael Blutrich
> David Davies
> Patrick Smythe
> Joseph Rouadi
> Perth Commercial Properties, Inc.
> Henry Grassi

defendants herein, knowingly transmitted and caused to be transmitted by means of wire

communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following

writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|---|---|---|---|
| 01/28/91 | $701,000.00 wire transfer | Bank Leumi, New York, NY | First Florida Bank, FL |
| 01/29/91 | $656,000.00 wire transfer | NCNB, Orlando, FL | Bank Leumi, New York, NY |
| 02/11/91 | $4,200,000.00 wire transfer | Bank Leumi, New York, NY | First Florida Bank, FL |
| 02/14/91 | $3,202,429.71 wire transfer | European American Bank, New York, NY | Bank Leumi, New York, NY |
| 03/22/91 | $2,000,000 wire transfer | LaSalle National Bank, Chicago, IL | European American Bank, New York, NY |

## E.    The Crown Regional Loan Scheme.

211.    In order to prolong National Heritage's life, to conceal and disguise

the conspiracy to loot National Heritage, and to continue to loot National Heritage,

Davies, Blutrich, Aloisi, Rouadi, Smythe, Hirsch and Crown Regional agreed to conduct

a scheme in which they caused National Heritage to make a sham loan to Crown

Regional.  The purported purpose of the Crown Regional loan was to finance real estate

transactions.  The actual purpose was to provide an additional method of looting National

Heritage.

212.    On or about March 1, 1991, Blutrich and Davies caused Crown

Regional to be formed as a New York corporation.  Blutrich, Falcone & Miller performed

the legal work in connection with the formation of Crown Regional.  The business

address of Crown Regional was 499 South Main Street, New City, New York, the

address of Hirsch's office and of Celeb Capital.

213.    Blutrich and Davies, with the knowledge and agreement of Aloisi,

Smythe, Hirsch and Rouadi, controlled Crown Regional.  Hirsch was a shareholder of

Crown Regional.  Blutrich and Davies paid Carl N. Knudson a fee in exchange for

Knudson acting as the nominal president of Crown Regional at their direction in order to

conceal and disguise their control of Crown Regional.

214.    The Crown Regional loan was secured by a mortgage on the real

estate pledged to secure the loan, but the fair market value of the real estate securing the

loan was substantially lower than the principal amount of the loan.  Davies, with the

knowledge and agreement of Blutrich, Aloisi, Rouadi, Smythe and Crown Regional,

caused National Heritage to carry the Crown Regional loan on its books at a value

corresponding to the principal amount of the loan, thus inflating National Heritage's

assets and concealing both the diversion of National Heritage monies and the worsening

financial condition of National Heritage.

215.    On March 19, 1991, Blutrich, Davies and Smythe caused National

Heritage to wire transfer $3.7 million from National Heritage's account number

1010006080 at First Florida Bank to the BF&M Trust Account.

216.    On March 20, 1991, Blutrich wire transferred $2.6 million from

the BF&M Trust Account to account number 01548924 in the name of Crown Regional

at Citibank in New York City (the "Crown Regional Account").

217.    Also on March 20, 1991, Blutrich, Levidy, Davies and Smythe closed the $3.7 million loan from National Heritage to Crown Regional for the purported purpose of financing Crown Regional's purchase of a fifty acre parcel of undeveloped real estate in New Paltz, New York.  However, Crown Regional's purchase price was $477,500.00, or approximately $3.2 million less than the principal amount of the loan.

218.    At the closing, Blutrich and Davies caused Knudson to execute loan documents to give the false appearance that the loan was a <u>bona fide</u>, arms-length transaction.

219.    During or shortly after the closing, Blutrich made the following additional disbursements of the Crown Regional loan proceeds to the indicated parties in the respectively indicated amounts:

|    | Check No. | Payee | Amount |
|----|-----------|-------|--------|
| 1. | 1158 | Henry Grassi | $18,000.00 |
| 2. | 1171 | Webb Associates | $21,000.00 |
| 3. | 1177 | Maxsam, Inc. | $468,370.40 |

220.    In connection with the closing, Blutrich prepared a false and fraudulent closing statement which represented that $2.6 million of the loan proceeds had been disbursed "by wire transfer to Seller."  In truth, as Blutrich and Crown Regional knew at the time, $2.6 million in loan proceeds was wire transferred to the Crown Regional Account.

221.    After the closing of the loan, Blutrich and Davies caused Knudson to sign numerous blank checks and wire transfer forms on the Crown Regional Account. Blutrich maintained possession of Crown Regional's checkbook and controlled the funds

that National Heritage "loaned" to Crown Regional. Blutrich paid Knudson approximately $2,000.00 per month for acting as the president of Crown Regional by issuing Knudson checks drawn on Crown Regional's account which Knudson had previously signed in blank.

222.    On or about March 22, 1991, Martin and Martin Appraisers, acting in furtherance of the Crown Regional Loan Scheme at the direction of Blutrich, Hirsch, Davies and Crown Regional, knowingly mailed to National Heritage an appraisal which grossly inflated the value of the property Crown Regional was purchasing at $5.6 million, for the purpose of fraudulently inducing National Heritage to lend $3.7 million to Crown Regional.

223.    On March 22, 1991, Blutrich, with the knowledge and agreement of Davies and Crown Regional, wire transferred $2.2 million from the Crown Regional Account to account number 62-6806-801-6 at LaSalle National Bank in Chicago, Illinois, in the name of David Davies.

224.    Approximately one year after the closing, in response to an inquiry from National Heritage with respect to the Crown Regional loan, Blutrich mailed a letter to the National Heritage CFO dated March 25, 1992 forwarding what he falsely represented to be a valuation by a "Certified and Accredited Appraiser." In truth, Blutrich forwarded a report dated March 25, 1992, prepared by Grassi, in which Grassi knowingly misrepresented that the fair market value of each unimproved two-acre lot located on the 50-acre parcel purchased by Crown Regional was $90,000.00. Grassi made this misrepresentation, and Blutrich mailed it to National Heritage, for the purpose

of fraudulently lulling National Heritage into believing that its $3.7 million loan to

Crown Regional would be more than adequately secured by the lots after they were

developed.  In truth, the fair market value of the entire 50-acre parcel was only slightly

more than $90,000.00.  National Heritage, by and through the National Heritage CFO,

relied on these misrepresentations to its detriment by believing that the Crown Regional

loan was adequately secured.  Had National Heritage, by and through the National

Heritage CFO, known that Grassi was not a "Certified and Accredited Appraiser" or that

the appraisal was fraudulent, it would have taken appropriate action to mitigate its

damages, including, for example, seeking rescission of the transaction and informing

National Heritage's regulators.

225.    On or about March 31, 1991, Davies caused $4.2 million,

consisting of proceeds of the fraudulent Perth and Crown Regional loans, to be wire

transferred from Davies' account at LaSalle National Bank in Chicago to account number

21510318801 in the name of "David L. Davies" at Barclays Bank PLC in the British

Virgin Islands.

226.    On April 17, 1991, Blutrich caused the false and fraudulent closing

statement relating to the Crown Regional loan to be mailed to Davies at National

Heritage.

227.    In response to National Heritage's inquiry concerning the state of

the development of the real estate securing the Crown Regional loan, under cover of a

memorandum dated May 14, 1992, Blutrich sent to National Heritage, via facsimile, false

and fraudulent documents on the letterhead of "Cal Mart Construction Corp.,"

purportedly documenting expenses Crown Regional had incurred in the development of the real estate, and falsely representing that Cal Mart Construction Corp. was "presently in full operation on the . . . project." In truth, no such expenditures had been made, and Cal Mart was not in full operation on the project.

228.   Shortly after the Crown Regional loan was closed, Crown Regional defaulted on the loan by failing to make the required loan payments. Crown Regional could not make the payments required under its loan because it did not have the financial ability to do so.

229.   The Crown Regional loan substantially worsened National Heritage's financial condition because it was worth, at most, the fair market value of the real estate securing it. However, because the Crown Regional loan was recorded on National Heritage's books and records at a value corresponding to the principal amount of the loan, the Crown Regional loan falsely inflated National Heritage's assets, concealed and disguised both the on-going conspiracy to loot National Heritage and National Heritage's worsening financial condition. This enabled Davies, Blutrich, Aloisi, Rouadi and Smythe to prolong the life of National Heritage, to retain control of National Heritage, and to continue to loot National Heritage.

**1.      Interstate Mailings in Furtherance of the Crown Regional Loan Scheme.**

230.   In furtherance of the Crown Regional Loan Scheme,

Michael Blutrich
David Davies
Patrick Smythe
Joseph Rouadi
Alan Hirsch

Crown Regional Properties, Inc.
Thomas Martin
Martin Real Estate Appraisers, Inc.
Henry Grassi

defendants herein, knowingly caused to be mailed and delivered by the United States

Postal Service, in violation of 18 U.S.C. § 1941, the following matter:

| Date | Matter Mailed/Delivered | To | From |
|------|-------------------------|----|------|
| 03/22/91 | Appraisal from Martin and Martin Appraisers to National Heritage | National Heritage, Orlando, FL | Martin and Martin Appraisers, West Nyack, NY |
| 04/17/91 | Closing Statement from Blutrich to National Heritage | National Heritage, Orlando, FL | Blutrich, Herman & Miller, New York, NY |
| 03/25/92 | Letter from Blutrich to National Heritage | The National Heritage CFO, National Heritage, Orlando, FL | Blutrich, New York, NY |

## 2.   Interstate Wire Communications in Furtherance of the Crown Regional Loan Scheme.

231.   In furtherance of the Crown Regional Loan Scheme,

Michael Blutrich
David Davies
Patrick Smythe
Joseph Rouadi
Alan Hirsch
Crown Regional Properties, Inc.
Thomas Martin
Martin Real Estate Appraisers, Inc.
Henry Grassi

defendants herein, knowingly transmitted and caused to be transmitted by means of wire

communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following

writings, signs, signals and sounds:

-68-

| Date | Writings, Signs, Signals or Sounds | To | From |
|---|---|---|---|
| 03/20/91 | $2,600,000.00 wire transfer | Citibank, New York, NY | Bank Leumi, New York, NY |
| 03/22/91 | $2,200,000.00 wire transfer | LaSalle National Bank, Chicago, IL | Citibank, New York, NY |
| 03/31/91 | $4,200,000.00 wire transfer | Barclays Bank PLC, British Virgin Islands | LaSalle National Bank, Chicago, IL |
| 05/14/92 | Letter re Cal Mart Construction | National Heritage, Orlando, FL | Blutrich, New York, NY |

**F.    The LPDA Line of Credit Scheme.**

232.   In April 1992, the Florida Department of Insurance ("Florida")
determined that each of National Heritage's loans to the following seven persons and
entities, with the respectively indicated outstanding principal balances at the time,
secured by mortgages, was too large relative to National Heritage's capital:  (1) Seek
Hotel Corp., $1,967,511.48; (2) M&T Pretzel Corp., $1,638,785.62; (3) Abraham
Weider, $3,575,734.29; (4) Franklin Realty Corp., $4,263,387.20; (5) Phillip G. Miller,
$1,295,423.87; (6) Thorr Financial, Inc., $969,943.12; and, (7) Perth, $4,900,000.00 (the
"LPDA Mortgages").  Florida directed National Heritage either to divest itself of a
substantial portion of the LPDA Mortgages or to raise additional capital.

233.     Following Florida's direction, Blutrich, Smythe, Pfeffer, D.
Aronow and J. Aronow agreed to implement a scheme to deter regulatory action and to
prolong National Heritage's life through the illusion that National Heritage had sold a
65% interest in the LPDA Mortgages in compliance with Florida's direction.

234.    On April 30, 1992, Blutrich, Pfeffer, D. Aronow and J. Aronow formed a shell corporation which they called LPDA.  On that same day, Smythe, Blutrich and LPDA fraudulently misrepresented to the National Heritage CFO that LPDA agreed to purchase 65% of the LPDA Mortgages, which would resolve Florida's concerns, and that LPDA was funded by a wealthy individual from Palm Beach, Florida.  At the time, Smythe, Blutrich and LPDA knew that LPDA had no funds and was not funded by any wealthy individual.

235.    Also on April 30, 1992, Smythe, purportedly on behalf of National Heritage but in fact pursuant to the LPDA Line of Credit Scheme, and Pfeffer, on behalf of LPDA, with the knowledge and agreement of Blutrich, D. Aronow and J. Aronow, entered into a "Participation Agreement."  Pursuant to the Participation Agreement, Smythe caused National Heritage to transfer an undivided 65% interest in the LPDA Mortgages and to retain an undivided 35% interest in the LPDA Mortgages.  At the time, the LPDA Mortgages had total outstanding principal balances of approximately $18,600,000.00.  In exchange for its 65% interest in the LPDA Mortgages, LPDA agreed to pay National Heritage approximately $12 million in cash.

236.    In addition, Smythe, on behalf of National Heritage, and Pfeffer, on behalf of LPDA, with the knowledge and agreement of Blutrich, D. Aronow and J. Aronow, entered into a "Guaranteed Fee Agreement," dated as of April 29, 1992. Pursuant to this "Agreement," LPDA was required to pay minimum monthly interest payments to National Heritage on National Heritage's 35% interest in the LPDA Mortgages.  The minimum monthly interest payments were to be 10.75% of

$6,510,175.35, divided by 12, or approximately $58,000.00 monthly during the term of the Participation Agreement.

237.    In exchange for LPDA's "promise" to make minimal monthly payments, Smythe, with the knowledge and agreement of Blutrich, Pfeffer, D. Aronow and J. Aronow, caused National Heritage to pay to LPDA a "guaranteed payment fee" of 7.5% of the outstanding principal balances of the LPDA Mortgages, or $1,396,000.00.

238.    At the time Smythe caused National Heritage to enter into the Participation Agreement and the Guaranteed Fee Agreement, LPDA did not have, of its own independent resources, either the $12 million necessary to pay National Heritage for the 65% of the LPDA Mortgages under the Participation Agreement or the funds necessary to make the minimal monthly payments under the Guaranteed Fee Agreement. Given LPDA's lack of assets, Blutrich, Smythe, Pfeffer, D. Aronow, J. Aronow and LPDA agreed to implement a scheme to use National Heritage's assets as security for a loan, the proceeds of which LPDA would use to fund the $12 million payment to National Heritage.

239.    Smythe fraudulently misrepresented to the National Heritage CFO that in consideration for LPDA's agreement to purchase 65% of the LPDA Mortgages, LPDA required that it be permitted to manage and direct the investment of $15 million of National Heritage's funds.  National Heritage's funds were to be kept solely in National Heritage's name at all times.

240.    On April 27, 1992, Blutrich, purportedly acting as National Heritage's attorney, sent a memo via facsimile to Aloisi instructing Aloisi to cause

National Heritage to wire transfer $17 million to account number 01517159 at Citibank in the name of "Michael D. Blutrich as attorney for National Heritage Life Insurance Company" (the "Blutrich Citibank Account").

      241.   On April 28, 1992, Blutrich and Aloisi, with the knowledge and agreement of Smythe, Pfeffer, D. Aronow, J. Aronow and LPDA, caused National Heritage to make two wire transfers for a total of $17 million to the Blutrich Citibank Account. Specifically, Aloisi sent a memorandum via facsimile directing Greenwell Montague, a British-based brokerage firm, to wire transfer $12 million from National Heritage's account number 92J at Greenwell Montague to the Blutrich Citibank Account. Aloisi also directed First Florida Bank to wire transfer $5 million from National Heritage's account number 1010006080 at First Florida Bank to the Blutrich Citibank Account. Each of these transfers was made under the guise of funding a bond trading account which LPDA was to manage for the purported benefit of National Heritage, and paying "brokerage commissions, legal fees, closing costs and title insurance endorsements."

      242.   On or about May 7, 1992, Blutrich, with the knowledge and agreement of Pfeffer, D. Aronow, J. Aronow and LPDA, and without National Heritage board approval or disclosure to the National Heritage CFO, issued check no. 92 in the amount of $15 million against the Blutrich Citibank Account, to LPDA. Also on May 7, 1992, LPDA deposited this check at Standard Chartered Bank ("SCB") as collateral for a $15 million line of credit which Pfeffer and D. Aronow, with the knowledge and

agreement of Blutrich and J. Aronow, established at SCB for LPDA on or about May 19, 1992.

243.    Blutrich, Smythe, Aloisi, Pfeffer and National Mortgage agreed to convert $1.4 million of the remaining $2 million of National Heritage's funds which had been transferred into the Blutrich Citibank Account on April 28, 1992.  On April 29, 1992, Blutrich transferred $999,999.99 from the Blutrich Citibank Account to a second account at Citibank held in the name of "Michael D. Blutrich, as Attorney for National Heritage Life Insurance Company," account number 01516949 (the "Blutrich Citibank Account #2").  On April 30, 1992, Blutrich transferred $885,000.00 from the Blutrich Citibank Account to the Blutrich Citibank Account #2.  Then, on May 21, 1992, Blutrich and Pfeffer converted $558,015.03 by wire transferring that amount from the Blutrich Citibank Account #2 to account number 3016948 at Standard Chartered Bank in the name of National Mortgage Corporation, a company controlled by Pfeffer and Contreras (the "National Mortgage Account").  Also on May 21, 1992, Blutrich, Smythe and Aloisi converted $837,022.55 by transferring that amount from the Blutrich Citibank Account #2 to Bartz and directed Bartz to launder those funds through an offshore account on behalf of and for the benefit of Blutrich, Smythe and Aloisi.

244.    On May 20, 1992, Pfeffer, D. Aronow, Blutrich and LPDA, with the knowledge and agreement of J. Aronow and LPDA, drew down $12.75 million against the LPDA credit line and credited that sum to the LPDA bank account at SCB. The next day, May 21, 1992, LPDA directed SCB to transfer $12,090,325.00 from its bank account to an account in the name of Fink, Weinberger, P.C., a New York law firm,

at Bank Leumi for the purpose of funding LPDA's $12 million payment to National

Heritage as required by the Participation Agreement. On May 21, 1992, Blutrich caused

Fink, Weinberger, P.C. to wire transfer $12,090,325.00 to National Heritage's account at

the Custodial Trust Company in Princeton, New Jersey, account no. 113-60010,

purportedly pursuant to the Participation Agreement.

245.    Thus, Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA

encumbered $15 million of National Heritage's assets to secure a loan to LPDA to enable

LPDA to pay National Heritage $12 million pursuant to the Participation Agreement.

246.    To conceal this misappropriation of National Heritage's assets, in

or about late May 1992, Blutrich and Smythe provided to the National Heritage

Controller what purported to be a copy of the statement for the Blutrich Citibank Account

for the period from April 27, 1992 to May 10, 1992, which indicated that Blutrich,

purportedly as National Heritage's attorney, was holding $15,086,704.00 of National

Heritage's funds in that account. In truth, Blutrich had caused the statement to be altered

and falsified. The actual bank statement reflected that the Blutrich Citibank Account had

a credit balance of only $66,704.12 as of May 10, 1992. Blutrich and Smythe

misrepresented the amount of National Heritage's funds in the Blutrich Citibank Account

for the purpose of causing National Heritage, by and through the National Heritage

Controller, to rely on the fraudulent statement. National Heritage, by and through the

National Heritage Controller, relied on the statement to its detriment in that it believed

that Blutrich was holding $15 million on behalf of National Heritage. Had National

Heritage, by and through the National Heritage Controller, known that $15 million was

missing from the Blutrich Citibank Account, it would have taken appropriate action to mitigate its damages, including, for example, seeking rescission of the pledge of its assets to SCB and informing National Heritage's regulators.

247.    In June 1992, Smythe fraudulently misrepresented to the National Heritage CFO that LPDA agreed to purchase 65% of the Crown Regional mortgage for $2,405,000.00.  Smythe fraudulently advised the National Heritage CFO that LPDA required that, in consideration for its agreement to purchase 65% of the Crown Regional mortgage, LPDA be permitted to manage and direct the investment of an additional $5 million of National Heritage's funds.  These funds were at all times supposed to be kept in National Heritage's name.

248.    On or about July 2, 1992, Smythe caused National Heritage to wire transfer $5 million from its account at First Florida Bank in Orlando, Florida, to the Blutrich Citibank Account, purportedly to be held in escrow by Blutrich until transferred to an investment account in National Heritage's name.

249.    From May 20, 1992 to May 12, 1993, Blutrich, D. Aronow, J. Aronow, Pfeffer, Yackow, LPDA, National Mortgage, Cromwell Building, Perfe Corp. and New Contenders, Inc. agreed to implement a scheme to further loot National Heritage by causing the balance of the LPDA credit line, or approximately $3 million, to be drawn down and some of the loan proceeds to be disbursed to themselves by checks drawn against LPDA's bank account at SCB funded by the line of credit, as follows:

a.      Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused $371,533.19 to be disbursed to D. Aronow on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 06/02/92 | 100,000.00 | 2372 |
| 06/25/92 | 26,533.19 | 1006 |
| 07/17/92 | 200,000.00 | 1009 |
| 08/28/92 | 20,000.00 | 1021 |
| 11/09/92 | 10,000.00 | 1031 |
| 03/19/93 | 10,000.00 | 1041 |
| 06/03/93 | 5,000.00 | 1051 |

b.      Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused $8,000.00 to be disbursed to J. Aronow on April 22, 1993 by means of check number 1047.

c.      Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused $425,000.00 to be disbursed to Blutrich, Falcone & Miller on May 26, 1992 by means of check number 2371.

d.      Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused $1,528,551.05 to be disbursed to Michael Blutrich on the dates, in the amounts and by the means indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 06/02/92 | 100,000.00 | 2375 |
| 06/25/92 | 26,533.19 | 1005 |
| 06/25/92 | 64,762.00 | 1003 |

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 06/25/92 | 18,838.20 | 1004 |
| 06/25/92 | 66,220.65 | 1002 |
| 07/17/92 | 400,000.00 | 1010 |
| 07/29/92 | 275,000.00 | 1019 |
| 08/18/92 | 50,010.00 | 1018 |
| 08/28/92 | 47,372.23 | 1015 |
| 09/21/92 | 51,094.29 | 1029 |
| 10/20/92 | 53,636.52 | 1027 |
| 11/06/92 | 46,881.91 | 1030 |
| 11/10/92 | 10,000.00 | 1026 |
| 12/10/92 | 38,343.46 | 1038 |
| 12/10/92 | 46,881.76 | 1037 |
| 12/10/92 | 29,603.00 | 1036 |
| 03/19/93 | 10,000.00 | 1043 |
| 06/02/93 | 153,373.84 | 1048 |
| 06/03/93 | 5,000.00 | 1050 |
| 11/01/93 | 25,000.00 | 1055 |
| 11/01/93 | 10,000.00 | 1058 |

e.       Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused $411,119.44 to be disbursed to LPDA Acquisition Corp. on November 8, 1993 by means of a debit memo.  Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA then caused $110,000.00 to be disbursed from LPDA to L. Pfeffer Corp., a company controlled by Pfeffer.

f.       Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused $12,230.00 to be disbursed to National Mortgage Corporation on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 06/19/92 | 2,100.00 | 1001 |
| 08/28/92 | 130.00 | 1023 |
| 03/19/93 | 10,000.00 | 1042 |

g.     Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused $386,533.19 to be disbursed to Pfeffer on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 06/02/92 | 100,000.00 | 2374 |
| 06/25/92 | 26,533.19 | 1007 |
| 07/17/92 | 200,000.00 | 1008 |
| 08/28/92 | 20,000.00 | 1017 |
| 11/09/92 | 10,000.00 | 1032 |
| 06/03/93 | 5,000.00 | 1049 |
| 11/04/93 | 25,000.00 | 1056 |

h.     Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused a total of $33,000.00 to be disbursed to Cromwell Building, an entity controlled by D. Aronow and J. Aronow, on April 16 and 22, 1993 by means of check numbers 1045 and 1046, respectively.

i.     Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused $25,000.00 to be disbursed to Perfe Corporation, an entity controlled by D. Aronow and J. Aronow, on November 1, 1993 by means of check number 1057.

j.      Blutrich, Smythe, D. Aronow, J. Aronow, Pfeffer and LPDA caused $20,000.00 to be disbursed to New Contenders, Inc., a company controlled by Blutrich and Yackow, on August 28, 1992 by means of check number 1016.

k.      D. Aronow, J. Aronow, Blutrich, LPDA, National Mortgage, Pfeffer, Cromwell Building, Perfe and New Contenders accepted these payments with the knowledge that the monies they received belonged to National Heritage and with the intent to further the on-going scheme to loot National Heritage.

250.    On March 13, 1993, D. Aronow and Pfeffer issued check number 1044 payable to National Heritage in the amount of $200,000.00, consisting of proceeds of the credit line, as payment for National Heritage's agreement to extend the loan to Crown Regional for a period of 90 days.

251.    LPDA never paid National Heritage the "guaranteed" minimum monthly interest payments required by the Guaranteed Fee Agreement.  As of December 31, 1996, LPDA owed National Heritage approximately $2.4 million in interest payments alone pursuant to the Participation Agreement and Guaranteed Fee Agreement.

252.    The Participation Agreement therefore created the illusion that National Heritage had sold 65% of its interest in the LPDA Mortgages for approximately $12 million, and had improved its financial condition.  In truth, National Heritage had transferred a 65% interest in the LPDA Mortgages, which had total outstanding principal balances of over $18,000,000.00, for which it received a $12 million payment funded by a loan secured by National Heritage's own assets.

1.      **Interstate Wire Communications in Furtherance of the LPDA Line of Credit Scheme.**

253.    In furtherance of the LPDA Line of Credit Scheme,

Michael Blutrich
Patrick Smythe
Lyle Pfeffer
Deborah Aronow
Joseph Aronow
Mark Yackow
LPDA Acquisition Corp.
National Mortgage Corp.
Cromwell Building, Inc.
Perfe Corporation
New Contenders, Inc.
L. Pfeffer Corp.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|-----------------------------------|-----|------|
| 4/27/92 | Memo faxed from Blutrich to Aloisi | Aloisi, National Heritage, Orlando, FL | Blutrich, New York, NY |
| 4/28/92 | $12,000,000 wire transfer | Citibank, New York, NY | Greenwell Montague, London, UK |
| 4/28/92 | $5,000,000 wire transfer | Citibank, New York, NY | First Florida Bank, FL |
| 5/21/92 | $12,090,325 wire transfer | National Heritage, Custodial Trust Company, Princeton, New Jersey | Fink, Weinberger, Bank Leumi, New York, NY |

### G.    The National Mortgage Corporation Scheme.

254.    Blutrich, Aloisi, Smythe, Pfeffer, Contreras and National Mortgage agreed to implement another scheme to loot National Heritage through a sham payment to a phony money management consultant.

255.    On April 24, 1992, Blutrich sent a memo via facsimile to Aloisi and Smythe instructing them to cause National Heritage to wire transfer $400,000.00 to Blutrich's account.

256.    In accordance with Blutrich's direction, on April 24, 1992, Aloisi and Smythe caused National Heritage to wire transfer $400,000.00 from National Heritage's account at Greenwell Montague, a British-based brokerage firm, to an account at Citibank in the name of Michael D. Blutrich, Attorney at Law, account number 01552907.

257.    On June 25, 1992, Pfeffer, on behalf of National Mortgage and with the knowledge and agreement of Contreras, executed a letter agreement also bearing Smythe's purported signature on behalf of National Heritage, pursuant to which National Heritage purportedly engaged Pfeffer and National Mortgage Corporation, a company controlled by Pfeffer and Contreras, as "money management consultants" to provide investment and financial advice.  In exchange for the services of Pfeffer and National Mortgage Corporation, National Heritage agreed to pay National Mortgage Corporation an advance payment of $400,000.00.

258.    On June 26, 1992, Blutrich transferred $400,000.00 from Citibank account number 01552907 to National Mortgage Corporation.

259.    In truth, the arrangement with Pfeffer and National Mortgage Corporation was simply another fraudulent scheme devised by Blutrich, Smythe, Aloisi, Pfeffer, Contreras and National Mortgage to loot National Heritage.  The only money management consulting services that National Heritage received from either Pfeffer or National Mortgage Corporation were "services" which were in furtherance of the conspiracy to loot National Heritage.

1.    **Interstate Wire Communications in Furtherance of the National Mortgage Corporation Scheme.**

260.    In furtherance of the National Mortgage Corporation Scheme,

> Michael Blutrich
> Patrick Smythe
> Lyle Pfeffer
> Charles Contreras
> National Mortgage Corp.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|------------------------------------|----|------|
| 04/24/92 | Memo faxed from Blutrich to Aloisi and Smythe | Aloisi and Smythe, National Heritage, Orlando, FL | Blutrich, Falcone & Miller, New York, NY |
| 04/24/92 | $400,000.00 wire transfer | Citibank, New York, NY | Greenwell Montague |

**H.**    <u>The Class D Preferred Stock Scheme</u>.

261.    In or about August 1992, Blutrich, Smythe, Pfeffer, Contreras, Weinschneider, Nulenda, National Mortgage and Future Diversified agreed to implement another scheme to loot National Heritage, involving a line of credit through which they misappropriated assets of National Heritage to fund the purchase of Lifeco Class D Preferred Stock.  Actual Funding, Anshlu, Ha-Lo, National Mortgage, National Finders, Banstar, Platzner, Platzner International, Scores, Bilzinsky, Kaltsas, Yackow, Schneiderman and Weiss joined in, agreed to and assisted the scheme to loot National Heritage by receiving monies disbursed from the line of credit with the knowledge that the monies were diverted from National Heritage.

262.    Blutrich and Pfeffer incorporated Nulenda and Future Diversified on August 21, 1992.  They then arranged for a $20 million line of credit from SCB for Nulenda, which SCB established on or about September 16, 1992, secured by National Heritage's assets.  Like LPDA, Nulenda had no business, income, or assets, and no ability to repay any monies drawn against the credit line.

263.    In connection with the Class D Preferred Stock Scheme, Blutrich purported to act as attorney for National Heritage, even though he simultaneously was a director and stockholder of Nulenda, and Herman acted as attorney for Future Diversified.

264.    On September 9, 1992, Blutrich, Smythe and Pfeffer caused National Heritage to wire transfer $20 million from its account at Raymond James & Associates to account number 37081473 in the name of "Michael D. Blutrich, Special

Attorney Escrow" at Citibank (the "Blutrich Special Escrow Account").  The purported purpose of these transfers was to collect capital with which to fund another bond trading account for Pfeffer to manage for the benefit of National Heritage.

265.    Beginning in September 1992, Blutrich, Pfeffer, D. Aronow and LPDA requested SCB to purchase various government securities and corporate bonds in an account in National Heritage's name at First Interstate Bank of California ("FIB") ("FIB Account No. 1") with the $15 million in National Heritage funds deposited at SCB to secure the LPDA credit line.

266.    Blutrich and Pfeffer then used the $20 million in the Blutrich Special Escrow Account to purchase government securities and corporate bonds to be placed in a second account at FIB in the name of National Heritage ("FIB Account No. 2").

267.    Thereafter, two Hypothecation Agreements (one securing the LPDA credit line, one securing the Nulenda credit line and each purportedly bearing Smythe's signature and a date of September 10, 1992), were provided to SCB which improperly pledged FIB Accounts No. 1 and No. 2 as security for the LPDA and Nulenda credit facilities in favor of SCB.

268.    As of the time that National Heritage's assets were pledged improperly as security for the LPDA and Nulenda credit lines, National Heritage no longer had sufficient assets to pay its creditors, its liabilities exceeded its assets, and it was insolvent.  National Heritage remained insolvent at all times thereafter.

269.    To conceal the pledge of the FIB No. 1 account from National

Heritage, by letter dated October 21, 1992 purportedly bearing Smythe's signature,

Blutrich, Smythe and Aloisi advised FIB that "any questions, inquiries, statements,

custodial receipts, monthly reports or any other information" about the FIB accounts

should be forwarded directly to Blutrich.  Blutrich and Smythe prepared false FIB

statements that did not reflect the pledge of the accounts, which Blutrich and Smythe then

provided to the National Heritage CFO.  To complete the deception, Blutrich and Smythe

included a false mailing address for FIB on the fraudulent statements they sent to

National Heritage, so they could intercept any return correspondence that National

Heritage might send to FIB concerning the accounts.  Blutrich and Smythe fraudulently

altered the FIB statements for the purpose of causing National Heritage, by and through

the National Heritage accounting department, including the National Heritage CFO and

the National Heritage Controller, to rely on the fraudulent statements.  National Heritage,

by and through the National Heritage CFO, relied on the fraudulent FIB statements to its

detriment by believing that its assets in the FIB Accounts were not encumbered.  Had

National Heritage, by and through the National Heritage CFO, known that its assets in the

FIB Accounts were encumbered, it would have taken appropriate action to mitigate its

damages, including, for example, seeking rescission of the hypothecation agreements and

informing National Heritage's regulators.

270.    On September 11, 1992, Pfeffer, acting on behalf of Future

Diversified, and Smythe, purporting to act on behalf of National Heritage but in fact

acting pursuant to the Class D Preferred Stock Scheme, with the knowledge and

agreement of Blutrich, Aloisi and Contreras, entered into and closed a Stock Purchase

Agreement, pursuant to which Future Diversified purchased 773,334 shares of Lifeco

Class D Preferred Stock for $11 million.

271.    Future Diversified did not pay Lifeco for the Class D Stock with its

own resources.  Rather, Future Diversified, by and through Pfeffer, Contreras and

Weinschneider, and with the knowledge and agreement of Blutrich, Aloisi, Smythe and

Nulenda, paid for the stock with proceeds from the Nulenda line of credit.  Future

Diversified, by and through Pfeffer, Contreras and Weinschneider, thus purchased

773,334 shares of Lifeco Class D Preferred Stock with the proceeds of the Nulenda line

of credit established through the wrongful pledge of National Heritage's assets.

272.    The Stock Purchase Agreement provided for a brokerage

commission of 8% of the purchase price and a finder's fee of 2% of the purchase price.

Lifeco received $9.9 million from the Class D Preferred Stock sale, which was the $11

million purchase price net of the 8% brokerage commission and 2% finder's fee.

273.    On September 17, 1992, Pfeffer issued check numbers 1 and 7,

drawn on the Nulenda account at SCB, under the guise of paying the 2% "finder's fee."

The checks were drawn in the amounts of $210,000.00 and $10,000.00, and were payable

to National Mortgage, which was controlled by Pfeffer and Contreras, and Blutrich,

Herman & Miller, respectively.

274.    Also on September 17, 1992, Pfeffer issued check no. 2, drawn on

the Nulenda account at SCB in the amount of $880,000.00, or 8% of the Class D

Preferred Stock purchase price, to "Michael D. Blutrich, as attorney for Nulenda," purportedly as a brokerage commission.

275.    The payment of $220,000.00 in "finder's fees" to National Mortgage and Blutrich, Herman & Miller, and the payment of $880,000.00 in "brokerage commissions" to Blutrich were misappropriations of National Heritage's assets pursuant to the Class D Preferred Stock Scheme.

276.    Thereafter, Blutrich, Smythe, Pfeffer, Contreras and Nulenda agreed to implement a scheme to convert an additional $10 million of National Heritage's funds to provide further security to SCB for the Nulenda line of credit as requested by SCB.

277.    On September 23, 1992, Blutrich issued check no. 89 in the amount of $5 million, consisting of monies diverted from National Heritage, drawn on the Blutrich Special Escrow Account payable to Nulenda.  On December 23, 1992, Blutrich, with the knowledge and agreement of Smythe, Pfeffer and Nulenda, used an additional $5 million from the Blutrich Citibank Account which had been diverted from National Heritage to purchase a cashier's check in the amount of $5 million payable to Nulenda.

278.    Lifeco paid quarterly dividends on the Class D Preferred Stock. From 1992 through 1994, Lifeco paid Future Diversified $1,265,754.00 in dividends on the 773,334 shares of Class D Preferred Stock.  Because Future Diversified purchased the Class D Stock with monies obtained by wrongfully pledging National Heritage's assets, the Class D dividends were rightfully assets of National Heritage.

279.   Blutrich, Smythe, Pfeffer and Nulenda misappropriated the Nulenda line of credit proceeds remaining after Future Diversified's purchase of the Class D Preferred Stock and disbursed certain of those misappropriated proceeds by drawing checks against Nulenda's account at SCB funded by the line of credit, as follows:

a.   Blutrich, Smythe, Pfeffer and Nulenda caused $159,000.00 to be disbursed to Actual Funding, Inc., an entity which Blutrich, Pfeffer, Schneiderman and Weiss controlled, on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 01/13/93 | 100,000.00 | 1018 |
| 02/23/93 | 59,000.00 | 1033 |

b.   Blutrich, Smythe, Pfeffer and Nulenda caused $87,000.00 to be disbursed to Anshlu, Inc., an entity which Blutrich controlled, on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 03/23/93 | 10,000.00 | 1041 |
| 04/30/93 | 25,000.00 | 1053 |
| 05/07/93 | 5,000.00 | 1054 |
| 05/08/93 | 5,000.00 | 1055 |
| 05/12/93 | 10,000.00 | 1057 |
| 05/13/93 | 10,000.00 | 1058 |
| 06/09/93 | 7,000.00 | 1065 |
| 06/21/93 | 15,000.00 | 1067 |

c.      Blutrich, Smythe, Pfeffer and Nulenda caused

$2,308,177.58 to be disbursed to Michael Blutrich on the dates, in the amounts and by the

means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 09/17/92 | 880,000.00 | 2 |
| 09/17/92 | 500,000.00 | 4 |
| 09/17/92 | 165,000.00 | illegible |
| 10/16/92 | 200,000.00 | 1002 |
| 10/21/92 | 8,333.33 | 1004 |
| 10/21/92 | 40,000.00 | 1003 |
| 12/07/92 | 77,381.47 | 1012 |
| 02/02/93 | 10,000.00 | 1023 |
| 02/04/93 | 2,000.00 | 1025 |
| 02/19/93 | 26,762.78 | 1031 |
| 03/02/93 | 7,000.00 | 1035 |
| 03/09/93 | 25,000.00 | 1038 |
| 03/17/93 | 2,300.00 | 1040 |
| 05/27/93 | 10,000.00 | 1062 |
| 06/17/93 | 285,000.00 | 1066 |
| 06/28/93 | 12,000.00 | 1069 |
| 07/06/93 | 10,000.00 | 1071 |
| 08/13/93 | 10,000.00 | 1081 |
| 09/17/93 | 5,400.00 | 1090 |
| 09/21/93 | 10,000.00 | 1092 |
| 09/21/93 | 20,000.00 | 1091 |
| 11/03/93 | 2,000.00 | 1103 |

d.      Blutrich, Smythe, Pfeffer and Nulenda caused $37,318.55 to be disbursed to Blutrich, Falcone & Miller on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 09/17/92 | $10,000.00 | 7 |
| 06/09/93 | 15,000.00 | 1064 |
| 09/30/93 | 12,318.55 | 1095 |

e.      Blutrich, Smythe, Pfeffer and Nulenda caused $10,000.00 to be disbursed to Ha-Lo Investment Associates, Inc., an entity which Pfeffer controlled, on September 30, 1993, by means of check number 1093.

f.      Blutrich, Smythe, Pfeffer and Nulenda caused $1,138,921.66 to be disbursed to National Mortgage, a company controlled by Pfeffer and Contreras, on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 09/17/92 | 210,000.00 | 1 |
| 10/16/92 | 20,000.00 | 1001 |
| 11/03/92 | 41,991.15 | 1008 |
| 11/30/92 | 50,000.00 | 1009 |
| 12/08/92 | 75,000.00 | 1013 |
| 01/22/93 | 40,000.00 | 1020 |
| 01/29/93 | 30,000.00 | 1022 |
| 02/04/93 | 157,430.51 | 1024 |
| 02/05/93 | 50,000.00 | 1026 |
| 02/18/93 | 20,000.00 | 1030 |

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 03/03/93 | 60,000.00 | 1036 |
| 03/26/93 | 20,000.00 | 1042 |
| 05/05/93 | 275,000.00 | Wire transfer |
| 07/06/93 | 26,500.00 | 1073 |
| 07/06/93 | 17,000.00 | 1072 |
| 09/07/93 | 5,000.00 | 1083 |
| 09/15/93 | 4,000.00 | 1089 |
| 10/19/93 | 12,500.00 | 1099 |
| 10/19/93 | 10,500.00 | 1100 |
| 11/16/93 | 14,000.00 | 1104 |

     g.     Blutrich, Smythe, Pfeffer and Nulenda caused $80,000.00 to be disbursed to National Finders Corp., a company controlled by Pfeffer and Contreras, on July 29, 1993, by means of a SCB internal transfer to account no. 01-3016921-01 in the name of National Finders Corp.

     h.     Blutrich, Smythe, Pfeffer and Nulenda caused $100,000.00 to be disbursed to Banstar, Inc., a company controlled by Smythe and Pfeffer, on January 22, 1993, by means of check number 1021.

     i.     Blutrich, Smythe, Pfeffer and Nulenda caused $74,283.00 to be disbursed to Nulenda on November 18, 1993, by means of check number 1109.

     j.     Blutrich, Smythe, Pfeffer and Nulenda caused $225,500.00 to be disbursed to Pfeffer on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 01/08/93 | 100,000.00 | Wire transfer |
| 09/30/93 | 20,000.00 | 1094 |
| 11/01/93 | 5,500.00 | 1102 |
| 12/04/92 | 100,000.00 | 1010 |

        k.     Blutrich, Smythe, Pfeffer and Nulenda caused $5,863.99 to be disbursed to "Platzner Group, Ltd.," an entity controlled by Platzner, on August 12, 1993 by means of check number 1079.

        l.     Blutrich, Smythe, Pfeffer and Nulenda caused $250,000.00 to be disbursed to Herman on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 09/16/92 | 11,000.00 | Wire Transfer |
| 09/17/92 | 35,000.00 | 6 |
| 10/28/92 | 154,000.00 | 1005 |
| 01/13/93 | 50,000.00 | 1017 |

      m.     Blutrich, Smythe, Pfeffer and Nulenda caused $1,500.00 to be disbursed to Pfeffer's mother, Shirley Pfeffer, for the benefit of Pfeffer, on April 21, 1993 by means of check number 1050.

      n.     Blutrich, Smythe, Pfeffer and Nulenda caused $50,000.00 to be disbursed to Windsor Worldwide Plumbing, an entity which Weiss controlled, on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 04/08/93 | 20,000.00 | 1044 |
| 04/23/93 | 15,000.00 | 1051 |
| 04/23/93 | 15,000.00 | 1052 |

      o.     Blutrich, Smythe, Pfeffer and Nulenda caused $356,000.00 to be disbursed to Scores Entertainment, a company controlled by Bilzinsky, Kaltsas, Yackow and Pfeffer, on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 03/16/93 | 40,000.00 | 1039 |

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 04/08/93 | 100,000.00 | 1043 |
| 05/11/93 | 50,000.00 | 1056 |
| 05/17/93 | 50,000.00 | 1059 |
| 06/07/93 | 100,000.00 | Wire Transfer |
| 07/08/93 | 10,000.00 | 1074 |
| 11/01/93 | 6,000.00 | 1101 |

280.    The funds disbursed as described in the immediately preceding paragraph rightfully belonged to National Heritage, and National Heritage was harmed by the wrongful diversion of those funds to the parties described above. Blutrich, Pfeffer, Schneiderman, Weiss, Smythe, Bilzinsky, Kaltsas, Yackow, Contreras, Actual Funding, Anshlu, Ha-Lo, National Mortgage, National Finders, Banstar, Nulenda, Platzner, Platzner International, Herman, Windsor Worldwide and Scores, accepted these payments with the knowledge that the monies they received belonged to National Heritage and with the intent to further the ongoing scheme to loot National Heritage.

281.    In addition, Blutrich, Pfeffer and Decker purported to return to National Heritage its $800,000.00 "investment" in the Scientific Waste joint venture by using proceeds of the Nulenda line of credit. On September 17, 1992, Pfeffer drew an $880,000.00 check in favor of Blutrich on an account in the name of Nulenda, Inc. with a memo indicating it was for Scientific Waste. On September 18, 1992, Blutrich opened account no. 01601713 at Citibank in the name of "Michael Blutrich, as attorney for Nulenda, Inc." (the "Blutrich Nulenda Account") and deposited the $880,000.00 therein.

282.   On September 21, 1992, Decker sent a letter via facsimile to Aloisi, purportedly advising National Heritage that Scientific Waste was terminating its joint venture with National Heritage, and that it would return National Heritage's $800,000.00 investment.

283.   On or about September 24, 1992, Blutrich caused $880,000.50 to be wire transferred from the Blutrich Nulenda Account to account no. 600-163-61 in the name of Scientific Waste at Enterprise Bank, Atlanta, Georgia.

284.   Thereafter, Scientific Waste used the funds drawn from the Nulenda line of credit to pay $800,000.00 to National Heritage. Decker, Blutrich and Pfeffer thus used funds secured by National Heritage's assets to repay National Heritage for its $800,000.00 investment in the Scientific Waste joint venture.

1.   **Interstate Wire Communications in Furtherance of the Class D Preferred Stock Scheme.**

285.   In furtherance of the Class D Preferred Stock Scheme,

Michael Blutrich
Patrick Smythe
Lyle Pfeffer
Charles Contreras
Future Diversified Projects, Inc.
Nulenda, Inc.
Deborah Aronow
LPDA Acquisition Corp.
National Mortgage Corp.
Gerald Decker
Scientific Waste Systems, Inc.
Actual Funding Co., Inc.
Anshlu, Inc.
Ha-Lo Investment Associates, Inc.
National Finders Corp.
Banstar, Inc.
Harrin Platzner

Platzner International Group, Ltd.
Scores Entertainment, Inc.
Irving Bilzinsky
Dean Kaltsas
Mark Yackow
Jan Schneiderman
Sholam Weiss

defendants herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|---|---|---|---|
| 09/09/92 | $20,000,000.00 wire transfer | Citibank, New York, NY | Raymond James |
| 09/16/92 | $11,000.00 wire transfer | Account for the benefit of Herman | SCB, New York, NY |
| 09/21/92 | Letter faxed from Decker to Aloisi | Lambert Aloisi, National Heritage, Orlando, FL | Gerald Decker, Atlanta, GA |
| 09/24/92 | $880,000.50 wire transfer | Scientific Waste, Enterprise Bank, Atlanta, GA | Blutrich, Citibank, New York, NY |
| 01/08/93 | $100,000.00 wire transfer | Pfeffer, SCB, New York, NY | Nulenda, SCB, New York, NY |
| 05/05/93 | $275,000.00 wire transfer | National Mortgage, SCB, New York, NY | Nulenda, SCB, New York, NY |
| 06/07/93 | $100,000.00 wire transfer | Scores Entertainment, Inc. | Nulenda, SCB, New York, NY |

I.      **The LPDA and Nulenda Credit Line of Credit Pay-Off Scheme**.

286.    Blutrich, Pfeffer, Schneiderman, Weiss, Oberlander and Actual Funding agreed to implement a scheme to loot National Heritage by misappropriating the proceeds from the sale of National Heritage's securities which were pledged as collateral for the LPDA and Nulenda credit lines.

-96-

287.    On June 15, 1993, SCB extended the maturity dates on both the LPDA and Nulenda loans from May 20, 1993 to June 23, 1993 at the request of Blutrich and Pfeffer.

288.    On June 23, 1993, the extended maturity date of the loans, Pfeffer, with the knowledge and agreement of Blutrich, and SCB entered into a letter agreement purportedly allowing SCB to liquidate the securities in the FIB Accounts until sufficient proceeds were generated to pay the LPDA and Nulenda credit lines, and to apply those liquidation proceeds against the outstanding balances of the LPDA and Nulenda credit lines, withhold $250,000.00 against future expenses, and remit any remainder to Blutrich.

289.    On or shortly after June 23, 1993, SCB requested FIB to begin liquidating the FIB Account, and FIB did so.

290.    On July 7, 1993, SCB sent Blutrich an accounting of the sales of securities in the FIB account.  According to the accounting, SCB realized proceeds from the sale of certain of National Heritage's securities of $35,894,832.00, leaving securities in the account worth approximately $10,326,000.00.

291.    On August 12, 1993, Blutrich caused SCB to make two wire transfers of monies from the FIB account to account number 251-04-545 in the name of "Jan R. Schneiderman Escrow for National Heritage Life Insurance and South Star Management Co. Inc." at Morgan Guaranty, New York City (the "Schneiderman Escrow"), in the amounts of $10,661,960.83 and $1,910,223.19, respectively, as further alleged below.

292.    On August 16, 1993, Schneiderman, with the knowledge and agreement of Blutrich, Pfeffer and Weiss, transferred $1,000,000.00 from the Schneiderman Escrow to Morgan Guaranty account no. 001-58-206 in the name of "Jan Schneiderman Escrow #1" (the "Schneiderman #1 Account").

293.    On August 16, 1993, Schneiderman, with the knowledge and agreement of Blutrich, Pfeffer, Weiss, Oberlander and Actual Funding, wire transferred $1,000,000.00 to account number 050022687 at Chase Manhattan Bank in the name of Actual Funding (the "Actual Funding Chase Account").  On August 18, 1993, Schneiderman, Blutrich, Pfeffer, Weiss and Actual Funding caused a certified check in the amount of $1,000,000.00 to be drawn from the Actual Funding Chase Account made payable to Oberlander.

294.    On August 19, 1993, Oberlander transferred $1,000,000.00 to an offshore account held in the name of Quill Management at the Commercial House in the Channel Islands (the "Quill Management Account").

295.    Shortly thereafter, Oberlander caused the $1,000,000.00, plus an additional $100,000.00, to be returned to the United States and transferred to Blutrich. On August 31, 1993, Oberlander wire transferred $600,000.00 from the Quill Management Account to account no. 085-4778-5 of European American Bank in the name of "Michael D. Blutrich – Special Escrow" (the "Blutrich EAB Special Escrow Account").  Oberlander also wire transferred $300,000.00 on September 28, 1993 and $200,000.00 on October 21, 1993 from the Quill Management Account to the Blutrich EAB Special Escrow Account.  In addition, Oberlander paid $40,000.00 to Blutrich on

July 30, 1993 by means of check no. 1279 drawn on account no. 8281831-06 in

Oberlander's name at Bank Leumi in New York City.  Oberlander further paid

$66,666.00 to Actual Funding, a company owned and controlled by Blutrich, Pfeffer,

Schneiderman and Weiss, by means of checks issued from Oberlander's Bank Leumi

account, on the dates and in the amounts respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NUMBER |
|---|---|---|
| 1/17/94 | 6,666.00 | 1208 |
| 2/17/94 | 6,666.00 | 1224 |
| 3/15/94 | 6,666.00 | 1243 |
| 4/15/94 | 6,666.00 | 1248 |
| 5/15/94 | 6,666.00 | 1262 |
| 6/17/94 | 6,666.00 | 1278 |
| 8/16/94 | 6,666.00 | 1310 |
| 3/26/95 | 6,666.00 | 1380 |
| 4/26/95 | 6,666.00 | 1382 |
| 6/1/95 | 6,666.00 | 1419 |

Each of these checks to Actual Funding was deposited into the Blutrich EAB Special

Escrow Account.

296.    Thus, Blutrich, Smythe, Aloisi, Pfeffer, LPDA, D. Aronow, J.

Aronow, Contreras, Nulenda, Future Diversified, National Mortgage, Cromwell Building,

Perfe, New Contenders, Actual Funding, Anshlu, Ha-Lo, National Finders, Banstar,

Platzner, Platzner International, Scores, Bilzinsky, Kaltsas, Yackow, Schneiderman,

Oberlander and Weiss misappropriated at least $45 million of National Heritage's assets

by pledging National Heritage's assets to secure loans to LPDA and Nulenda, using the

loan proceeds for their own purposes, allowing SCB to foreclose on the assets they caused National Heritage to pledge as security for these loans, and then diverting the remaining funds in the FIB account to Schneiderman and Oberlander.

### 1. Interstate Wire Communications in Furtherance of the LPDA and Nulenda Credit Line Pay-Off Scheme.

297. In furtherance of the LPDA and Nulenda Credit Line Pay-Off Scheme,

Michael Blutrich
Lyle Pfeffer
Jan Schneiderman
Sholam Weiss
Michael Oberlander
Actual Funding Co., Inc.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|-----------------------------------|-----|------|
| 08/12/93 | $10,661,960.83 wire transfer | Morgan Guaranty, New York, NY | FIB, New York, NY |
| 8/12/93 | $1,910,223.19 wire transfer | Morgan Guaranty, New York, NY | FIB, New York, NY |
| 8/31/93 | $600,000.00 wire transfer | EAB, New York, NY | Quinn Management |
| 9/28/93 | $300,000.00 wire transfer | EAB, New York, NY | Quill Management |
| 10/21/93 | $200,000.00 wire transfer | EAB, New York, NY | Quill Management |

**J.**     **The Blutrich EAB Special Escrow Payout Scheme**

298.    Blutrich, Pfeffer, Contreras, Smythe, D. Aronow, J. Aronow, Schneiderman, Yackow, Bilzinsky, Kaltsas, Oberlander, TTT Capital, New Contenders, Future Diversified, National Mortgage, Scores, L. Pfeffer Corp., South Star  and Perfe agreed to implement a scheme to distribute money stolen from National Heritage to various defendants, and to conceal and disguise the looting of National Heritage, by depositing money misappropriated from National Heritage into the Blutrich EAB Special Escrow Account and, from there, distributing it to various defendants.

299.    The Blutrich EAB Special Escrow Account was used as a repository for money misappropriated, directly or indirectly, from National Heritage.  For example, the Blutrich EAB Special Escrow Account was opened on February 4, 1993 with a check from National Heritage in the amount of $150,000.00, which Smythe caused to be issued to Franklin Realty, a corporation involved in other schemes to defraud National Heritage not alleged herein.  In addition, as alleged above, Oberlander wire transferred over $1,000,000.00 misappropriated from National Heritage to the Blutrich EAB Special Escrow Account from August 31, 1993 to October 21, 1993.

300.    From February 11, 1993 to July 31, 1996, Blutrich disbursed at least $1,204,177.89 of the monies misappropriated from National Heritage and deposited into the Blutrich EAB Special Escrow Account to himself and the law firm in which he was a partner.  In addition, during that same time period, Blutrich disbursed certain of the monies misappropriated from National Heritage and deposited into the Blutrich EAB Special Escrow Account as follows:

a.   Blutrich disbursed $641,666.00 to TTT Capital Corp., a company controlled by Yackow, Blutrich, Pfeffer, Schneiderman and Weiss, on the dates, in the amounts and by the means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| 7/4/94 | $ 50,000.00 | 1207 |
| 9/16/94 | $ 60,000.00 | 1239 |
| 9/22/94 | 400,000.00 | 1249 |
| 3/17/95 | 26,666.00 | 1388 |
| 6/29/95 | 105,000.00 | 1465 |

b.   Blutrich disbursed $809,952.42 to Schneiderman, on the dates, in the amounts and by the means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| 9/2/93 | $600,000.00 | 1040 |
| 9/22/93 | 6,797.42 | 1048 |
| Illegible | 56,555.00 | 1286 |
| 12/6/94 | 45,000.00 | 1305 |
| 12/30/94 | 15,000.00 | 1322 |
| 1/12/95 | 50,000.00 | 1332 |
| 1/27/95 | 1,000.00 | 1344 |
| 2/3/95 | 5,000.00 | 1349 |
| 6/29/95 | 5,000.00 | 1322 |
| 6/8/95 | 10,000.00 | 1443 |
| 7/18/95 | 7,000.00 | 1476 |
| 11/30/95 | 2,000.00 | 1359 |
| 5/20/96 | 3,600.00 | 1435 |

c.   Blutrich disbursed $370,500.00 to Weiss, on the dates, in the amounts and by the means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| 10/25/94 | $10,000.00 | 1266 |
| 12/30/94 | 7,500.00 | 1319 |
| 2/9/95 | 15,000.00 | 1355 |
| 2/15/95 | 4,000.00 | 1356 |
| 2/22/95 | 25,000.00 | 1368 |
| 2/24/95 | 5,000.00 | 1366 |
| 3/6/95 | 25,000.00 | 1376 |
| 3/10/95 | 25,000.00 | 1382 |
| 3/21/95 | 25,000.00 | 1389 |
| 3/22/95 | 30,000.00 | 1390 |
| 3/25/95 | 20,000.00 | 1392 |
| 5/13/95 | 50,000.00 | 1425 |
| 6/2/95 | 34,000.00 | 1437 |
| 7/11/95 | 15,000.00 | 1472 |
| 8/9/95 | 10,000.00 | 1485 |
| 9/9/95 | 10,000.00 | 1305 |
| 9/12/95 | 10,000.00 | 1307 |
| 9/28/95 | 10,000.00 | 1324 |
| 10/19/95 | 30,000.00 | 1337 |
| 11/28/95 | 10,000.00 | 1358 |

d.     Blutrich disbursed $189,704.00 to New Contenders, a company controlled by Blutrich and Yackow, on the dates, in the amounts and by the means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| Illegible | $4,308.00 | 1128 |
| 1/6/94 | 1,500.00 | 1100 |
| 1/13/94 | 2,296.00 | 1112 |
| 2/24/94 | 10,000.00 | 1148 |

| | | |
|---|---|---|
| 4/25/94 | 10,000.00 | 1179 |
| 8/12/94 | 3,000.00 | 1220 |
| 5/6/94 | 5,000.00 | 1185 |
| 8/12/94 | 3,000.00 | 1220 |
| 9/26/94 | 3,500.00 | 1245 |
| 10/3/94 | 6,000.00 | 1254 |
| 10/26/94 | 20,000.00 | 1267 |
| 11/15/94 | 5,000.00 | 1283 |
| 12/22/94 | 5,000.00 | 1316 |
| 8/9/95 | 60,000.00 | 1486 |
| 9/5/95 | 7,500.00 | 1498 |
| 10/12/95 | 2,000.00 | 1328 |
| 10/20/95 | 2,000.00 | 1338 |
| 10/24/95 | 7,000.00 | 1340 |
| 11/2/95 | 5,000.00 | 1347 |
| 12/4/95 | 3,100.00 | 1360 |
| 2/28/96 | 9,000.00 | 1407 |
| 5/7/96 | 10,000.00 | 1429 |
| 5/20/96 | 8,500.00 | 1438 |

   e.   Blutrich disbursed $166,000.00 to Scores, a company controlled by Bilzinsky, Kaltsas, Yackow and Pfeffer, on the dates, in the amounts and by the means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| 9/23/93 | $20,000.00 | 1052 |
| 9/28/93 | 15,000.00 | 1053 |
| 2/11/94 | 10,000.00 | 1142 |
| 2/8/95 | 8,000.00 | 1353 |
| 3/1/95 | 10,000.00 | 1369 |
| 3/30/95 | 10,000.00 | 1395 |

| | | |
|---|---|---|
| 4/20/95 | 15,000.00 | 1407 |
| 4/25/95 | 15,000.00 | 1409 |
| 4/26/95 | 12,000.00 | 1410 |
| 5/2/95 | 11,000.00 | 1415 |
| 5/3/95 | 10,000.00 | 1416 |
| 7/25/95 | 7,000.00 | 1479 |
| 10/12/95 | 10,000.00 | 1334 |
| 6/6/96 | 13,000.00 | Certified Check |

       f.       Blutrich disbursed $107,000.00 to National Mortgage, a

company controlled by Pfeffer and Contreras, on the dates, in the amounts and by the

means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| Illegible | $ 5,000.00 | 1296 |
| 11/1/94 | 45,000.00 | 1274 |
| 6/27/95 | 12,000.00 | Certified Check |
| 1/18/96 | 45,000 | 1378 |

       g.       Blutrich disbursed $96,013.90 to Future Diversified, a

company controlled by Pfeffer, Contreras and Shafran, on the dates, in the amounts and

by the means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| 3/15/94 | $14,138.12 | 1170 |
| 4/28/94 | 55,000.00 | 1181 |
| 4/29/94 | 13,375.78 | 1184 |
| 5/3/95 | 13,500.00 | 1417 |

       h.       Blutrich disbursed $60,000.00 to Yackow, on the dates, in

the amounts and by the means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| 9/8/93 | $ 4,000.00 | 1042 |
| 8/22/95 | 20,000.00 | 1494 |
| 1/29/96 | 5,000.00 | 1392 |
| 2/14/96 | 5,000.00 | 1402 |
| 2/21/96 | 5,000.00 | 1396 |
| 2/28/96 | 10,000.00 | 1408 |
| 5/31/96 | 4,000.00 | 1441 |
| 6/11/96 | 7,000.00 | 1451 |

       i.     Blutrich disbursed $46,495.59 to L. Pfeffer Corp., a

company controlled by Pfeffer, on the dates, in the amounts and by the means

respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| Illegible | $7,500.00 | 1310 |
| 12/9/93 | 3,398.71 | 1089 |
| 2/7/94 | 3,398.70 | 1138 |
| 3/2/94 | 3,398.71 | 1153 |
| 8/3/94 | 3,398.71 | 1211 |
| 10/7/94 | 3,220.50 | 1257 |
| 10/31/94 | 3,220.50 | 1270 |
| 11/22/94 | 4,000.00 | 1293 |
| 12/6/94 | 3,220.50 | 1303 |
| 12/30/94 | 3,220.50 | 1323 |
| 5/7/95 | 3,220.63 | 1439 |
| 5/11/95 | 3,220.63 | 1423 |
| 8/17/95 | 2,077.50 | 1488 |

       j.     Blutrich disbursed $50,000.00 to South Star, on September

21, 1994, by means of check number 1241.

k.    Blutrich disbursed $12,500.00 to Bilzinsky, on the dates, in the amounts and by the means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| 2/19/93 | 5,000.00 | 99 |
| 8/13/93 | 2,500.00 | 1029 |
| 11/22/94 | 5,000.00 | 1290 |

l.    Blutrich disbursed $38,128.00 to Perfe, a company controlled by D. Aronow and J. Aronow, on the dates, in the amounts and by the means respectively indicated below:

| Date of Disbursement | Amount of Disbursement | Check No. |
|---|---|---|
| 12/7/93 | $2,162.00 | 1086 |
| 1/11/94 | 2,128.00 | 1109 |
| 2/8/94 | 2,152.50 | 1140 |
| 3/07/94 | 2,177.50 | 1162 |
| 4/5/94 | 2,142.50 | 1173 |
| 6/11/94 | 2,132.50 | 1194 |
| 7/18/94 | 2,132.50 | 1206 |
| 8/23/94 | 2,122.50 | 1228 |
| 9/22/94 | 2,117.00 | 1243 |
| 10/26/94 | 2,117.00 | 1268 |
| 11/25/94 | 2,107.00 | 1291 |
| 4/11/95 | 2,087.50 | 1400 |
| 4/11/95 | 2,082.50 | 1401 |
| 10/12/95 | 2,067.50 | 1330 |
| 12/22/95 | 2,057.00 | 1366 |
| 1/30/96 | 250.00 | 1393 |
| 2/21/96 | 2,050.00 | 1402 |
| 4/18/96 | 2,017.50 | 1420 |

| 5/2/96 | 2,025.00 | 1428 |
|---|---|---|

m.     Blutrich, Pfeffer, Contreras, Smythe, D. Aronow, J.

Aronow, Schneiderman, Yackow, Bilzinsky, Kaltsas, TTT Capital, New Contenders,

Future Diversified, National Mortgage, Scores, L. Pfeffer Corp., South Star and Perfe

accepted these payments with the knowledge that the monies they received belonged to

National Heritage and with the intent to further the on-going scheme to loot National

Heritage.

        **1.**        **Interstate Wire Communications and Furtherance of
the Blutrich EAB Special Escrow Payout Scheme.**

    301.    In furtherance of the Blutrich EAB Special Escrow Payout Scheme,

> Michael Blutrich
> Patrick Smythe
> Lyle Pfeffer
> Charles Contreras
> Deborah Aronow
> Joseph Aronow
> Jan Schneiderman
> Mark Yackow
> Irving Bilzinsky
> Dean Kaltsas
> Michael Oberlander
> TTT Capital Corporation
> New Contenders, Inc.
> Future Diversified Projects, Inc.
> National Mortgage Corporation
> Scores Entertainment, Inc.
> L. Pfeffer Corporation
> Perfe Corporation
> South Star Management Co.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | From | To |
|------|-----------------------------------|------|-----|
| 8/31/93 | $600,000 wire transfer | Quill Management | EAB, New York, NY |
| 9/28/93 | $300,000 wire transfer | Quill Management | EAB, New York, NY |
| 10/21/93 | $200,000 wire transfer | Quill Management | EAB, New York, NY |

### K.   The National Mortgage Payout Scheme.

302.   Blutrich, Pfeffer, Contreras, Smythe, D. Aronow, J. Aronow, Schneiderman, Hirsch, Bilzinsky, Kaltsas, National Mortgage, Perfe, Scores, Nulenda, New Contenders, National Finders, Anshlu, Ha-Lo, Maxsam and L. Pfeffer Corp. agreed to implement a scheme to distribute money stolen from National Heritage to various defendants and to conceal and disguise the looting of National Heritage by distributing money misappropriated from National Heritage to National Mortgage, and, in turn, from National Mortgage to various defendants.

303.   As alleged above, on May 21, 1992, $558,015.03 was wire transferred from the Blutrich Citibank Account #2 to National Mortgage.  As further alleged above, Blutrich, Smythe, Pfeffer and Nulenda caused Nulenda to disburse $1,138,921.66 to National Mortgage between September 17, 1992 until November 16, 1993.  In addition, on September 21, 1993, Schneiderman caused $150,000 misappropriated from National Heritage to be deposited into the National Mortgage

Account and paid an additional $100,000 of National Heritage's money to National

Mortgage on December 15, 1993.

304.    Pfeffer, Contreras and National Mortgage subsequently disbursed

certain of the monies misappropriated from National Heritage as follows:

a.    Pfeffer, Contreras and National Mortgage caused

$375,000.00 to be disbursed to Scores Entertainment, a company controlled by Bilzinsky,

Kaltsas, Yackow and Pfeffer, on the dates, in the amounts and by the means respectively

indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 11/04/92 | 20,000.00 | 3931 |
| 11/30/92 | 20,000.00 | 3981 |
| 12/08/92 | 50,000.00 | 3996 |
| 01/22/93 | 40,000.00 | 4080 |
| 01/29/93 | 30,000.00 | 4093 |
| 02/05/93 | 50,000.00 | 4102 |
| 03/19/93 | 5,000.00 | 4184 |
| 06/01/93 | 50,000.00 | Debit Transfer |
| 06/02/93 | 55,000.00 | Debit Transfer |
| 09/27/93 | 45,000.00 | 4407 |
| 10/15/93 | 10,000.00 | 4443 |

b.    Pfeffer, Contreras and National Mortgage caused

$260,000.00 to be disbursed to Nulenda, a company controlled by Blutrich, Pfeffer and

Smythe, on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 11/05/92 | 100,000.00 | 3935 |
| 10/15/93 | 160,000.00 | 4445 |

    c.      Pfeffer, Contreras and National Mortgage caused

$159,928.57 to be disbursed to Contreras on the dates, in the amounts and by the means

respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 01/10/92 | 1,200.00 | 3244 |
| 01/10/92 | 1,200.00 | 3250 |
| 01/24/92 | 1,200.00 | 3270 |
| 02/07/92 | 1,200.00 | 3286 |
| 02/21/92 | 1,200.00 | 3315 |
| 03/03/92 | 1,500.00 | 3348 |
| 03/06/92 | 1,200.00 | 3361 |
| 03/12/92 | 1,000.00 | 3369 |
| 03/20/92 | 1,200.00 | 3382 |
| 04/03/92 | 1,200.00 | 3400 |
| 04/09/92 | 1,000.00 | 3413 |
| 04/16/92 | 1,166.00 | 3424 |
| 04/16/92 | 3,500.00 | 3421 |
| 04/20/92 | 1,200.00 | 3434 |
| 04/22/92 | 1,000.00 | 3453 |
| 04/28/92 | 5,000.00 | 3463 |
| 05/01/92 | 1,200.00 | 3480 |
| 05/15/92 | 1,200.00 | 3511 |
| 05/21/92 | 20,000.00 | 3533 |
| 05/29/92 | 1,500.00 | 3563 |

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 06/12/92 | 1,500.00 | 3599 |
| 06/24/92 | 2,000.00 | 3629 |
| 07/10/92 | 2,000.00 | 3677 |
| 07/24/92 | 2,000.00 | 3706 |
| 08/07/92 | 2,000.00 | 3741 |
| 08/21/92 | 2,000.00 | 3782 |
| 09/04/92 | 2,000.00 | 3805 |
| 09/17/92 | 50,000.00 | 3823 |
| 09/18/92 | 2,000.00 | 3839 |
| 10/02/92 | 1,000.00 | 3861 |
| 10/06/92 | 2,000.00 | 3866 |
| 10/16/92 | 2,000.00 | 3893 |
| 10/30/92 | 2,000.00 | 3916 |
| 11/13/92 | 2,000.00 | 3950 |
| 11/30/92 | 2,000.00 | 3980 |
| 12/11/92 | 2,000.00 | 4001 |
| 01/11/93 | 2,000.00 | 4041 |
| 01/22/93 | 2,000.00 | 4079 |
| 02/05/93 | 2,000.00 | 4101 |
| 02/19/93 | 2,000.00 | 4138 |
| 03/19/93 | 2,000.00 | 4185 |
| 04/02/93 | 2,000.00 | 4199 |
| 04/16/93 | 2,000.00 | 4210 |
| 04/30/93 | 2,000.00 | 4250 |
| 05/03/93 | 1,400.00 | 4258 |
| 05/28/93 | 1,500.00 | 4279 |
| 06/11/93 | 1,500.00 | 4304 |
| 07/09/93 | 1,500.00 | 4328 |
| 09/03/93 | 1,500.00 | 4372 |

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 09/17/93 | 1,500.00 | 4390 |
| 09/21/93 | 4,662.57 | 4398 |
| 10/01/93 | 1,500.00 | 4411 |
| 10/28/93 | 1,500.00 | 4463 |

d.      Pfeffer, Contreras and National Mortgage caused

$158,400.00 to be disbursed to New Contenders on the dates, in the amounts and by the

means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 05/20/92 | 153,400.00 | 3528 |
| 02/17/93 | 5,000.00 | 4123 |

e.      Pfeffer, Contreras and National Mortgage caused

$155,099.00 to be disbursed to Pfeffer on the dates, in the amounts and by the means

respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 02/25/92 | 2,500.00 | 3327 |
| 02/26/92 | 80,000.00 | Debit Memo |
| 04/17/92 | 1,500.00 | 3425 |
| 05/06/92 | 5,500.00 | Debit Memo |
| 05/12/92 | 5,000.00 | 3501 |
| 05/27/92 | 11,000.00 | 3552 |
| 05/27/92 | 4,599.00 | Debit Memo |
| 06/01/92 | 5,000.00 | 3574 |
| 01/13/93 | 40,000.00 | 4048 |

f.    Pfeffer, Contreras and National Mortgage caused $111,000.00 to be disbursed to Schneiderman on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 09/10/92 | 1,000.00 | 3811 |
| 09/30/93 | 100,000.00 | 4410 |
| 10/21/93 | 10,000.00 | 4455 |

Schneiderman, in turn, disbursed $150,000.00, consisting of monies directed from National Heritage, to L. Pfeffer Corp., a company controlled by Pfeffer.

g.    Pfeffer, Contreras and National Mortgage caused $153,400.00 to be disbursed to Perfe Corporation, an entity controlled by D. Aronow and J. Aronow, on May 20, 1992 by means of check no. 3527.

h.    Pfeffer, Contreras and National Mortgage caused $43,123.50 to be disbursed to D. Aronow on December 10, 1992 by means of check no. 3998.

i.    Pfeffer, Contreras and National Mortgage caused $33,000.00 to be disbursed to Bilzinsky on September 17, 1992 by means of check no. 3825.

j.    Pfeffer, Contreras and National Mortgage caused $26,000.00 to be disbursed to Hirsch's wife, Rene Hirsch, on May 20, 1992 and September 7, 1993 by means of check nos. 3531 and 4375, respectively.

k.      Pfeffer, Contreras and National Mortgage caused

$17,000.00 to be disbursed to Maxsam, a company controlled by Hirsch, on the dates, in

the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 11/10/92 | 6,000.00 | 3942 |
| 11/24/92 | 6,000.00 | 3971 |
| 09/13/93 | 1,000.00 | 4385 |
| 09/20/93 | 1,000.00 | 4395 |
| 10/04/93 | 1,000.00 | 4415 |
| 10/11/93 | 1,000.00 | 4438 |
| 10/18/93 | 1,000.00 | 4453 |

l.      Pfeffer, Contreras and National Mortgage caused

$17,500.00 to be disbursed to Hirsch on the dates, in the amounts and by the means

respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 04/27/92 | 4,000.00 | 3461 |
| 05/20/92 | 5,000.00 | 3530 |
| 05/03/93 | 1,500.00 | 4257 |
| 05/25/93 | 1,000.00 | 4273 |
| 05/28/93 | 1,000.00 | 4285 |
| 06/07/93 | 1,000.00 | 4294 |
| 08/18/93 | 2,000.00 | 4348 |
| 08/23/93 | 1,000.00 | 4351 |
| 09/27/93 | 1,000.00 | 4408 |

m.     Pfeffer, Contreras and National Mortgage caused $15,000.00 to be disbursed to Anshlu, a company controlled by Blutrich, on February 18, 1993 by means of check no. 4124.

n.     Pfeffer, Contreras and National Mortgage caused $13,500.00 to be disbursed to Ha-Lo, a company controlled by Pfeffer, on April 16 and June 15, 1992, by means of check nos. 3422 and 3605, respectively.

o.     Pfeffer, Contreras and National Mortgage caused $10,000.00 to be disbursed to Pfeffer's mother, Shirley Pfeffer, on the dates, in the amounts and by the means respectively indicated below:

| DATE OF DISBURSEMENT | AMOUNT OF DISBURSEMENT | CHECK NO. |
|---|---|---|
| 05/27/92 | 2,000.00 | 3560 |
| 06/09/92 | 2,000.00 | 3588 |
| 06/29/92 | 2,000.00 | 3653 |
| 06/03/93 | 3,000.00 | 4291 |

p.     Blutrich, Pfeffer, Contreras, Smythe, D. Aronow, J. Aronow, Schneiderman, Hirsch, Bilzinsky, Kaltsas, National Mortgage, Perfe, Scores, Nulenda, New Contenders, National Finders, Anshlu, Ha-Lo, Maxsam and L. Pfeffer Corp. accepted these payments with the knowledge that the monies they received belonged to National Heritage and with the intent to further the ongoing scheme to loot National Heritage.

**L.**     **The CMO to PAC Swap Scheme**.

305.     Prior to June 1993, National Heritage had purchased various

mortgage-backed bonds known as collateralized mortgage obligations or "CMOs." As of

June 1993, the market value of National Heritage's CMOs had declined significantly.

This decline posed a substantial risk of regulatory action because if the book value of the

CMOs were reduced to their market value or "marked-to-market," National Heritage

would not have had sufficient capital surplus with which to conduct business.

306.     In order to prevent regulatory action against National Heritage and

to prolong National Heritage's life, Blutrich, Smythe, Aloisi, Pfeffer and Ha-Lo agreed to

implement a scheme to create the appearance that the CMOs had been exchanged for

securities known as planned amortization class bonds ("PACs") at values approximating

the book values of National Heritage's CMOs, without incurring any loss on the

transaction. Specifically, Blutrich, Smythe, Aloisi, Pfeffer and Ha-Lo agreed to create

the appearance of a "swap" of CMOs with market values of approximately $104 million

for PACs with market values of approximately $108 million but with "held-to-maturity"

values of approximately $143 million. This scheme was designed to disguise National

Heritage's deteriorating financial condition generally, and to prevent the recognition of a

loss on the sale of National Heritage's CMOs specifically, by recording the PACs on

National Heritage's books and records at "held-to-maturity" values which were

substantially higher than their market values.

307.     On June 1, 1993, Smythe, Aloisi and Pfeffer caused National

Heritage's Investment Oversight Committee (the "Investment Committee") to approve a

"restructuring" of National Heritage's CMOs by swapping substantially all of the CMOs

for PACs. Smythe, Aloisi and Pfeffer misrepresented to the National Heritage CFO at

the meeting of the Investment Committee that the transaction would be structured as a

swap and thereby prevent the recognition of a loss on the sale of National Heritage's

CMOs. Smythe, Aloisi and Pfeffer made this misrepresentation for the purpose of

inducing National Heritage, by and through the National Heritage CFO, to rely thereon.

National Heritage, by and through the National Heritage CFO, relied on the

misrepresentation to its detriment by believing that the transaction was in fact a swap,

and, in turn, that National Heritage did not have to recognize any loss in the disposition

of its CMOs through the swap. Had National Heritage, by and through the National

Heritage CFO, known that its CMOs were in fact sold at a substantial loss, rather than

"swapped," it would have informed National Heritage's regulators, and it would not have

booked the swap on its records as it did.

308.    On June 24, 1993, Smythe, Aloisi and Pfeffer caused Walker to

execute a Securities Exchange Agreement with Palm Beach Equities Corp. ("PBE"),

purportedly on behalf of National Heritage but in fact pursuant to the CMO to PAC Swap

Scheme. Pursuant to the Securities Exchange Agreement, National Heritage was to swap

its CMOs with book values totaling approximately $144 million for PACs with "an equal

or greater value than the CMO's." Pursuant to the Securities Exchange Agreement, the

swap was to be completed over a period of 30 to 90 days, during which time National

Heritage and PBE were to transfer into escrow the assets to be exchanged. Blutrich

purported to act as National Heritage's attorney in connection with the Securities
Exchange Agreement.

309. The previous day, June 23, 1993, PBE entered into a written
"Consulting Agreement" with IIC Resources Ltd. ("IIC") and Matthew Silpe ("Silpe"),
pursuant to which IIC and Silpe were to "consult" with respect to the purchase of
securities as set forth in the Securities Exchange Agreement. In return, PBE agreed to
pay IIC and Silpe $750,000.00.

310. On June 25, 1993, Smythe, Aloisi and Pfeffer caused Walker to
execute a "Procedure Memorandum" with PBE, IIC and Silpe, purportedly on behalf of
National Heritage but in fact pursuant to the CMO to PAC Swap Scheme. This document
purported to authorize the "liquidation and/or exchange" of the National Heritage CMO
portfolio with the "advice and consent of IIC and Silpe." The Procedure Memorandum
also provided that "sales shall be conducted on an open auction conducted under the
auspices of Silpe and IIC."

311. On June 29, 1993, Smythe and Aloisi, with the knowledge and
agreement of Blutrich and Pfeffer, caused the National Heritage board to authorize
Blutrich to act as escrowee in connection with the CMO to PAC swap, to open a
brokerage account in the name of "Michael D. Blutrich escrow (sic) as agent for National
Heritage Life Insurance Company," and ". . . to direct the withdrawal and disposition of
any or all of the assets which said escrow account may, from time to time, contain and
that said Michael D. Blutrich may act alone and without counter-signature or other
authority. . . ."

312.    By letter dated July 2, 1993 from Silpe to Smythe, Silpe informed Smythe that IIC was not a registered broker-dealer and that all regulatory filings for IIC needed to be made "expeditiously."  Silpe also requested $75,000.00 from Smythe for "sufficient capitalization of the broker-dealer, and to cover fees, consulting charges and administrative expenses. . . ."

313.    On July 7, 1993, Smythe, Aloisi and Pfeffer caused Walker to execute a document entitled "Acknowledgement of Liquidation," purportedly on behalf of National Heritage but in fact pursuant to the CMO to PAC Swap Scheme.  This document purported to approve the liquidation of CMOs with an "investment value" as of May 31, 1993 of over $136 million.

314.    To facilitate the CMO to PAC Swap Scheme, Ha-Lo Investment Associates, Inc., by and through Pfeffer, knowingly misrepresented to the Delaware Department of Insurance, by letter dated July 19, 1993, that:  (a) "the exchange/swap program is in the best interests of the company and will result in a substantial improvement in the financial status of the investment portfolio;" and (b) "[i]n moving from CMOs to PAC bonds, National Heritage has increased the quality and value of its portfolio. . . ."

315.    By letter dated July 28, 1993, sent to Blutrich via facsimile, Smythe authorized Blutrich to transfer National Heritage's CMOs to an account at the brokerage firm of Gruntal & Co. ("Gruntal").

316.    By letter dated July 30, 1993, Smythe authorized Blutrich "to take any and all action necessary to authorize and direct Gruntal and Company to effect the purchase of securities recommended by IIC Resources, Inc."

317.    By letter dated August 2, 1993, sent to Blutrich via facsimile, Smythe authorized Blutrich to enter into a "Master Dealer Agreement with Gruntal and Company pending settlement of the securities which have been exchanged."

318.    By letter dated September 10, 1993, Ha-Lo, by and through Pfeffer, forwarded to Glenn Kenton, one of National Heritage's outside attorneys, what Pfeffer falsely represented to be "fully detailed summaries of the pre-swap and post-swap portfolios of National Heritage. . . ."  The summaries were at least materially omissive in that they did not disclose the market values of either the "pre-swap" or "post-swap" portfolios, and they did not disclose the sales prices of the "pre-swap" portfolio or the purchase prices of the "post-swap" portfolio.  Pfeffer sent this letter via facsimile from the office of Herman.  Ha-Lo and Pfeffer made this misrepresentation to National Heritage, by and through Kenton, for the purpose of inducing National Heritage, by and through Kenton, to rely thereon.  National Heritage, by and through Kenton, relied thereon to its detriment.  Had National Heritage, by and through Kenton, known that the summaries were omissive, it would have taken appropriate action, including, for example, informing National Heritage's regulators and refraining from booking the CMO to PAC swap on its records as represented by Pfeffer.

319.    By letter dated September 16, 1993 from Ha-Lo, by and through Pfeffer, to Glenn Kenton, sent via facsimile from the office of Herman, Pfeffer

misrepresented that National Heritage had swapped its CMOs for PACs with PBE, notwithstanding PBE's lack of substantial capitalization. Ha-Lo and Pfeffer made this misrepresentation to National Heritage, by and through Kenton, for the purpose of inducing National Heritage, by and through Kenton, to rely thereon.

320.    On October 15, 1993, Blutrich forwarded, by facsimile, a letter to the National Heritage CFO at National Heritage which falsely represented that the CMO to PAC swap had been completed on September 2, 1993 through the exchange of CMOs with a book value of approximately $144,000,000.00 for PACs which, if held to maturity, would be worth approximately $143,000,000.00.

321.    In fact, however, no "swap" occurred.  Rather, Blutrich caused the CMOs to be sold in the securities markets through Gruntal.  The sales proceeds from the liquidation of the CMOs totaled $104,516,770.00, and the book value of the CMOs at the time they were sold was $144,356,467.00, resulting in a loss of approximately $40 million to National Heritage.

322.    Blutrich misrepresented the nature of the CMO to PAC swap to National Heritage, by and through the National Heritage CFO, for the purpose of inducing National Heritage to rely thereon.

323.    National Heritage, by and through Kenton and the National Heritage CFO, relied on Blutrich's, Pfeffer's and Ha-Lo's misrepresentations by booking the CMO to PAC swap on National Heritage's records as described by Blutrich, Pfeffer and Ha-Lo.  Had National Heritage, by and through Kenton and the National Heritage CFO, known that Blutrich's, Pfeffer's and Ha-Lo's misrepresentations were false, it would

have taken appropriate action, including, for example, informing National Heritage's regulators and refraining from booking the CMO to PAC swap as represented by Blutrich, Pfeffer and Ha-Lo.

324.   Blutrich used the $104 million in CMO sales proceeds to purchase the National Heritage PACs.  While the total purchase price of the PACs was $108,809,201.00, the total "held-to-maturity" value was approximately $143,660,268.00, and this is the value at which Blutrich, Smythe and Aloisi caused National Heritage to record the PACs on its books and records.

325.   Through the CMO to PAC Swap Scheme, Blutrich, Smythe, Aloisi, Pfeffer and Ha-Lo replaced CMOs, with a market value of approximately $104 million, on National Heritage's books and records, with PACs with a "held-to-maturity" value of $143,660,268.00, even though the market value of the PACs was only approximately $108 million at the time.  The CMO to PAC Swap Scheme thus concealed the declining value of National Heritage's assets and the conspiracy to loot National Heritage, deferred regulatory action, and enabled the conspirators to retain control over National Heritage and to continue to loot it.

1.   **Interstate Wire Communications in Furtherance of the CMO to PAC Swap Scheme.**

326.   In furtherance of the CMO to PAC Swap Scheme,

> Michael Blutrich
> Patrick Smythe
> Lyle Pfeffer
> Ha-Lo Investment Associates, Inc.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|---|---|---|---|
| 07/28/93 | Letter faxed from Smythe to Blutrich | Blutrich, New York, NY | Smythe, Orlando, FL |
| 08/02/93 | Letter faxed from Smythe to Blutrich | Blutrich, New York, NY | Smythe, Orlando, FL |
| 09/10/93 | Letter faxed from Pfeffer to Glenn Kenton | Glenn Kenton, Wilmington, DE | Pfeffer, New York, NY |
| 09/16/93 | Letter faxed from Pfeffer to Kenton | Glenn Kenton, Wilmington, DE | Pfeffer, New York, NY |
| 10/15/93 | Letter faxed from Blutrich to National Heritage | National Heritage, Orlando, FL | Blutrich, New York, NY |

**M.      The Scheme to Misappropriate the Proceeds of the Sale of the "Seven PACs.**

327.    As a result of the CMO to PAC Swap Scheme alleged above, in October 1993, National Heritage owned nineteen PACs artificially over-valued at more than $143 million on National Heritage's books.  Blutrich, Smythe, Aloisi, Plato, Ford, Smith, Pound, Schick, Shafran, Frenkel & Hershkowitz, Regency Financial, American Capital, Momentum Energy, Somerset and Cornerstone Oil and Gas agreed to implement a scheme to misappropriate the proceeds of the sale of seven of the PACs owned by National Heritage.  Bartz later agreed to, joined in and assisted in this scheme.

328.    On or about December 1 and 2, 1993, Smythe and Pound transferred nineteen of the National Heritage PACs from National Heritage brokerage

account number 133-46626-14125 at Smith Barney in New York to brokerage account number 06710171 in the name of "Richard M. Plato, P.C. Escrow Account for National Heritage Life Insurance Company" at Westcap Securities, L.P. in Houston, Texas (the "Plato Westcap Account").

**1.     The Misappropriation of the Proceeds from the Sale of the "Seven PACs" Through the Phoenix Trust Texas Bank Account.**

329.    From December 1, 1993 through December 13, 1993, Plato, with the knowledge and agreement of Ford, Smith, Pound, Smythe and Aloisi, sold seven of the National Heritage PACs in the Plato Westcap Account (the "Seven PACs") for $22,774,208.00 for the purpose of stealing the sales proceeds.

330.    In August 1993, Plato, with the knowledge and agreement of Ford and Smith, opened account number 02-01898 at Texas Bank in Baytown, Texas in the name of Phoenix Trust, Ltd. (the "Phoenix Trust Texas Bank Account") as a repository for certain of the diverted proceeds of the sale of the Seven PACs. As of November 30, 1993, the balance in the Phoenix Trust Texas Bank Account was $521.40. After November 30, 1993, only four deposits were made into the Phoenix Trust Texas Bank Account. Plato, with the knowledge and agreement of Ford, made each of the four deposits into the Phoenix Trust Bank Account on the dates and in the amounts respectively indicated below by wire transfer from the Plato Westcap Account, each deposit constituting a misappropriation of the proceeds of the sale of the Seven PACs:

| DATE | AMOUNT |
|---|---|
| 12/02/93 | $4,950,000.00 |

| | |
|---|---|
| 12/08/93 | $1,249,988.21 |
| 12/15/93 | $1,000,000.00 |
| 12/22/93 | $ 576,359.67 |

331.    Plato, Ford and Smith disbursed some of the misappropriated proceeds of the sale of the Seven PACs from the Phoenix Trust Texas Bank Account as follows:

a.    Plato, with the knowledge and agreement of Ford and Smith, disbursed $1,860,377.07 on the dates, in the amounts and by the means respectively indicated below, for the purpose of purchasing an office building in Houston, Texas generally known as the Great Southwest Life Insurance Building, on behalf and in the name of Phoenix Trust:

| DATE | MEANS | AMOUNT |
|---|---|---|
| 12/07/93 | Check No. 1024 | $50,000.00 |
| 12/09/93 | Check No. 1025 | $1,810,377.07 |

b.    Plato disbursed $275,000.00 to himself on the dates, in the amounts and by the means respectively indicated below:

| DATE | MEANS | AMOUNT |
|---|---|---|
| 12/02/93 | Check No. 1020 | $150,000.00 |
| 12/10/93 | Check No. 1029 | $100,000.00 |
| 12/23/93 | Check No. 1040 | $25,000.00 |

c.    Plato disbursed $12,000.00 to "Cash," on the dates, in the amounts and by the means respectively indicated below:

| DATE | MEANS | AMOUNT |
|---|---|---|

| DATE | MEANS | AMOUNT |
|---|---|---|
| 12/08/93 | Check with no number indicated | $9,000.00 |
| 12/10/93 | Check with no number indicated | $3,000.00 |

        d.      Plato, with the knowledge and agreement of Ford,

disbursed $1,960,761.00 to American Capital Business Loans, Inc., on the dates, in the

amounts and by the means respectively indicated below:

| DATE | MEANS | AMOUNT |
|---|---|---|
| 12/03/93 | Wire to Account No. 3004028241 at First Interstate Bank, Houston, Texas | $1,013,000.00 |
| 12/10/93 | Check No. 1028 | $647,761.00 |
| 12/16/93 | Wire to Account No. 3000054290 at First Interstate Bank, Houston, Texas | $300,000.00 |

Ford controlled American Capital Business Loans at the time of each of the payments set

forth above.

        e.      Plato, with the knowledge and agreement of Ford,

disbursed $1,382,000.00 to Momentum Energy Resources Corporation, on the dates, in

the amounts and by the means respectively indicated below:

| DATE | MEANS | AMOUNT |
|---|---|---|
| 12/02/93 | Check No. 1021 | $817,000.00 |
| 12/10/93 | Check No. 1031 | $200,000.00 |
| 12/16/93 | Debit Memo | $300,000.00 |
| 12/23/93 | Check No. 1038 | $55,000.00 |
| 02/07/94 | Check No. 1058 | $10,000.00 |

Plato incorporated and controlled Momentum Energy Resources Corporation and was its registered agent.

        f.      Plato, with the knowledge and agreement of Smith, disbursed $594,613.00 to Somerset Properties, Inc., on the dates, in the amounts and by the means respectively indicated below:

| DATE | MEANS | AMOUNT |
|---|---|---|
| 12/10/93 | Check No. 1026 | $147,947.00 |
| 12/16/93 | Check No. 1033 | $66,666.00 |
| 12/24/93 | Check No. 1041 | $380,000.00 |

Smith controlled Somerset Properties at the time of each of the transfers set forth above.

        g.      Plato disbursed $300,000.00 to Cornerstone Oil and Gas Inc., on December 10, 1993, by means of check number 1030. Plato incorporated Cornerstone Oil and Gas and was president, a director and registered agent for Cornerstone Oil and Gas.

        h.      Plato, with the knowledge and agreement of Ford, disbursed $239,000.00 to "Riley Super Rocket," on December 22, 1993, by means of wire transfer to account no. 1045210534 at Bank America, Carlsbad Branch #1045. Plato made this transfer in order to purchase a Cessna Skymaster airplane for Ford.

        i.      Plato, with the knowledge and agreement of Ford, disbursed $140,000.00 to Regency Financial, on the dates, in the amounts and by the means respectively indicated below:

| DATE | MEANS | AMOUNT |
|---|---|---|
| 12/16/93 | Wire to Account No. 00402226 at NationsBank, | $30,000.00 |

| DATE | MEANS | AMOUNT |
|------|-------|--------|
| | ABA Routing No. 061000052 | |
| 12/31/93 | Check No. 1036 | $100,000.00 |

Regency Financial was purportedly a "financial consulting group" located in Atlanta, Georgia, operated by Jim Rice, a co-defendant of Ford in <u>United States v. Ford, et al.</u>, No. SA 95 CR302 (W.D. Tex.). Rice pled guilty in that case to one count of transporting, transmitting and transferring stolen savings bonds in interstate commerce and receiving, possessing, concealing, pledging and disposing of stolen and unlawfully converted savings bonds.

j.      Plato, Phoenix Trust, American Capital, Momentum Energy, Somerset, Cornerstone Oil and Gas, Ford, Smith and Regency Financial accepted these payments with the knowledge that the monies they received had been diverted from National Heritage and with the intent to further the scheme to loot National Heritage.

**2.      The Misappropriation of the Proceeds of the Sale of the "Seven PACs" Through the Phoenix Trust Merrill Lynch Account.**

332.    Also in November 1993, Plato and Ford opened account number 568-17H84 in the name of Phoenix Trust at Merrill Lynch (the "Phoenix Trust Merrill Lynch Account"). As of November 27, 1993, the balance in the Phoenix Trust Merrill Lynch Account was zero. On December 16, 1993, Plato misappropriated an additional $8,000,000.00 in proceeds of the sale of the Seven PACs by wire transferring $8,000,000.00 from the Plato Westcap Account to the Phoenix Trust Merrill Lynch Account.

333.    Plato and Ford disbursed some of the misappropriated proceeds of the sale of the Seven PACs from the Phoenix Trust Merrill Lynch Account as follows:

a.    On or about December 22, 1993, Plato, with the knowledge and agreement of Ford and Bartz, caused $2,213,995.00 to be wire transferred from the Phoenix Trust Merrill Lynch Account to an offshore account Bartz opened on October 28, 1993, account number 009233, in the name of New Horizons, Ltd., a British Virgin Islands corporation, at Westcap Bank Corp. (Jersey) Ltd. in the Channel Isles (the "New Horizons Account"). Bartz was a signatory on the New Horizons Account, and he controlled it. Thereafter, Bartz laundered the $2,213,995.00 on behalf of Blutrich, Smythe and Aloisi. For example, on June 7, 1994 and on June 17, 1994, Bartz transferred $25,000.00 and $75,000.00, respectively, of the $2,213,995.00 by drawing two checks on an account at the Canadian Imperial Bank of Commerce in the Cayman Islands and causing those checks to be deposited in a bank account in Orlando, Florida, with the intention of concealing the source and ownership of those funds.

b.    In January 1994, Plato caused a total of $950,000.00 to be transferred from the Phoenix Trust Merrill Lynch Account to Plato's personal account at Merrill Lynch.

c.    In January 1994, Plato, with the knowledge and agreement of Blutrich and Smythe, caused $3 million to be transferred from the Phoenix Trust Merrill Lynch Account to Capital Clearing, which on January 26, 1994 wire transferred $3 million to the New York law firm of Shea & Gould, which then disbursed $3 million

to Aloisi for the purpose of financing Smythe's personal purchase of all the Lifeco

common stock Aloisi owned at the time.

> **3.     The Diversion of the Proceeds of the Sale of the "Seven
> PACs" to Frenkel & Hershkowitz.**

334.    On December 16, 1993, Plato and Ford wire transferred

$7,000,000.00 from the Plato Westcap Account to the Bank of New York for

further credit to National Heritage's account with Gruntal, account

no. 866001841 (the "National Heritage Gruntal Account").

335.    On December 30, 1993, Aloisi, with the knowledge and agreement

of Schick, Shafran and Frenkel & Hershkowitz, directed Gruntal to wire transfer

$6,400,000.00 from the National Heritage Gruntal Account to an account at Citibank in

the name of Frenkel & Hershkowitz Attorney Trust Iola No. D, account no. 01567164

(the "Frenkel & Hershkowitz Iola No. D Account") for the purpose of consummating the

purchase of mortgages from Yasuda Trust & Banking, Ltd., pursuant to the Mortgages

Scheme alleged in detail below.

336.    On December 31, 1993, pursuant to the direction of Aloisi and

with the knowledge and agreement of Schick, Shafran and Frenkel & Hershkowitz,

Gruntal wire transferred $6,400,000.00 from the National Heritage Gruntal Account to

the Frenkel & Hershkowitz Iola No. D Account.

> **4.     Interstate Wire Communications in Furtherance of the Scheme
> to Misappropriate the Proceeds of the Sale of the "Seven
> PACs."**

337.    In furtherance of the Scheme to Misappropriate the Proceeds of the

Sale of the "Seven PACs",

Michael Blutrich
Patrick Smythe
Keith Pound
Regency Financial Group, Inc.
Somerset Properties, Inc.
Momentum Energy Resources Corp.
Cornerstone Oil and Gas Inc.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire

communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following

writings, signs, signals and sounds:

| Date | Writings, Signs,<br>Signals or Sounds | To | From |
|------|----------------------------------------|-----|------|
| 12/02/93 | $4,950,000.00 wire transfer | Texas Bank,<br>Baytown, TX | Westcap<br>Securities,<br>Houston,<br>TX |
| 12/03/93 | $1,013,000.00 wire transfer | First Interstate Bank,<br>Houston, TX | Texas Bank,<br>Baytown,<br>TX |
| 12/08/93 | $1,249,988.21 wire transfer | Texas Bank,<br>Baytown, TX | Westcap<br>Securities,<br>Houston,<br>TX |
| 12/15/93 | $1,000,000.00 wire transfer | Texas Bank,<br>Baytown, TX | Westcap<br>Securities,<br>Houston,<br>TX |
| 12/16/93 | $30,000.00 wire transfer | NationsBank | Texas Bank,<br>Baytown,<br>TX |
| 12/16/93 | $8,000,000.00 wire transfer | Merrill Lynch,<br>Houston, TX | Westcap<br>Securities,<br>Houston,<br>TX |
| 12/16/93 | $300,000.00 wire transfer | First Interstate Bank,<br>Houston, TX | Texas Bank,<br>Baytown,<br>TX |
| 12/16/93 | $7,000,000.00 wire transfer | Gruntal,<br>New York, NY | Westcap<br>Securities,<br>Houston, |

| Date | Writings, Signs, Signals or Sounds | To | From |
|---|---|---|---|
| | | | TX |
| 12/22/93 | $2,213,995.00 wire transfer | Westcap Bank Corp. (Jersey) Channel Isles | Merrill Lynch, Houston, TX |
| 12/22/93 | $239,000.00 wire transfer | Bank America | Texas Bank, Baytown, TX |
| 12/22/93 | $576,359.67 wire transfer | Texas Bank, Baytown, TX | Westcap Securities, Houston, TX |
| 12/31/93 | $6,400,000.00 wire transfer | Citibank, New York, NY | Gruntal & Co., New York, NY |
| 01/26/94 | $3,000,000.00 wire transfer | Shea & Gould, New York, NY | First Interstate Bank, TX |

**N.** **The Scheme to Cover Up the Misappropriation of the Proceeds of the Sale of the "Seven PACs."**

338. In December 1993, Blutrich, Smythe, Pound and Plato agreed to implement a scheme to cover up the misappropriation of the proceeds of the sale of the Seven PACs by creating the illusion that National Heritage had exchanged the PACs for mortgages.

339. From on or about December 17, 1993 through December 20, 1993, at the direction of Smythe and Pound, Plato transferred National Heritage's remaining twelve PACs to a brokerage account at Gruntal & Co. in the name of "Lifeco Mortgage Services" (the "Lifeco Mortgage Gruntal Account"), which Pound opened on the previous day, December 16, 1993. Plato, at the direction of Smythe and Pound, sold these

remaining twelve PACs by January 14, 1994, generating sales proceeds of $79,664,848.00.

340.    On December 27, 1993, Pound and Blutrich caused Walker to mail a letter to Plato, falsely representing that Lifeco Mortgage Services, Inc. had reviewed the mortgages to be exchanged for the PACs on behalf of National Heritage. Pound and Blutrich caused Walker to instruct Plato to take directions from Lifeco Mortgage Services concerning the exchange of the PACs for mortgages. At the time, Pound was the president of Lifeco Mortgage Services.

341.    On or about December 28, 1993, Plato, Ford, Smith, Pound, Blutrich, Smythe and Aloisi falsely informed National Heritage that the PAC to mortgages exchange was complete, and that through the swap, National Heritage had realized cash proceeds of $32,569,486.00 and mortgages worth $111,756,457.00.

342.    On or about January 14, 1994, Pound wire transferred $76,694,564.25 of the proceeds of the sale of the twelve National Heritage PACs from the Lifeco Mortgage Gruntal Account to the Plato Westcap Account. At or about the same time, Plato, with the knowledge and agreement of Smythe and Pound, wire transferred $32,266,433.20 from the Plato Westcap Account to an account at Barnett Bank in Orlando, Florida in the name of National Heritage to perpetuate the illusion that the CMO to mortgages swap had been consummated.

343.    On or about January 15, 1994, Plato transmitted to National Heritage a "Final Closing Statement," which falsely reported that prior to December 31, 1993, the PACs had been exchanged for a total of $32,266,433.20 in cash and

$111,564,125.26 in mortgages, and that the cash and mortgages had been transferred to National Heritage on January 14, 1994.

344.    Plato provided National Heritage with an "Amended Escrow Statement" on February 10, 1994, and a "Revised Amended Escrow Statement" on February 11, 1994.  The Amended Escrow Statement increased the value of the mortgages purportedly transferred to National Heritage from $111,564,125.26 to $111,935,741.66 and also reflected an entitlement to accrued interest in the amount of $1,158,712.45.  The "Revised Amended Escrow Statement" further increased the value of the mortgages to $112,317,106.73 and thus reported gross proceeds from the purported swap of $144,583,539.73 in assets, a gain of more than $3.1 million over the $141,458,700.00 book value of the National Heritage PACs.

345.    By letter dated March 22, 1994, Plato, Blutrich, Smythe and Pound caused Walker to direct Gruntal to wire transfer $814,752.02, representing income which the National Heritage PACs had generated before they were sold, from the Lifeco Mortgage Gruntal Account to account number 0202398, also at Texas Bank in the name of "Richard M. Plato, Escrow Agent for National Heritage Life Insurance Company" (the "Plato Texas Bank Account"), which Plato opened in March 1994.  Gruntal did so that same day.

346.    On or about March 24, 1994, Plato caused $740,754.16 to be transferred from the Plato Texas Bank Account to the Phoenix Trust Merrill Lynch Account, and on March 25, 1994, Plato caused $69,245.89 to be transferred from the Plato Texas Bank Account to the Westcap Account.  Shortly thereafter, Plato closed the

Plato Texas Bank Account by drawing a check payable to "Cash" in the amount of $4,739.42 against the account.

347.    From and after December 1993, Plato, Ford, Smith, Pound, Smythe and Aloisi, falsely and fraudulently maintained that the PAC to mortgages exchange was complete and that Phoenix Trust had transferred mortgages with outstanding principal balances of $112,317,106.73 and cash in the amount of $32,266,433.20 to National Heritage by year-end 1993. In truth, Phoenix Trust had not transferred or sold any mortgages to National Heritage, and the $32,266,433.20 in cash which Phoenix Trust transferred to National Heritage consisted of proceeds from the fraudulent sale of National Heritage's own PACs.

348.    Based on this information, National Heritage recorded the sale of the PACs on its books and records as of the year ended December 31, 1993, and recorded the receipt of the cash and mortgages which Plato falsely represented National Heritage had acquired through the purported swap. The net effect of these transactions was to reflect an increase in capital on National Heritage's books and records as of December 31, 1993 of over $2.5 million.

349.    In fact, the sales of National Heritage's PACs only realized slightly over $100 million, $15,776,399.00 of which Plato, Ford, Smith, Blutrich, Smythe, Pound and Aloisi misappropriated. Thus, instead of realizing the $2.5 million gain from this transaction, National Heritage in fact realized a substantial loss.

1.   **Interstate Mailings in Furtherance of the Scheme to Cover Up the Scheme to Misappropriate the Proceeds of the Sale of the "Seven PACs."**

350..   In furtherance of the Scheme to Cover Up the Scheme to

Misappropriate the Proceeds of the Sale of the "Seven PACs",

Michael Blutrich
Patrick Smythe
Keith Pound

defendants herein, knowingly caused to be mailed and delivered by the United States

Postal Service, in violation of 18 U.S.C. § 1941, the following matter:

| Date | Matter Mailed/Delivered | To | From |
|------|------------------------|-----|------|
| 12/27/93 | Letter from Walker to Plato | Richard Plato, Houston, TX | Walker, Walker & Associates, Orlando, FL |

2.   **Interstate Wire Communications in Furtherance of the Scheme to Cover Up the Scheme to Misappropriate the Proceeds of the Sale of the "Seven PACs."**

351.   In furtherance of the Scheme to Cover Up the Scheme to

Misappropriate the Proceeds of the Sale of the "Seven PACs",

Michael Blutrich
Patrick Smythe
Keith Pound

defendants herein, knowingly transmitted and caused to be transmitted by means of wire

communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following

writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|---|---|---|---|
| 1/14/94 | $76,694,564.25 wire transfer | Westcap Securities, Houston, Texas | Gruntal, New York, NY |
| 1/14/94 | $32,266,433.20 wire transfer | Barnett Bank, Orlando, FL | Westcap Securities, Houston, TX |
| 3/22/94 | $814,752.02 wire transfer | Texas Bank, Baytown, TX | Gruntal & Co., New York, NY |
| 3/24/94 | $740,754.16 wire transfer | Merrill Lynch, Houston, TX | Texas Bank, Baytown, TX |
| 3/25/94 | $69,245.89 wire transfer | Westcap Securities, Houston, TX | Texas Bank, Baytown, TX |

O.   **The Mortgages Scheme**.

352.   Blutrich, Smythe, Pfeffer, Schneiderman, Pound, Hershkowitz, Schick, Simon, Weinschneider, Frenkel & Hershkowitz, Weiss, Obstfeld, Grin, Starr, Rothman, Global Equities, South Star and NHE agreed to implement a scheme to continue to loot National Heritage through the misappropriation of over $82 million under the guise of purchasing mortgages. NES, Spear, Kaltsas and FDPI later agreed to, joined in and assisted in this scheme, as alleged in detail below.

353.   In or about May or June 1993, Smythe told the National Heritage CFO that he was negotiating the acquisition of up to $200 million of reinsurance for National Heritage's annuity portfolio, and that National Heritage needed to accumulate substantial liquid assets to finance this transaction. In reliance on this representation, the National Heritage CFO agreed to the accumulation of tens of millions of dollars in

National Heritage assets in various accounts for the purpose of financing a reinsurance transaction.

354.    In August 1993, Aloisi caused National Heritage to retain Phoenix Trust as its agent.  Smythe misrepresented to the National Heritage CFO that the purpose of retaining Phoenix Trust was to obtain $200 million in reinsurance.  However, Phoenix Trust never arranged for any reinsurance for National Heritage, and the actual purpose of accumulating tens of millions of dollars in National Heritage assets was to allow Blutrich, Smythe, Pfeffer, Schneiderman, Pound, Hershkowitz, Schick, Simon, Weinschneider, Frenkel & Hershkowitz, Weiss, Obstfeld, Grin, Starr, Rothman, Global Equities, South Star and NHE to use the accumulated funds to continue to loot National Heritage.

355.    National Heritage, by and through the National Heritage CFO, relied to its detriment on the misrepresentations regarding reinsurance.  Had National Heritage, by and through the National Heritage CFO, known that the funds were being looted from National Heritage, it would have taken appropriate action, including, for example, informing National Heritage's regulators and preventing the transfers of National Heritage's funds.

### 1.    The FIB Accounts Liquidation Aspect of the Mortgages Scheme.

356.    Pursuant to the LPDA and Nulenda Line of Credit Pay-Off Scheme alleged in detail above, SCB realized proceeds from the sale of certain of National Heritage's securities in the FIB accounts of $35,894,832.00.

357.    On or shortly after the liquidation of the FIB accounts, Smythe and Pfeffer told the National Heritage CFO that the securities in the FIB accounts had been

liquidated. Smythe and Pfeffer affirmatively misrepresented to the National Heritage CFO that the liquidation proceeds had been forwarded to an escrow account purportedly maintained by Schneiderman, as escrow agent acting on behalf of National Heritage, as part of the accumulation of funds for the purpose of financing a $200 million reinsurance transaction.

358.   Thereafter, Schneiderman forwarded purported escrow statements to the National Heritage CFO, affirmatively misrepresenting that Schneiderman had received and was holding the $35,589,219.19 as escrowee as indicated below:

| Date | Amount Disbursed | Origin of Funds |
|---|---|---|
| 08/24/93 | $10,000,000.00 | First Interstate Bank Fund No. 196-0335737193 |
| 08/31/93 | $9,000,000.00 | First Interstate Bank Fund No. 196-0335734687 |
| 09/09/93 | $7,719,521.13 | First Interstate Bank Fund No. 196-0335737193 |
| 09/09/93 | $1,630,478.87 | First Interstate Bank Fund No. 196-0335734687 |
| 09/30/93 | $7,239,219.19 | First Interstate Bank Fund No. 196-0335734687 |
| TOTAL | $35,589,219.19 | |

In truth, Schneiderman never received any of these funds because they were used to repay the LPDA and Nulenda lines of credit.

359.   National Heritage, by and through the National Heritage CFO, relied to its detriment on Schneiderman's misrepresentation. Had National Heritage, by and through the National Heritage CFO and the National Heritage Controller, known that the funds were not transferred to the Schneiderman Escrow and were used to pay off the LPDA and Nulenda credit lines, it would have taken appropriate action, including, for

example, informing National Heritage's regulators and preventing or rescinding the transfers to pay off LPDA's and Nulenda's credit lines.

### 2. The Accumulation of $82 Million Aspect of the Mortgages Scheme.

360. Beginning in August 1993 and continuing into December 1993, Smythe, with the knowledge and agreement of Blutrich, Pfeffer, Schneiderman, Pound, Hershkowitz, Schick, Frenkel & Hershkowitz, Weiss, Obstfeld, Grin, Rothman, Global Equities, South Star and Starr, transferred over $82 million of National Heritage's assets to Schneiderman and Frenkel & Hershkowitz, which also maintained an escrow account for the purported benefit of National Heritage.

361. Specifically, in August 1993, Smythe caused National Heritage to wire transfer $46,886,431.54 into account number 251-04-545 in the name of "Jan R. Schneiderman Escrow for National Heritage Life Insurance and South Star Management Co. Inc." at Morgan Guaranty, New York City (the "Schneiderman Escrow"), in the following four transactions:

| Date | Amount Wired | Account From Which Money Was Wired |
|------|-------------|------------------------------------|
| 08/12/93 | $1,910,223.19 | First Interstate Bank Fund No. 196-0335734687 |
| 08/12/93 | $10,661,960.83 | First Interstate Bank Fund No. 196-0335737193 |
| 08/31/93 | $4,000,000.00 | Barnett Bank of Central Florida Account No. 42-Q662019 |
| 08/31/93 | $30,314,247.52 | Smith Barney Shearson Account No. 133-4662614 |
| TOTAL AMOUNT WIRED | $46,886,431.54 | |

362.    From September 23, 1993 through December 22, 1993, Smythe
caused National Heritage to wire transfer $35,871,051.50 into two Frenkel &
Hershkowitz accounts (the "Frenkel & Hershkowitz Escrow") in the following seven
transactions:

| | Date | Amount Wired | Account From Which Monies Wired | Account To Which Monies Wired |
|---|------|-------------|-------------------------------|------------------------------|
| 1. | 09/28/93 | $4,604,019.54 | Barnett Bank Trust Account No. 42-Q662001 | Frenkel & Hershkowitz Attorney Trust IOLA B Account No. 01567121 Citibank, N.A. Branch 10 1 Park Avenue New York, New York |
| 2. | 09/28/93 | $5,000,000.00 | Barnett Bank Trust Account No. 42-Q662019 | Frenkel & Hershkowitz Attorney Trust IOLA B Account No. 01567121 Citibank, N.A. Branch 10 1 Park Avenue New York, New York |
| 3. | 10/09/93 | $5,000,000.00 | Barnett Bank Trust Account No. 42-Q662019 | Frenkel & Hershkowitz Attorney Trust IOLA B Account No. 01567121 Citibank, N.A. |

| | Date | Amount Wired | Account From Which Monies Wired | Account To Which Monies Wired |
|---|---|---|---|---|
| | | | | Branch 10<br>1 Park Avenue<br>New York, New York |
| 4. | 11/24/93 | $15,000,000.00 | Barnett Bank Trust Account No. 42-Q662001 | Frenkel & Hershkowitz<br>Fleet Bank Account No.<br>9379131371<br>60 Broad Street<br>New York, New York |
| 5. | 12/09/93 | $3,359,213.91 | Smith Barney Shearson Account No. 133-46626-14-125 | Frenkel & Hershkowitz<br>Fleet Bank Account No.<br>9379131371<br>60 Broad Street<br>New York, New York |
| 6. | 12/10/93 | $407,818.00 | Prudential Securities Account No. OES-964847-42 | Frenkel & Hershkowitz<br>Fleet Bank Account No.<br>9379131371<br>60 Broad Street<br>New York, New York |
| 7. | 12/22/93 | $2,500,000.00 | Barnett Bank Trust Account No. 42-Q662001 | Frenkel & Hershkowitz<br>Fleet Bank Account No.<br>9379131371<br>60 Broad Street<br>New York, New York |
| TOTAL AMOUNT WIRED | | $35,871,0 | | |

363.    Neither the monies realized from the liquidation of securities in the

FIB accounts nor the monies accumulated in the Schneiderman and Frenkel &

Hershkowitz Escrows were used to finance any reinsurance transaction.  Rather, the

monies realized from the liquidation of securities in the FIB accounts were used to pay

off the LPDA and Nulenda credit lines, and South Star used at least a substantial portion

of the monies transferred to the Schneiderman and Frenkel & Hershkowitz Escrows to

purchase non-performing mortgage loans to loot National Heritage and to continue

National Heritage in existence past its point of insolvency.

364.    Beginning in August 1993, South Star, by and through Starr, Obstfeld, Grin, Global Equities, Rothman, Weiss, Hershkowitz, Schick and Frenkel & Hershkowitz, used millions of dollars from the Schneiderman and Frenkel & Hershkowitz Escrows to purchase, in its own name, pools of notes secured by mortgages from various sellers, including the Resolution Trust Corporation ("RTC"), Consolidated Asset Recovery Corporation ("CARC") and Yasuda Trust & Banking Co., Ltd. ("Yasuda").

3.    **The RTC Mortgages**.

365.    On August 24 and 25, 1993, less than one week after its formation, South Star, by and through Starr, Obstfeld, Grin, Global Equities, Rothman, Weiss, Hershkowitz, Schick, Weinschneider and Frenkel & Hershkowitz, purchased 452 non-performing mortgage loans (the "RTC Mortgages") from the RTC, at a loan auction conducted in Kansas City, Missouri, for $38,470,000.00, or 52.6% of the $73,119,341.00 in total outstanding principal balances due on the RTC Mortgages at the time of the purchase.  Global Equities submitted the bid on the RTC Mortgages on behalf of South Star.

366.    South Star, by and through Starr, Obstfeld, Grin, Global Equities, Rothman, Weiss, Hershkowitz, Schick, Weinschneider and Frenkel & Hershkowitz, paid the RTC for the RTC Mortgages in full with monies from the Schneiderman Escrow.  On or about August 23, 1993, Schneiderman transferred $3.1 million from the Schneiderman Escrow to the Schneiderman #1 Account.  Also on August 23, 1993, Schneiderman paid a deposit to the RTC of $3.1 million by means of three Treasurer's Checks, two in the

amount of $50,000.00 and the third in the amount of $3,000,000.00, payable to the RTC and issued by Morgan Guaranty against the Schneiderman #1 Account.

367.    On August 26, 1993, Schneiderman paid an additional deposit to the RTC by wire transferring $747,000.00 from the Schneiderman #1 Account to the RTC.

368.    On September 1, 1993, Schneiderman completed the purchase of the RTC Mortgages by wire transferring $34,623,000.00 from the Schneiderman Escrow to the RTC.

369.    Thereafter, the RTC transferred title to the RTC Mortgages to South Star.

### 4.    The CARC Mortgages.

370.    Pursuant to a loan sale agreement dated August 31, 1993, South Star, by and through Rothman, Starr, Obstfeld, Grin, Global Equities, Weiss, Hershkowitz, Schick and Frenkel & Hershkowitz, purchased 39 non-performing mortgage loans from CARC (the "CARC Mortgages") for $1,134,705.56, or approximately 31.2% of the $3,642,453.43 in total outstanding principal balances due on all the CARC Mortgages at the time of the purchase.  Rothman bid on the CARC Mortgages on behalf of Global Equities and executed the loan sale agreement as president of South Star.

371.    On September 3, 1993, Schneiderman transferred $113,470.56 from account number 251-04-556 at Morgan Guaranty into Morgan Guaranty Account No. 001-58-217, in the name of "Jan Schneiderman Attorney at Law Special No. 2" (the

"Schneiderman #2 Account"). Prior to this transfer, there had been no activity in the Schneiderman #2 Account.

372.    Also on September 3, 1993, Schneiderman wire transferred $113,470.56, or ten percent of the purchase price of the CARC Mortgages, from the Schneiderman #2 Account to CARC as an earnest money deposit.

373.    On September 9, 1993, Schneiderman wire transferred $1 million from the Schneiderman Escrow to the Schneiderman #1 Account.  Schneiderman transferred an additional $23,235.01 from the Schneiderman Escrow to the Schneiderman #1 Account on September 28, 1993.  Also on September 28, 1993, Schneiderman completed the purchase of the CARC Mortgages by wire transferring $1,021,235.01 from the Schneiderman #1 Account to CARC.

374.    Thereafter, CARC transferred title to the CARC Mortgages to South Star.

### 5.    The Yasuda Mortgages and Co-ops.

375.    On December 16, 1993, South Star, by and through Starr, Obstfeld, Grin, Rothman, Weiss, Hershkowitz, Schick, Simon and Frenkel & Hershkowitz, and with the knowledge and agreement of NES, Pfeffer, Schneiderman, Spear, Kaltsas and FDPI, entered into a Purchase and Sale Agreement with Yasuda, pursuant to which South Star agreed to purchase 231 purchase money notes, 100 of which were non-performing, secured by cooperative apartments in New York City (the "Yasuda Mortgages"), and 317 contracts for the purchase of unsold cooperative apartments in New York City (the

"Yasuda Co-ops").  Pursuant to the Purchase and Sale Agreement, South Star agreed to pay Yasuda $8,526,000.00 for the Yasuda Mortgages and the Yasuda Co-ops.

376.    On December 30, 1993, Schneiderman, on behalf of South Star, cancelled the Purchase and Sale Agreement dated December 16, 1993 and entered into a new Purchase and Sale Agreement, pursuant to which South Star agreed to purchase the Yasuda Mortgages, but not the Yasuda Co-ops, for $8,426,000.00, just $100,000.00 less than the purchase price in the original Purchase and Sale Agreement.

377.    Also on December 30, 1993, NES entered into a Purchase and Sale Agreement with Yasuda, pursuant to which NES agreed to purchase all 371 Yasuda Co-ops for $100,000.00.  The fair market value of the Yasuda Co-ops was far in excess of $100,000.00 at the time.  NES was controlled by Weiss, Obstfeld, Grin, Blutrich, Pfeffer, Schneiderman, Spear, Kaltsas and FDPI.

378.    South Star's purchase of the Yasuda Mortgages for $8,426,000 and NES's purchase of the Yasuda Co-ops were simultaneously closed on December 30, 1993.  Schneiderman attended the closing on behalf of South Star.

379.    South Star paid at least $8,351,025.00 of the purchase price for the Yasuda Mortgages with monies from the following Frenkel & Hershkowitz accounts as indicated below:

| Date | Account Name | Account Number | Bank | Amount | Means of Transmission |
|---|---|---|---|---|---|
| 12/14/93 | Frenkel & Hershkowitz Attorney for South Star Management Company, Inc. | 313753916 | Sterling National Bank & Trust Company of New York | $425,000 | Check |

| Date | Account Name | Account Number | Bank | Amount | Means of Transmission |
|------|--------------|----------------|------|--------|----------------------|
| 12/16/93 | Frenkel & Hershkowitz as Attorneys for South Star Management Co., Inc. | 9379131371 | Fleet Bank | $352,600 | Check |
| 01/03/94 | Frenkel & Hershkowitz IOLA D | 01567164 | Citibank | $7,573,425 | Check |

380.     NES, by and through Weiss, Obstfeld, Grin, Blutrich, Pfeffer, Schneiderman, Spear, Kaltsas and FDPI, also paid the purchase price for the Yasuda Co-ops with a check drawn on a Frenkel & Hershkowitz account.

381.     South Star's purchase of the Yasuda Mortgages and NES's purchase of the Yasuda Co-ops were part of the conspiracy to divert assets from National Heritage.  South Star, NES, Starr, Weiss, Obstfeld, Grin, Blutrich, Pfeffer, Schneiderman, Spear, Kaltsas and FDPI used National Heritage's monies to overpay substantially for the Yasuda Mortgages, while in effect subsidizing NES's purchase of the Yasuda Co-ops, which were highly valuable assets worth far in excess of NES's purchase price of $100,000.  Moreover, NES funded the artificially low purchase price with National Heritage's monies from the Frenkel & Hershkowitz escrow accounts.

382.     On September 2, 1994, NES sold the Yasuda Co-ops, which were worth millions of dollars, purchased with National Heritage's money, to UFH Apartments, Inc., a corporation owned and controlled by Obstfeld, Grin and Rothman, for the inadequate sum of $200,000.00, $190,000.00 of which was paid to Weiss.

**6.    Interstate Wire Communications in Furtherance of the Mortgages Scheme.**

383.    In furtherance of the Mortgages Scheme,

Michael Blutrich
Patrick Smythe
Lyle Pfeffer
Jan Schneiderman
Keith Pound
Jan Starr
Sholam Weiss
Solomon Obstfeld
Eugene Grin
Samuel Rothman
John Spear
Dean Kaltsas
South Star Management Co.
N.E.S. Consulting Corp.
FDPI Holding, Inc.
Global Equities & Realty, Inc.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire

communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following

writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|-----------------------------------|-----|------|
| 08/11/93 | $4,000,000.00 wire transfer | Morgan Guaranty, New York, NY | Barnett Bank, Orlando, FL |
| 08/12/93 | $1,910,223.19 wire transfer | Morgan Guaranty, New York, NY | First Interstate Bank, Los Angeles, CA |
| 08/12/93 | $10,661,960.83 wire transfer | Morgan Guaranty, New York, NY | First Interstate Bank, Los Angeles, CA |
| 08/26/93 | $747,000.00 wire transfer | RTC, Kansas City, MO | Morgan Guaranty, |

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|-----------------------------------|-----|------|
| | | | New York, NY |
| 08/31/93 | $30,314,247.52 wire transfer | Morgan Guaranty, New York, NY | Smith Barney Shearson, New York, NY |
| 09/01/93 | $34,623,000.00 wire transfer | RTC, Kansas City, MO | Morgan Guaranty, New York, NY |
| 09/03/93 | $113,470.56 wire transfer | Morgan Guaranty New York, NY | Morgan Guaranty, New York, NY |
| 09/09/93 | $1,000,000.00 wire transfer | Morgan Guaranty New York, NY | Morgan Guaranty, New York, NY |
| 09/28/93 | $1,021,235.01 wire transfer | CARC, Bridgeport, CT | Morgan Guaranty, New York, NY |
| 09/28/93 | $4,604,019.54 wire transfer | Citibank, New York, NY | Barnett Bank, Orlando, FL |
| 09/28/93 | $5,000,000.00 wire transfer | Citibank New York, NY | Barnett Bank, Orlando, FL |
| 10/29/93 | $5,000,000.00 wire transfer | Citibank New York, NY | Barnett Bank, Orlando, FL |
| 11/24/93 | $15,000,000.00 wire transfer | Fleet Bank, New York, NY | Barnett Bank, Orlando, FL |
| 12/09/93 | $3,359,213.91 wire transfer | Fleet Bank, New York, NY | Smith Barney Shearson, New York, NY |
| 12/10/93 | $407,818.00 wire transfer | Fleet Bank, New York, NY | Prudential Securities, New York, NY |
| 12/22/93 | $2,500,000.00 wire transfer | Fleet Bank, New York, NY | Barnett Bank, Orlando, FL |

**P.**   **The Class E Preferred Stock Scheme**.

384.   Blutrich, Smythe, Aloisi, Pound, Schneiderman, Schick, Shafran, Pfeffer, Contreras, Weinschneider, Frenkel & Hershkowitz and Future Diversified agreed

to implement a scheme to continue to defraud National Heritage through the purchase by Future Diversified of over $22 million of Lifeco stock in exchange for fraudulently over-valued mortgage loans and real estate which, pursuant to the stock purchase agreement, would be returned to Future Diversified in the event that any regulatory order was entered against National Heritage. The purpose of this scheme was three-fold. The first purpose was to create the appearance of a capital infusion for National Heritage in order to prolong its life beyond the time it became insolvent while in effect ensuring that the mortgages would be reconveyed to Future Diversified. The second purpose was to generate $2 million surreptitiously to pay to Lifeco Mortgage Services in order to create the false appearance that Lifeco Mortgage Services was profitable. The third purpose was to allow Future Diversified, Pfeffer and Contreras to reap payments of cash in the form of dividends on Class E Preferred Stock.

      385.   On November 12, 1993, Smythe and Pound, with the knowledge and agreement of Blutrich, Aloisi, Schneiderman, Schick and Shafran, caused Lifeco to sell 906,616.56 shares, or $22,300,000.00, of Class E Preferred Stock to Future Diversified, a company controlled by Pfeffer and Contreras, in exchange for the following loans and real estate valued at approximately $22,665,414.00 at the time of the transaction (collectively the "Capital Mortgages"), which Lifeco was to transfer to National Heritage as a capital contribution:

| | Type of Asset | Name of Mortgagor or Property | Address of Property |
|---|---|---|---|
| 1. | Mortgage | Y&G Partners | 191-199 Fabyan Place Newark, N.J. |
| 2 | Mortgage | Governale Industrial Sales Corp. | 5402-5424 Avenue N |

|   | Type of Asset | Name of Mortgagor or Property | Address of Property |
|---|---|---|---|
| . |  |  | Units 1 and 2<br>Brooklyn, N.Y. |
| 3. | Bond | Accusharp Realty, Inc. | 1382-92 Atlantic Avenue<br>and 886-904 Dahill Road<br>Brooklyn, N.Y. |
| 4. | Mortgage | Eklam Realty Corp. | 1433 38th St.<br>Brooklyn, N.Y. |
| 5. | Mortgage | Kalmal Corp. | 5502/5510 Avenue N<br>Brooklyn, N.Y. |
| 6. | Mortgage | Moses Weiss | 2389 Coney Island Avenue<br>Brooklyn, N.Y. |
| 7. | Mortgage | Windsor Plumbing Supply | 4002 15th Avenue<br>Brooklyn, N.Y. |
| 8. | Mortgage | Windsor Plumbing Supply | 3916-3922 15th Avenue<br>Brooklyn, N.Y. |
| 9. | Real Property | Center Point Mall | Highway 36<br>Middletown, N.J. |
| 10. | Real Property | Catskill Funland Amusement Park | Route 42<br>Falkburg, N.Y. |

1. **The Capital Infusion Aspect of the Class E Preferred Stock Scheme.**

386.   In or about September 1993, Pound and Pfeffer purportedly retained Platzner International to value the Capital Mortgages.  However, neither Platzner nor Platzner International was a licensed real estate appraiser in either the states of New York or New Jersey.

387.   Platzner and Platzner International joined in, agreed to and assisted in the Class E Preferred Stock Scheme.  On September 16, 1993, Platzner and Platzner International, pursuant to the Class E Preferred Stock Scheme, mailed to the National

-152-

Heritage CFO what purported to be written appraisals, valuing the properties secured by

the Capital Mortgages as respectively indicated below:

| | Property | Platzner Appraised Value |
|---|---|---|
| 1. | Y&G Partners | $3.6 million |
| 2. | Governale Industrial | $1.4 million |
| 3. | Accusharp Realty, Inc. (886-904 Dahill Road) | $8.0 million |
| 4. | Accusharp Realty, Inc. (1382-92 Atlantic Ave.) | $.75 million |
| 5. | Eklam Realty Corp. | $2.4 million |
| 6. | Kalmal Corp. | $1.6 million |
| 7. | Moses Weiss | $.75 million |
| 8. | Windsor Plumbing (4002 15th Ave.) | $1.5 million |
| 9. | Windsor Plumbing (3916-22 15th Ave.) | $1.52 million |
| 10. | Center Point Mall | $7.0 million |
| 11. | Catskill Funland | $4.0 million |
| | TOTAL | $29.52 million |

388.    The values of the Capital Mortgages as reported by Platzner were

grossly inflated.  Platzner and Platzner International knowingly and intentionally inflated

the values of the Capital Mortgages at the direction of Blutrich, Pound, Pfeffer and

Contreras in order to allow Future Diversified to acquire the Class E stock in exchange

for the Capital Mortgages priced at artificially inflated values.  National Heritage, by and

through the National Heritage CFO, relied to its detriment on the fraudulent appraisals in

believing that the Capital Mortgages were adequately secured.  Had National Heritage, by

and through the National Heritage CFO, known that the appraisals were fraudulent, it

would have taken appropriate action, including, for example, seeking to prevent Lifeco

from selling the Class E Preferred Stock to Future Diversified and informing National

Heritage's regulators.

389.   To verify Platzner's valuation of the Capital Mortgages, National

Heritage requested a second appraisal of the Capital Mortgages.

390.   In November 1993, Pfeffer retained Daniel Houlihan of Houlihan

& O'Malley Appraisal Co., Inc. to perform "desk reviews" of Platzner's appraisals of the

Capital Mortgages.  At that time, Houlihan sent an engagement letter to Pfeffer, agreeing

to review the Platzner appraisals within approximately two months, or by approximately

January 1994.

391.   Pfeffer directed Houlihan to forward the completed desk reviews

to Pfeffer in care of the office of Blutrich, Falcone & Miller.  On or about November 1,

1993, Pfeffer and Blutrich, with the knowledge and agreement of Contreras, falsified the

letterhead of Houlihan & O'Malley Appraisal Co., Inc. and forged Houlihan's signature

on eight desk review reports, which Pfeffer and Contreras caused to be mailed to

National Heritage on November 1, 1993.  The falsified documents misrepresented that

Houlihan agreed with the Platzner appraisals.  Houlihan & O'Malley Appraisal Co. in fact

never provided any desk review reports directly to National Heritage.

392.   Pfeffer, Blutrich and Contreras sent or caused to be sent the

fraudulent desk review reports to the National Heritage CFO for the purpose of inducing

National Heritage to rely on them.  National Heritage, by and through the National

Heritage CFO, relied on the fraudulent desk reviews to its detriment in believing the

Capital Mortgages were adequately secured.  Had National Heritage, by and through the

National Heritage CFO, known that the desk review reports it received were false and fraudulent, it would have taken appropriate action to mitigate its damages, including, for example, seeking rescission of the transaction and informing National Heritage's regulators and Lifeco.

393.    On November 12, 1993, Pfeffer, on behalf of Future Diversified, signed the subscription agreement evidencing the purchase of the Class E Preferred Stock.  The executed subscription agreement was faxed from the office of Blutrich, Falcone & Miller on November 12, 1993.

394.    Blutrich, with the knowledge and agreement of Weiss, Schick, Shafran, Weinschneider and Frenkel & Hershkowitz, then caused National Heritage to pay a fraudulent and grossly inflated commission of $2,231,098.20 on the Capital Mortgage transaction to Venture Mortgage L.P., a limited partnership owned and controlled by Schick.

395.    Pfeffer misrepresented to the National Heritage CFO that the commission to Venture Mortgage was legitimate and reasonable.  National Heritage, by and through the National Heritage CFO, relied on Pfeffer's misrepresentation to its detriment by not objecting to the commission and by informing National Heritage's regulators of the same information Pfeffer had misrepresented to National Heritage.

396.    On November 15, 1993, Blutrich caused Lifeco to assign the Capital Mortgages to National Heritage, and National Heritage recorded the Capital Mortgages on its books and records as assets with values totaling $20,434,315.80, the value of the Capital Mortgages less the commission paid to Venture Mortgage.  This

transaction appeared to provide National Heritage with a $20,434,315.80 capital contribution.

397.    In or about November 1993, Smythe caused National Heritage to enter into an agreement with APX to service the Capital Mortgages for National Heritage's benefit.

398.    On December 30, 1993, Aloisi executed a document entitled "Power of Attorney and Re-Assignment of Notes, Mortgages and Other Loans and Security Documents and Any Equity Interest In and To Any Realty or Entities that Hold Realty or Assets, Notes and Security Documents" in favor of Future Diversified (the "Power of Attorney").

399.    The purpose of the Power of Attorney was to provide Pfeffer and Contreras with a mechanism for transferring all of National Heritage's interest in the Capital Mortgages back to Future Diversified.  The Power of Attorney was self-implementing in that it provided that the transfer of the Capital Mortgages back to Future Diversified was effective upon either the entry of any regulatory order that could adversely affect National Heritage or the failure of Lifeco to make payments due to Future Diversified on any class of Lifeco stock which Future Diversified held.

400.    In February and March 1994, Houlihan & O'Malley Appraisal Co., Inc. mailed its actual reports on the Platzner appraisals to Pfeffer at the office of Blutrich, Falcone & Miller.  These reports stated that the Platzner appraisals overvalued the Capital Mortgages.

401.    On or about April 15, 1994, Pfeffer and Blutrich, with the knowledge and agreement of Contreras, again falsified the letterhead of Houlihan & O'Malley Appraisal Co., Inc. and forged Houlihan's signature on five additional desk review reports, which Pfeffer and Blutrich caused to be mailed to the National Heritage CFO on or about April 15, 1993.   The falsified reports again misrepresented that Houlihan agreed with the Platzner appraisals.   Pfeffer, Blutrich and Contreras sent or caused to be sent the fraudulent desk review reports to the National Heritage CFO for the purpose of inducing National Heritage to rely on them.   National Heritage, by and through the National Heritage CFO, relied on the fraudulent desk reviews to its detriment in believing the Capital Mortgages were adequately secured.   Had National Heritage, by and through the National Heritage CFO, known that the desk review reports it received were false and fraudulent, it would have taken appropriate action to mitigate its damages, including, for example, seeking rescission of the transaction and informing the regulators.

402.    In May and June, 1994, shortly after the Order of Supervision was entered against National Heritage, Future Diversified, through Pfeffer and Contreras, reassigned each of the Capital Mortgages to Future Diversified, purportedly pursuant to the Power of Attorney.

## 2.  The Lifeco Mortgage Services Aspect of the Class E Preferred Stock Scheme.

403.   On or about December 3, 1993, Blutrich, Pfeffer, Aloisi, Schick, Shafran and Frenkel & Hershkowitz caused National Heritage to wire transfer $2,231,098.20 to a bank account in the name of Venture Mortgage Fund, L.P., c/o David Schick, Esq., account no. 0037611278, at Citibank in New York.  On or about December 3, 1993, Schick and Frenkel & Hershkowitz caused Venture Mortgage to wire transfer $2,231,098.20 to account no. 01567164 at Citibank in New York in the name of Frenkel & Hershkowitz Attorney Trust - IOLA "D".

404.   Frenkel & Hershkowitz thereafter paid $2 million, consisting of proceeds of the commission from the Capital Mortgages transaction, to Lifeco Mortgage Services.

405.   The purpose of this payment was to create the false appearance that Lifeco Mortgage Services had realized $2 million in revenue.  Schick, Frenkel & Hershkowitz and Pound falsely represented to Lifeco and to Lifeco's auditors that this $2 million was paid pursuant to a highly confidential consulting agreement between a Canadian real estate company whose identity could not be disclosed pursuant to the terms of the consulting agreement.  In truth, the payment consisted of National Heritage's own money, which Smythe, Pfeffer, Contreras, Pound, Blutrich, Weiss, Schick and Shafran caused National Heritage to pay to Venture Mortgage, Venture Mortgage to pay to Frenkel & Hershkowitz, and Frenkel & Hershkowitz to pay to Lifeco Mortgage Services. Lifeco Mortgage Services did not receive the $2 million directly or indirectly from a Canadian real estate company.

3.      **The Dividends Aspect of the Class E Preferred Stock Scheme.**

406.    From December 1993 to March 1994, Lifeco paid Future

Diversified $630,285.08 in dividends on the Class E Preferred Stock.

4.      **Interstate Mailings in Furtherance of the Class E Preferred Stock Scheme.**

407.    In further of the Class E Preferred Stock Scheme,

> Michael Blutrich
> Patrick Smythe
> Keith Pound
> Jan Schneiderman
> Lyle Pfeffer
> Charles Contreras
> Sholam Weiss
> Future Diversified Projects, Inc.
> Harrin Platzner
> Platzner International Group, Ltd.

defendants herein, knowingly caused to be mailed and delivered by the United States

Postal Service, in violation of 18 U.S.C. § 1941, the following matters:

| Date | Matter Mailed/Delivered | To | From |
|------|------------------------|-----|------|
| 09/16/93 | Appraisal from Platzner and Platzner International to National Heritage | National Heritage, Orlando, FL | Platzner and Platzner International, New Rochelle, NY |
| 11/01/93 | Fraudulent desk review reports from Pfeffer to National Heritage | National Heritage, Orlando, FL | Lyle Pfeffer, Lifeco, New York, NY |

5.      **Interstate Wire Communications in Furtherance of the Class E Preferred Stock Scheme.**

408.    In further of the Class E Preferred Stock Scheme,

> Michael Blutrich
> Patrick Smythe
> Keith Pound
> Jan Schneiderman

Lyle Pfeffer
Charles Contreras
Sholam Weiss
Future Diversified Projects, Inc.
Harrin Platzner
Platzner International Group, Ltd.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire

communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following

writings, signs, signals and sounds:

| Date | Writings, Signs,<br>Signals or Sounds | To | From |
|---|---|---|---|
| 11/12/93 | Subscription Agreement faxed from<br>Blutrich, Herman & Miller | Smythe,<br>Orlando, FL | Pfeffer,<br>New York, NY |
| 12/03/93 | $2,231,098.20 wire transfer | Citibank,<br>New York,<br>NY | National Heritage<br>Account |
| 12/03/93 | $2,231,098.20 wire transfer | Citibank,<br>New York,<br>NY | Citibank,<br>New York, NY |

### Q.   The Mortgage-Backed Bond Scheme.

409.   In order to conceal the conspiracy to loot National Heritage and the

millions of dollars in losses the defendants had caused National Heritage to incur, to

continue National Heritage's existence beyond the time it became insolvent, to retain their

control over National Heritage, and to continue to loot it, Blutrich, Pound, Weiss, Starr,

Obstfeld, Grin, Schneiderman, South Star, APX and NHE agreed to implement a scheme

pursuant to which they caused National Heritage to record the purchase of 21 series of

1993 8.5% Registered Collateralized Mortgage Debentures (the "Bond") on its books and

records as of December 28, 1993 for over $118 million. The Bond was designed to

conceal and disguise the ongoing conspiracy to loot National Heritage and to deter regulatory action.

410.    Pursuant to the Mortgage-Backed Bond Scheme, on December 21, 1993, Pound recommended the purchase of the Bond to the National Heritage Investment Committee, of which the National Heritage CFO was a member.  Pound made at least the following false representations to the National Heritage CFO and the Investment Committee, among others:  that the Bond was an attractive investment in that the purchase price was only $118 million while the Bond had a face value of $126 million and was secured by a pool of mortgages (the "Bond Mortgages") having even greater value; that the Bond would yield 8.5% from earnings on the Bond Mortgages, which themselves yielded 11%; that he expected to obtain a favorable bond rating promptly; and that the Bond would comply with insurance regulations prohibiting over-concentration of an insurer's investment because it would be issued in 21 separate series, each series being secured by its own distinct collateral.  National Heritage, by and through the National Heritage CFO, relied on Pound's false representations to its detriment in approving the purchase of the Bond.

411.    The face value of the Bond was the sum of the outstanding principal balances of the Bond Mortgages, many of which were the non-performing mortgages South Star, by and through Starr, Obstfeld, Grin, Rothman and Weiss, purchased from the RTC, CARC and Yasuda pools with National Heritage's monies diverted through the Schneiderman Escrow and the Frenkel & Hershkowitz Escrow.

412.   Despite the fact that all the mortgage loans were purchased by South Star with National Heritage's money from the Schneiderman and Frenkel & Hershkowitz Escrows, not all of those mortgage loans were pledged as collateral for the Bond.  Unbeknownst to National Heritage, South Star retained the following mortgage loans purchased from the respectively indicated mortgage pools:

| NAME OF MORTGAGE POOL | NAME OF MORTGAGOR OR ADDRESS OF PROPERTY | OUTSTANDING PRINCIPAL BALANCE AT THE TIME OF SOUTH STAR'S PURCHASE |
|---|---|---|
| CARC | Nembhard | $23,257.52 |
| CARC | Piazza | 16,770.11 |
| CARC | Lenci | 28,116.53 |
| CARC | Lenci | 25,285.40 |
| CARC | Bacon | 26,412.00 |
| CARC | Batam Associates | 29,820.00 |
| YASUDA | 25 Tudor City Place Unit 1009 | 32,379.75 |
| YASUDA | 321 East 43rd Street Unit 702 | 61,058.40 |
| YASUDA | 5 Tudor City Place Unit 237 | 27,076.14 |
| YASUDA | 5 Tudor City Place Unit 308 | 28,239.51 |
| YASUDA | 5 Tudor City Place Unit 437 | 25,662.00 |
| YASUDA | 5 Tudor City Place Unit B-17 | 47,470.02 |
| YASUDA | 25 Tudor City Place Unit 715 | 34,420.62 |
| RTC | Fronen II | 155,819.90 |
| RTC | Goldstein | 38,841.29 |
| RTC | Le | 132,034.58 |

| NAME OF MORTGAGE POOL | NAME OF MORTGAGOR OR ADDRESS OF PROPERTY | OUTSTANDING PRINCIPAL BALANCE AT THE TIME OF SOUTH STAR'S PURCHASE |
|---|---|---|
| RTC | OSJ Construction | 127,200.00 |
| RTC | James Carboni | 54,297.04 |
| RTC | Alamo Printing | 8,915.34 |
| RTC | Green | 17,120.81 |
| RTC | Laren | 39,632.31 |
| RTC | Kassir | 171,681.42 |
| RTC | Perez | 69,692.43 |
| RTC | Patton | 48,100.01 |
| RTC | Davis | 21,742.25 |
| RTC | Hudson | 5,915.50 |
| RTC | Azano | 29,799.30 |
| RTC | Messenger | 10,559.02 |
| RTC | Singer | 15,509.92 |
| RTC | Gill | 106,000.00 |
| RTC | Loa's Tires | 98,954.06 |
| RTC | Ritenour | 560,553.03 |
| RTC | Mullen | 26,222.48 |
| RTC | Malone II | 78,126.53 |
| RTC | Airies Enterprise | 205,197.66 |
| | | 2,427,882.88 |

413.    The Bond was issued by National Housing Exchange Inc.

("NHE"), a North Carolina corporation formed for the exclusive purpose of issuing the

Bond.  Blutrich, Weiss, Schneiderman, Starr and South Star controlled NHE at all

relevant times, and Blutrich, Starr, Weiss, Schneiderman, South Star and NHE knew at

all relevant times that the Bond was a sham transaction intended to further the Mortgage-

Backed Bond Scheme.  The Bond was governed by an "Indenture and Servicing Agreement," executed by NHE, APX and Continental Stock Transfer and Trust Co. (the "Trustee") on or about December 28, 1993.

414.    On December 28, 1993, Pound and Blutrich caused Walker to send a letter to the Trustee via facsimile falsely and fraudulently representing that National Heritage "had access to all of the mortgage files containing among other things the original copies of the mortgages, the mortgage notes, title policies, and payment history of the mortgages and is satisfied that the mortgage files are complete and conform to the mortgage schedule."  In truth, no employee of National Heritage had access to any such documents, and Pound and Blutrich caused Walker to make this false and fraudulent representation to the Trustee, contrary to the interests of National Heritage, in order to facilitate the closing of the Bond sale and the perpetration of the Mortgage-Backed Bond Scheme.

415.    The Bond Mortgages were listed in the Bond Indenture at grossly inflated values, in that they were valued at the amount of their outstanding principal balances.  However, the fair market values of the Bond Mortgages were substantially lower than the outstanding principal balances because, among other things, they were non-performing.  In fact, as of December 28, 1993, from 66% to 90% of the Bond Mortgages were non-performing, i.e., at least 90 days or more past due.

416.    Additionally, Bond Mortgages with outstanding principal balances of over $3 million which South Star, by and through Starr, purchased from the RTC in August 1993 were listed twice in the Indenture.  This duplication inflated the total

outstanding principal balances of the Bond Mortgages, and thus the face value of the

Bond, by over $3 million.

417.    The Mortgage-Backed Bond Scheme created the appearance that

National Heritage acquired a $126 million asset as of December 28, 1993 for $118

million, thus concealing and disguising the crippling financial effect the conspirators'

prior diversions had on National Heritage's financial condition, continuing the existence

of National Heritage beyond the time it became insolvent, delaying regulatory action,

concealing the ongoing conspiracy to loot National Heritage and perpetuating the

defendants' control over National Heritage.

**1.      Interstate Wire Communications in Furtherance of the
        Mortgage-Backed Bond Scheme.**

418.    In furtherance of the Mortgage-Backed Bond Scheme,

Michael Blutrich
Keith Pound
Sholam Weiss
Jan Schneiderman
Jan Starr
Solomon Obstfeld
Eugene Grin
Samuel Rothman
APX Mortgage Services, Inc.
South Star Management Co.
National Housing Exchange, Inc.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire

communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following

writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|------------------------------------|----|------|
|      |                                    |    |      |

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|-----------------------------------|-----|------|
| 12/28/93 | Letter faxed from Walker to the Trustee | Continental Stock Transfer & Trust Co., New York, NY | Walker, Orlando, FL |

### R.    The Mortgage Servicing Scheme.

419.    Subsequent to December 28, 1993, Blutrich, Weiss, South Star, Starr, Obstfeld, Grin, Rothman, Pound, APX, Gorski, Allen, Hershkowitz, Simon and Frenkel & Hershkowitz, and later RAM and National Work-Out, agreed to implement a scheme to service the Bond Mortgages for their own benefit, rather than for the benefit of National Heritage, the sole bondholder.

420.    Pursuant to the Mortgage Servicing Scheme, in approximately late 1993 or early 1994, South Star, by and through Starr, Obstfeld, Grin, Rothman, Weiss, Hershkowitz and Frenkel & Hershkowitz, delivered numerous mortgages to APX in order to allow APX, by and through Gorski and Allen, to service the mortgages purportedly for the benefit of National Heritage by, among other things, collecting payments on the mortgages, foreclosing on mortgages in default, and disbursing monies realized from those collection activities.

421.    The mortgages which South Star, by and through Starr, Obstfeld, Grin, Rothman, Weiss, Hershkowitz and Frenkel & Hershkowitz, delivered to APX, by and through Gorski and Allen, included both the Bond Mortgages and certain other mortgages which South Star had purchased with National Heritage's money, but which South Star, by and through Starr, Obstfeld, Grin, Rothman, Weiss, Hershkowitz, Simon, Schick and Frenkel & Hershkowitz, had wrongfully retained in its own name and for its

own benefit, as alleged above. APX, Gorski and Allen referred to the mortgages which South Star retained in its own name as the "I-250 Mortgages." APX, Gorski and Allen serviced both the Bond Mortgages and the I-250 Mortgages until December 1, 1994 when RAM, by and through Pound, took over the servicing of those mortgages from APX.

422.  Pursuant to the Mortgage Servicing Scheme, Blutrich issued the following checks to APX from the "Blutrich, Herman & Miller Special No. 1 Escrow Account" on the dates and in the amounts respectively indicated:

| Date | Check No. | Amount |
|---|---|---|
| 04/11/94 | 2059 | $135,000.00 |
| 04/12/94 | 2060 | 64,541.99 |
| 04/22/94 | 2061 | 72,500.00 |
| 04/29/94 | 2064 | 15,500.00 |
| | TOTAL | $287,541.99 |

423.  RAM serviced the Bond Mortgages until January 8, 1996, when a receiver was appointed for those mortgages in the case entitled Williams v. National Housing Exchange, Inc., et al., No. 95 C 4243 (N.D. Ill.) (the "NHE Litigation"). RAM serviced the I-250 Mortgages until February 15, 1996, when a receiver was similarly appointed for those mortgages in the NHE Litigation.

424.  On April 3, 1996 and September 13, 1996, declaratory judgment orders were entered in the NHE Litigation declaring the Commissioner to be the owner of both the Bond Mortgages and the I-250 Mortgages.

425.  On information and belief, the total value of the Bond Mortgages and I-250 Mortgages does not exceed approximately $50 million.

426.   APX, by and through Gorski and Allen, and RAM, by and through Pound, serviced the Bond Mortgages and the I-250 Mortgages pursuant to the Mortgage Servicing Scheme to the direct detriment of National Heritage, rather than for the benefit of National Heritage, as they were bound to do by the terms of the Indenture and their role as servicing agent, as alleged in detail below.

### 1.   **The Theft of the Roberts Mortgage**.

427.   South Star, by and through Starr, Obstfeld, Grin, Rothman, Weiss, Hershkowitz, Simon and Frenkel & Hershkowitz, assigned many of the Bond Mortgages to NHE, which was controlled by Starr, and under the Indenture, NHE was to execute assignments of each of the Bond Mortgages to the Trustee, for the benefit of National Heritage. NHE in fact did so. However, neither APX, RAM, nor any other person or entity ever recorded the assignments from NHE to the Trustee. As a result, according to the public real estate records, NHE was the holder of the mortgage on each of the properties that secured the Bond Mortgages. This allowed South Star, Starr, Obstfeld, Grin, Weiss, Hershkowitz, Simon, Frenkel & Hershkowitz, APX, Gorski, Allen, RAM and Pound to divert early pay-offs of mortgages and to foreclose on properties in the name of NHE, rather than in the name of the Trustee, and at least RAM and Pound in fact did so.

428.   For example, on February 8, 1994, less than two months after National Heritage purchased the Bond, Pound received, via facsimile transmission, a copy of a letter from Schick to South Star concerning Pound's review of fourteen of South Star's proposed modifications of non-performing Bond Mortgages. One of these

Bond Mortgages was the Roberts Mortgage, which had an outstanding principal balance of $48,573.74 as of December 28, 1993.

429.    Attached to the February 8, 1994 letter were "Workout Approval Request" forms for each of fourteen Mortgages.  The Workout Approval Request form for the Roberts Mortgage stated that:

> At this time the mortgagor has an offer from a buyer that has been approved for a mortgage and wants to close as soon as possible.  We paid 56% of book ($48,573.00 x .56) or $27,301.00.  The offer we have is for $40,000 minus selling expenses.  This sale can net us approximately $36,500.00.  As a result we can realize an instant profit of ($36,500.00 - $27,301.00 = $9,199.00) $9,199.00 if we do not allow sale mortgagor to walk away.

430.    Pound approved of South Star's proposed sale of the property securing the Roberts Mortgage by writing in hand on the face of the Workout Approval Request form: "OK KP."

431.    On or about February 25, 1994, South Star, by and through Grin, Simon and Frenkel & Hershkowitz, agreed to accept $35,643.53 as payment for discharge of the Roberts Mortgage.  On or about March 3, 1994, Simon and Frenkel & Hershkowitz delivered a check in the amount of $35,643.53 to South Star.

432.    Subsequent to Pound's approval of the sale of the property securing the Roberts Mortgage, the Roberts Mortgage was not part of the collateral securing the Bond.  Neither RAM nor APX ever accounted for the disposition of the proceeds of the sale of the property securing the Roberts Mortgage.

## 2.    The Replacement of APX with RAM.

433.    On July 29, 1994, the Trustee mailed a letter to APX and NHE, notifying them that they were in default under the Indenture, for, among other things, failing to make payments to the Trustee for the benefit of National Heritage.  Neither APX nor NHE cured their defaults.

434.    Thereafter, Pound devised a scheme to retain control of the servicing of the Bond Mortgages and the I-250 Mortgages and to perpetuate his ability to divert monies from these mortgages to himself and to South Star.

435.    On September 19, 1994, Pound incorporated National Work-Out. Pound was the sole officer, director, shareholder and employee of National Work-Out at all relevant times.  The address of National Work-Out was the same address as Pound's personal residence at all relevant times.  On October 6, 1994, Pound incorporated RAM.

436.    On November 7, 1994, the Trustee terminated all rights of NHE and APX under the Indenture.

437.    Thereafter, on December 1, 1994, RAM covertly took over all of APX's business, including the servicing of the Bond Mortgages and I-250 Mortgages. RAM began its operations on December 1, 1994 at 1585 North Rand Road in Palatine, Illinois, the same address where APX operated.  RAM employed the same people and used the same documents and physical facilities that APX had employed through the close of business on the previous day, November 30, 1994.

438.   Neither RAM, Pound, APX, Gorski nor Allen notified the Trustee, National Heritage or the Commissioner that RAM had taken over the servicing from APX.

439.   RAM's covert acquisition of the servicing of the Bond Mortgages violated the Indenture, which vested the Trustee with the exclusive authority to appoint the mortgage servicer.

440.   On January 4, 1995, the Trustee faxed a letter to APX and NHE, demanding that APX deliver the Bond Mortgages, cash and related documents to the Trustee's designee on January 11, 1995 at 10:00 a.m.  At the time, neither the Trustee, National Heritage nor the Commissioner was aware that RAM and Pound had taken over the servicing from APX, Gorski and Allen.

441.   On January 5, 1995, RAM faxed a letter to the Trustee, in which RAM refused to surrender the servicing of the Bond Mortgages, advised the Trustee that RAM was "prepared and will welcome any opportunity to litigate this matter . . ." and warned the Trustee to "GOVERN YOUR ACTIONS ACCORDINGLY."

442.   On January 19, 1995, the Commissioner instituted the NHE Litigation against NHE, APX, and RAM.  RAM was in possession of the Bond Mortgages at all times until January 8, 1996 when a receiver was appointed in the NHE Litigation for the Bond Mortgages.

**3.      The Diversion of Funds Through a "Servicing Fee."**

443.     The Indenture provided for a payment to the servicer of the Bond

Mortgages of a service fee "pursuant to a separate agreement."  The principals of NHE

and APX executed a servicing fee agreement dated December 28, 1993, setting forth a

servicing fee based on a schedule of specified dollar amounts to be charged per mortgage,

but this agreement was never executed by the Trustee.  Gorski, on behalf of APX, signed

a servicing fee agreement, also dated December 28, 1993, which authorized the servicer

to collect 1% of the aggregate unpaid principal balance of the Bond Mortgages as a

servicing fee.  This agreement was never signed by either NHE or the Trustee.  The

Trustee never agreed with any servicer for the payment of a servicing fee calculated as

1% of the outstanding principal balances on the Bond Mortgages.

444.     Despite the non-existence of any servicing fee agreement, both

APX and RAM paid themselves a monthly servicing fee calculated as 1/12 of 1% of the

outstanding principal balance of the Bond Mortgages.  APX paid itself servicing fees of

approximately $780,000.00 through November 30, 1994.  RAM paid itself servicing fees

of at least $973,240.18 through August 1995 alone.

**4.      The Diversion of Funds to National Work-Out.**

445.     On October 7, 1994, Starr, on behalf of NHE, executed a Limited

Power of Attorney to Pound, as president of National Work-Out, appointing National

Work-Out as attorney for NHE to take action relating to the Bond Mortgages.  This

Limited Power of Attorney was faxed from RAM on May 18, 1995.

446.    From December 1, 1994 to May 11, 1995, RAM paid at least $279,120.00 to National Work-Out directly from income generated by the Bond Mortgages.  The payments were made under the guise of compensating National Work-Out for workout services in connection with delinquent Bond Mortgages.  However, pursuant to the terms of the Indenture, RAM was required to perform workout services at its own expense, and National Work-Out never performed services related to the Bond Mortgages and was not entitled to such compensation.

447.    On September 20, 1995, two days prior to the commencement of the hearing on the Commissioner's request for a preliminary injunction in the NHE Litigation, Pound attempted to conceal and disguise certain of the payments RAM had made to National Work-Out.  Pound caused RAM to return $74,900.00 to the bank accounts RAM maintained for the purpose of collecting and disbursing monies relating to the Bond.  Pound did not repay this money from either his or National Work-Out's own resources; however, instead, Pound caused RAM to transfer the money from an account RAM maintained in connection with its servicing of the I-250 Mortgages.

5.    **The Diversion of Funds to South Star Through the Laguna Beach Mortgages.**

448.    Among the mortgages South Star purchased at the RTC non-performing loan auction in August 1993 were three loans secured by property located at 84 La Senda Drive, Laguna Beach, California (the "Laguna Beach Mortgages"). Although South Star purchased all three Laguna Beach Mortgages with National Heritage's money from the Schneiderman Escrow, only one of the three loans, the only one that was a third mortgage, was pledged as collateral for the Bond (the "Third Laguna

Beach Mortgage"). This mortgage also was the one of the three with the lowest outstanding principal balance, and the only loan of the three that lacked a personal guarantee. The inclusion of the Third Laguna Beach Mortgage as part of the collateral securing the Bond was a violation of Section 4.01(a)(x)(9) of the Indenture, which required that each Bond Mortgage constitute a "valid, subsisting and enforceable first or second lien . . . ."

449.   On or about March 24, 1995, RAM foreclosed the Third Laguna Beach Mortgage and purchased the first two Laguna Beach Mortgages from South Star in the name of NHE with $476,957.67 taken from monies generated from the Bond Mortgages. RAM thus purchased from South Star, in the name of NHE, with National Heritage's money, the first two Laguna Beach Mortgages which South Star had originally purchased from the RTC, also with National Heritage's money.

### 6.   The Diversion of Funds to South Star Through the "Unidentified Funds" Account.

450.   APX, by and through Gorski and Allen, and RAM, by and through Pound, maintained an "unidentified funds" bank account to hold funds that could not be attributed to either Bond Mortgages or I-250 Mortgages. On or about March 23, 1995, RAM paid South Star $130,007.95 out of the "unidentified funds" bank account, despite the fact that RAM could not attribute those monies to the I-250 Mortgages.

### 7.   The Diversion of Interest Which Accrued Prior to December 28, 1993 to South Star.

451.   Under Section 6.05(A) of the Indenture, all interest that accrued on the Bond Mortgages prior to December 28, 1993 was to be paid to NHE. Both APX, by

and through Gorski and Allen, and RAM, by and through Pound, maintained a segregated

bank account for interest which accrued on the Bond Mortgages prior to December 28,

1993. RAM, at the direction of Pound, made a number of payments from the accrued

interest account to persons and entities other than NHE, including a $92,000.00 payment

to South Star in March 1995.

### 8.   Interstate Mailings in Furtherance of the Mortgage Servicing Scheme.

452.   In furtherance of the Mortgage Servicing Scheme,

Michael Blutrich
Sholam Weiss
South Star Management Co.
Jan Starr
Solomon Obstfeld
Eugene Grin
Samuel Rothman
Keith Pound
APX Mortgage Services, Inc.
Robert Gorski
Nadine Gorski
National Housing Exchange, Inc.

defendants herein, knowingly caused to be mailed and delivered by the United States

Postal Service, in violation of 18 U.S.C. § 1941, the following matter:

| Date | Matter Mailed/Delivered | To | From |
|------|-------------------------|-----|------|
| 07/29/94 | Letter from Trustee to NHE and APX | NHE, Greensboro, NC, and APX, Palatine, IL | Trustee, New York, NY |

### 9.   Interstate Wire Communications in Furtherance of the Mortgage Servicing Scheme.

453.   In further of the Mortgage Servicing Scheme,

Michael Blutrich

-175-

Sholam Weiss
South Star Management Co.
Jan Starr
Solomon Obstfeld
Eugene Grin
Keith Pound
APX Mortgage Services, Inc.
Robert Gorski
Nadine Gorski
National Housing Exchange, Inc.

defendants herein, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, in violation of 18 U.S.C. § 1943, the following writings, signs, signals and sounds:

| Date | Writings, Signs, Signals or Sounds | To | From |
|------|-----------------------------------|-----|------|
| 02/08/94 | Letter faxed to Pound | Keith Pound | David Schick, New York, NY |
| 01/04/95 | Letter faxed from Trustee to NHE and APX | APX, Palatine, IL | Trustee, New York, NY |
| 01/05/95 | Letter faxed to RAM to Trustee | Trustee, New York, NY | RAM, Palatine, IL |

## COUNT I - VIOLATIONS OF 18 U.S.C. § 1962(c)

454.     The Commissioner realleges and reincorporates paragraphs 1-428 above as if fully set forth herein.

455.     This Count I is directed against defendants Michael Blutrich; David Davies; Patrick Smythe; Joseph Rouadi; Lyle Pfeffer; and Keith Pound, hereinafter collectively referred to as the "1962(c) Defendants."

456.     At all relevant times, the Commissioner, National Heritage and each of the 1962(c) Defendants were persons within the meaning of 18 U.S.C. § 1961(3).

457.   At all relevant times, National Heritage was a corporation and as such constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), engaged in activities which affected interstate commerce.

458.   At all relevant times, each of the 1962(c) Defendants was employed by or associated with National Heritage.

459.   Beginning at least as early as May 1990 and continuing to at least May 25, 1994, each of the 1962(c) Defendants directly and indirectly conducted and participated in the conduct of the affairs of National Heritage through a pattern of racketeering activity within the meaning to 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

460.   The pattern of racketeering activity alleged herein includes numerous acts of mail and wire fraud committed by the various defendants during the course of the multiple schemes, detailed above, to defraud and loot National Heritage. The pattern of these offenses was continuous in nature, posed a threat of continued activity, and had the same or similar purpose and result -- to defraud and loot National Heritage.  These acts were not isolated events but were interrelated, repeated, and at all times threatened repetition and future criminal activity.

461.   Each of the aforementioned acts of mail and wire fraud constitutes a predicate act of racketeering activity as defined in 18 U.S.C. § 1961(1)(B).

462.   Each of the schemes detailed above constitutes a scheme and artifice to defraud within the meaning of the mail fraud statute, 18 U.S.C. § 1941, and the wire fraud statute, 18 U.S.C. § 1943.

463.    As a direct and proximate result of the 1962(c) Defendants'

violation of 18 U.S.C. § 1962(c), National Heritage has suffered injury to its business and

property and is thereby entitled to recover from the defendants treble damages and the

cost of this lawsuit, including a reasonable attorney's fee, pursuant to 18 U.S.C.

§ 1964(c).

## COUNT II - VIOLATIONS OF 18 U.S.C. § 1962(d)

464.    The Commissioner realleges and reincorporates paragraphs 1-428

above as if fully set forth herein.

465.    This Count II is directed against Michael Blutrich; David Davies;

Patrick Smythe; Joseph Rouadi; Gerald Decker; Capital Comparisons, Inc.; Schooner

Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.; Celeb Capital, Inc.;

Heathmead Development Corp.; Schecter, Ltd.; Perth Commercial Properties, Inc.; Webb

Associates, Inc.; Crown Regional Properties, Inc.; Maxsam Entertainment, Inc.; Harrin

Platzner; Platzner International Group, Ltd.; Alan Hirsch; Thomas Martin; Martin Real

Estate Appraisers, Inc.; Henry Grassi; LPDA Acquisition Corp.; Banstar, Inc.; Cromwell

Building, Inc.; Perfe Corporation; New Contenders, Inc.; Actual Funding Company, Inc.;

Anshlu, Inc.; Lyle Pfeffer; Deborah Aronow; Joseph Aronow; Nulenda, Inc.; National

Finders Corp.; Scores Entertainment, Inc.; Irving Bilzinsky; Mark Yackow; National

Mortgage Corp.; Charles Contreras; Future Diversified Projects, Inc.; Michael

Oberlander; T.T.T. Capital Corp.; L. Pfeffer Corp.; Keith Pound; Jan Schneiderman;

South Star Management Co., Inc.; Jan Starr a/k/a Jan Stark; Sholam Weiss; Solomon

Obstfeld; Eugene Grin; Samuel Rothman; Global Equities & Realty, Inc.; N.E.S.

Consulting Corp.; John Spear; Dean Kaltsas; FDPI Holding, Inc.; Ha-Lo Investment

Associates, Inc.; Regency Financial Group, Inc.; Somerset Properties, Inc.; Momentum

Energy Resources Corp.; Cornerstone Oil and Gas Inc.; National Housing Exchange,

Inc.; APX Mortgage Services, Inc.; Robert Gorski; Nadine Gorski a/k/a Nadine Allen;

Resource Asset Management, Inc.; and National Work-Out Specialists, Inc., hereinafter

collectively referred to as the "1962(c) Conspiracy Defendants."

466.    As alleged above, each of the 1962(c) Defendants violated 18

U.S.C. § 1962(c).

467.    Each of the 1962(c) Conspiracy Defendants knowingly agreed,

combined and conspired with each other and among themselves to conduct and

participate in the affairs of National Heritage through a pattern of racketeering activity.

This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C.

§ 1962(d).

468.    As a direct and proximate result of the 1962(c) Conspiracy

Defendants' agreement to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C.

§ 1962(d), National Heritage suffered injury to its business and property and is thereby

entitled to recover from the defendants treble damages and the cost of this lawsuit,

including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

### COUNT III - VIOLATIONS OF 18 U.S.C. § 1962(c)
### (ASSOCIATION-IN-FACT ENTERPRISE)

469.    The Commissioner realleges and reincorporates paragraphs 1-428

above as if fully set forth herein.

470.   This Count III is directed against Michael Blutrich; David Davies; Patrick Smythe; Joseph Rouadi; Gerald Decker; Capital Comparisons, Inc.; Schooner Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.; Celeb Capital, Inc.; Heathmead Development Corp.; Schecter, Ltd.; Perth Commercial Properties, Inc.; Webb Associates, Inc.; Crown Regional Properties, Inc.; Maxsam Entertainment, Inc.; Harrin Platzner; Platzner International Group, Ltd.; Alan Hirsch; Thomas Martin; Martin Real Estate Appraisers, Inc.; Henry Grassi; LPDA Acquisition Corp.; Banstar, Inc.; Cromwell Building, Inc.; Perfe Corporation; New Contenders, Inc.; Actual Funding Company, Inc.; Anshlu, Inc.; Lyle Pfeffer; Deborah Aronow; Joseph Aronow; Nulenda, Inc.; National Finders Corp.; Scores Entertainment, Inc.; Irving Bilzinsky; Mark Yackow; National Mortgage Corp.; Charles Contreras; Future Diversified Projects, Inc.; Michael Oberlander; T.T.T. Capital Corp.; L. Pfeffer Corp.; Keith Pound; Frenkel & Hershkowitz; Bernard Shafran; Joseph Hershkowitz; Neil Simon; Devorah Weinschneider; Jan Schneiderman; South Star Management Co., Inc.; Jan Starr a/k/a Jan Stark; Sholam Weiss; Solomon Obstfeld; Eugene Grin; Samuel Rothman; Global Equities & Realty, Inc.; N.E.S. Consulting Corp.; John Spear; Dean Kaltsas; FDPI Holding, Inc.; Ha-Lo Investment Associates, Inc.; Regency Financial Group, Inc.; Somerset Properties, Inc.; Momentum Energy Resources Corp.; Cornerstone Oil and Gas Inc.; National Housing Exchange, Inc.; APX Mortgage Services, Inc.; Robert Gorski; Nadine Gorski a/k/a Nadine Allen; Resource Asset Management, Inc.; and National Work-Out Specialists, Inc., herein collectively referred to as the "1962(c) Association-in-Fact Defendants."

471.   At all relevant times, the mutual combination and association in fact of each of the 1962(c) Association-in-Fact Defendants, as alleged above, was an enterprise within the meaning of § 1961(4) of the RICO Act (the "Association-in-Fact Enterprise").  The Association-in-Fact Enterprise was a continuous organization characterized by the common purpose of looting National Heritage and using the money looted from National Heritage for the perpetuation of the Association-in-Fact Enterprise and otherwise for the benefit of the Association-in-Fact Enterprise and its members.  The Association-in-Fact Enterprise had a decision-making structure, a continuity of structure, and a continuity of personnel characterized by the roles played by each of its members as alleged in detail above.  At all relevant times, the Association-in-Fact Enterprise engaged in, and its activity affected, interstate commerce.

472.   The activities of the Association-in-Fact Enterprise were not limited to the pattern of racketeering activity.  The Association-in-Fact Enterprise engaged in conduct which went beyond, and was separate and apart from, the pattern of racketeering activity, such as doing all that was necessary to continue the business of National Heritage during the course of the schemes and conspiracy.  This conduct had some, but not all, of the same purposes as the pattern of racketeering activity, such as to delay and obstruct regulatory action and to extend National Heritage's life beyond the time it became insolvent.

473.   At all relevant times, each of the 1962(c) Association-in-Fact Defendants was employed by or associated with the Association-in-Fact Enterprise.

-181-

474.    Beginning at least as early as May 1990 and continuing to at least May 25, 1994, each of the 1962(c) Association-in-Fact Defendants directly and indirectly conducted and participated in the conduct of the affairs of the Association-in-Fact Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

475.    As a direct and proximate result of the 1962(c) Association-in-Fact Defendants' violation of 18 U.S.C. § 1962(c), National Heritage has suffered injury to its business and property and is thereby entitled to recover from the defendants treble damages and the cost of this lawsuit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

### COUNT IV - VIOLATIONS OF 18 U.S.C. § 1962(d) (ASSOCIATION-IN-FACT ENTERPRISE)

476.    The Commissioner realleges and reincorporates paragraphs 1-428 above as if fully set forth herein.

477.    This Count IV is directed against each of the 1962(c) Association-in-Fact Defendants.

478.    As alleged above, each of the 1962(c) Association-in-Fact Defendants violated 18 U.S.C. § 1962(c).

479.    Each of the 1962(c) Association-in-Fact Defendants knowingly agreed, combined and conspired with each other and among themselves to conduct and participate in the affairs of the Association-In-Fact Enterprise through a pattern of racketeering activity.  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

-182-

480.    As a direct and proximate result of the 1962(c) Association-in-Fact Defendants' agreement to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), National Heritage suffered injury to its business and property, and is thereby entitled to recover from the defendants treble damages and the cost of this lawsuit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

### COUNT V - VIOLATIONS OF 18 U.S.C. § 1962(b)

481.    The Commissioner realleges and reincorporates paragraphs 1-428 above as if fully set forth herein.

482.    This Count V is directed against defendants David Davies, Patrick Smythe and Joseph Rouadi, hereinafter collectively referred to as the "1962(b) Defendants."

483.    In violation of § 1962(b) of the RICO Act, each of the 1962(b) Defendants acquired or maintained an interest in or control of National Heritage by means of the pattern of racketeering activity described above.

484.    As a direct and proximate result of each of the 1962(b) Defendant's acquisition or maintenance of an interest in or control of National Heritage, National Heritage suffered injury to its business and property.  Each of the 1962(b) Defendant's acquisition of the stock of Lifeco and resulting acquisition of control of National Heritage was itself a distinct injury to National Heritage, in that the acquisition in and of itself directly and proximately caused National Heritage to be controlled by individuals who were incompetent and incapable of running a life insurance company for profit, immediately and substantially reducing the value of National Heritage.  The amount of

damages suffered by National Heritage should be trebled pursuant to the terms of the RICO Act.

## COUNT VI - VIOLATIONS OF 18 U.S.C. § 1962(d)
## (DIRECTED AGAINST 1962(b) DEFENDANTS)

485.     The Commissioner realleges and reincorporates paragraphs 1-428 above as if fully set forth herein.

486.     This Count VI is directed against Michael Blutrich, David Davies, Patrick Smythe, Joseph Rouadi and Capital Comparisons, Inc., hereinafter collectively referred to as the "1962(b) Conspiracy Defendants."

487.     As alleged above, each of the 1962(b) Conspiracy Defendants violated 18 U.S.C. § 1962(b).

488.     Each of the 1962(b) Defendants knowingly agreed, combined and conspired with each other and among themselves to acquire or maintain an interest in or control of National Heritage by means of the pattern of racketeering activity described above.  This conspiracy to violate 18 U.S.C. § 1962(b) constitutes a violation of 18 U.S.C. § 1962(d).

489.     As a direct and proximate result of the 1962(b) Defendants' agreement to violate 18 U.S.C. § 1962(b), in violation of 18 U.S.C. § 1962(d), National Heritage suffered injury to its business and property and is thereby entitled to recover from the defendants treble damages and the cost of this lawsuit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

## COUNT VII - VIOLATIONS OF 18 U.S.C. § 1962(a)

490.   The Commissioner realleges and reincorporates paragraphs 1-428 above as if fully set forth herein.

491.   This Count VII is directed against David Davies; Patrick Smythe; and Joseph Rouadi, hereinafter collectively referred to as the "1962(a) Defendants."

492.   Each of the 1962(a) Defendants received income from a pattern of racketeering, including but not limited to monies diverted directly or indirectly from the Robert Earl Trust and National Heritage, and used and invested, directly or indirectly, that income in acquiring an interest in or operating National Heritage in violation of § 1962(a) of the RICO Act.

493.   As a direct and proximate result of each of the 1962(a) Defendant's use or investment of racketeering income in National Heritage, National Heritage suffered injury to its business and property. Each of the 1962(a) Defendant's use of racketeering income and investment thereof to acquire the stock of Lifeco and, as a result, to acquire control of National Heritage was itself a distinct injury to National Heritage in that the acquisition in and of itself directly and proximately caused National Heritage to be controlled by individuals who were incompetent and incapable of running a life insurance company for profit, immediately and substantially reducing the value of National Heritage. The amount of damages suffered by National Heritage should be trebled pursuant to the terms of the RICO Act.

## COUNT VIII - VIOLATIONS OF 18 U.S.C. § 1962(d)
## (DIRECTED AGAINST THE 1962(a) DEFENDANTS)

494.     The Commissioner realleges and reincorporates paragraphs 1-428 above as if fully set forth herein.

495.     This Count VIII is directed against Michael Blutrich; David Davies; Patrick Smythe; Joseph Rouadi; and Capital Comparisons, Inc., hereinafter collectively referred to as the "1962(a) Conspiracy Defendants."

496.     As alleged above, each of the 1962(a) Conspiracy Defendants violated 18 U.S.C. § 1962(a).

497.     Each of the 1962(a) Conspiracy Defendants knowingly agreed, combined and conspired with each other and among themselves to receive income from a pattern of racketeering, including but not limited to monies diverted directly or indirectly from the Robert Earl Trust and National Heritage, and use and invest, directly or indirectly, that income in acquiring an interest in or operating National Heritage.  This conspiracy to violate 18 U.S.C. § 1962(a) constitutes a violation of 18 U.S.C. § 1962(d).

498.     As a direct and proximate result of the 1962(a) Conspiracy Defendants' agreement to violate 18 U.S.C. § 1962(a), in violation of 18 U.S.C. § 1962(d), National Heritage suffered injury to its business and property and is thereby entitled to recover from the defendants treble damages and the cost of this lawsuit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

## COUNT IX - FRAUD

499.     The Commissioner realleges and reincorporates paragraphs 1-428 above as if fully set forth herein.

500.     As alleged above, each of the following defendants made material representations or omissions which were untrue and known to be untrue and which were made with the intent to deceive and for the purpose of inducing National Heritage to act or refrain from acting:  Michael Blutrich; David Davies; Patrick Smythe; Joseph Rouadi; Gerald Decker; Capital Comparisons, Inc.; Schooner Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.; Celeb Capital, Inc.; Heathmead Development Corporation; Perth Commercial Properties, Inc.; Crown Regional Properties, Inc.; Harrin Platzner; Platzner International Group, Ltd.; Alan Hirsch; Thomas Martin; Martin Real Estate Appraisers, Inc.; Henry Grassi; LPDA Acquisition Corp.; Lyle Pfeffer; Deborah Aronow; Joseph Aronow; Nulenda, Inc.; National Mortgage Corp.; Future Diversified Projects, Inc.; Keith Pound; Jan Schneiderman; South Star Management Co., Inc.; Jan Starr a/k/a Jan Stark; Sholam Weiss; Solomon Obstfeld; Eugene Grin; Samuel Rothman; Global Equities & Realty, Inc.; N.E.S. Consulting Corp.; John Spear; Dean Kaltsas; FDPI Holding, Inc.; Ha-Lo Investment Associates, Inc.; APX Mortgage Services, Inc.; Robert Gorski; Nadine Gorski a/k/a Nadine Allen; and, Resource Asset Management, Inc.

501.     As alleged above, National Heritage justifiably relied on the fraudulent representations and omissions and was induced thereby to act or refrain from acting to its injury and damage.

502.     This Count IX does not seek recovery against David Davies and Patrick Smythe for acts of fraud alleged in Count I of the lawsuit pending in the Circuit Court of Orange County, Florida, Civil Division, entitled <u>Donna Lee H. Williams,</u> <u>Insurance Commissioner of the State of Delaware, as Receiver for National Heritage Life</u>

Insurance Company in Liquidation v. Prudential Insurance Company, et al., Case No.

C196-3225.  Further, this Count IX does not seek recovery against Michael Blutrich and

Patrick Smythe for acts of fraud alleged in Count II of the lawsuit pending in the United

States District Court for the Middle District of Florida, entitled Donna Lee H. Williams,

Insurance Commissioner of the State of Delaware, as Receiver for National Heritage Life

Insurance Company in Liquidation v. Patrick Smythe, et al., Case No. 95-910-CIV-OR-

22.

## COUNT X - AIDING AND ABETTING FRAUD

503.     As alleged above, each of the following defendants knew of fraudulent representations or omissions which were untrue and known to be untrue and which were made for the purpose of inducing National Heritage to act, and knowingly participated in, and provided substantial assistance and encouragement to, the fraud: Michael Blutrich; David Davies; Patrick Smythe; Joseph Rouadi; Gerald Decker; Capital Comparisons, Inc.; Schooner Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.; Celeb Capital, Inc.; Heathmead Development Corporation; Perth Commercial Properties, Inc.; Crown Regional Properties, Inc.;  Harrin Platzner; Platzner International Group, Ltd.; Alan Hirsch; Thomas Martin; Martin Real Estate Appraisers, Inc.; Henry Grassi; LPDA Acquisition Corp.; Lyle Pfeffer; Deborah Aronow; Joseph Aronow; Nulenda, Inc.; Irving Bilzinsky; Mark Yackow; National Mortgage Corp.; Charles Contreras; Future Diversified Projects, Inc.; Michael Oberlander; T.T.T. Capital Corp.; L. Pfeffer Corp.; Keith Pound; Jan Schneiderman; South Star Management Co., Inc.; Jan Starr a/k/a Jan Stark; Sholam Weiss; Solomon Obstfeld; Eugene Grin; Samuel Rothman; Global Equities & Realty, Inc.; N.E.S. Consulting Corp.; John Spear; Dean Kaltsas; FDPI Holding, Inc.; Ha-Lo Investment Associates, Inc.; National Housing Exchange, Inc.; APX Mortgage Services, Inc.; Robert Gorski; Nadine Gorski a/k/a Nadine Allen; Resource Asset Management, Inc.; and, National Work-Out Specialists, Inc.

504.   As alleged above, National Heritage justifiably relied on the fraudulent representations and omissions and was induced thereby to act or refrain from acting to its injury and damage.

505.   This Count X does not seek recovery against Michael Blutrich and Patrick Smythe for acts of aiding and abetting fraud alleged in Count III of the lawsuit pending in the United States District Court for the Middle District of Florida, entitled Donna Lee H. Williams, Insurance Commissioner of the State of Delaware, as Receiver for National Heritage Life Insurance Company in Liquidation v. Patrick Smythe, et al., Case No. 95-910-CIV-OR-22.

## COUNT XI - BREACH OF FIDUCIARY DUTY

506.   The Commissioner realleges and reincorporates paragraphs 1-428 above as if fully set forth herein.

507.   As alleged above, each of the following defendants was either an officer, director, employee, attorney, partner or agent for National Heritage:  David Davies; Patrick Smythe; Capital Comparisons, Inc.; Scientific Waste Systems, Inc.; LPDA Acquisition Corp.; Lyle Pfeffer; National Mortgage Corporation; Jan Schneiderman; Ha-Lo Investment Associates, Inc.; APX Mortgage Services, Inc.; Robert Gorski; Nadine Gorski a/k/a Nadine Allen; and Resource Asset Management, Inc., hereinafter collectively referred to as the "Breach of Fiduciary Duty Defendants."

508.   Each of the Breach of Fiduciary Duty Defendants owed National Heritage a fiduciary duty.

-190-

509.     As alleged above, each of the Breach of Fiduciary Duty
Defendants breached his or her fiduciary duty to National Heritage by, among other
breaches, self-dealing and failing to disclose material information to National Heritage.

510.     National Heritage justifiably relied on the Breach of Fiduciary
Duty Defendants and sustained damages, as alleged above, as a direct and proximate
result of each breach of fiduciary duty committed by each Breach of Fiduciary Duty
Defendant.

511.     This Count XI does not seek recovery against Patrick Smythe for
breaches of fiduciary duty alleged in Count VI of the lawsuit pending in United States
District Court for the Middle District of Florida, entitled <u>Donna Lee H. Williams,
Insurance Commissioner of the State of Delaware, as Receiver for National Heritage Life
Insurance Company in Liquidation v. Patrick Smythe, et al.</u>, Case No. 95-910-CIV-OR-
22.

## COUNT XII - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

512.     The Commissioner realleges and reincorporates paragraphs 1-428
above as it fully set forth herein.

513.     This Count XII is directed against defendants Michael Blutrich;
David Davies; Patrick Smythe; Joseph Rouadi; Gerald Decker; Capital Comparisons,
Inc.; Schooner Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.;
Celeb Capital, Inc.; Heathmead Development Corporation; Schecter, Ltd.; Perth
Commercial Properties, Inc.; Webb Associates, Inc.; Crown Regional Properties, Inc.;
Maxsam Entertainment, Inc.; Harrin Platzner; Platzner International Group, Ltd.; Alan

Hirsch; Thomas Martin; Martin Real Estate Appraisers, Inc.; Henry Grassi; LPDA Acquisition Corp.; Banstar, Inc.; Cromwell Building, Inc.; Perfe Corporation; New Contenders, Inc.; Actual Funding Company, Inc.; Anshlu, Inc.; Lyle Pfeffer; Deborah Aronow; Joseph Aronow; Nulenda, Inc.; National Finders Corp.; Scores Entertainment, Inc.; Irving Bilzinsky; Mark Yackow; National Mortgage Corp.; Charles Contreras; Future Diversified Projects, Inc.; Michael Oberlander; T.T.T. Capital Corp.; L. Pfeffer Corp.; Keith Pound; Jan Schneiderman; South Star Management Co., Inc.; Jan Starr a/k/a Jan Stark; Sholam Weiss; Solomon Obstfeld; Eugene Grin; Samuel Rothman; Global Equities & Realty, Inc.; N.E.S. Consulting Corp.; John Spear; Dean Kaltsas; FDPI Holding, Inc.; Ha-Lo Investment Associates, Inc.; Regency Financial Group, Inc; Somerset Properties, Inc.; Momentum Energy Resources Corporation; Cornerstone Oil and Gas Inc.; National Housing Exchange Inc.; APX Mortgage Services, Inc.; Robert Gorski; Nadine Gorski a/k/a/ Nadine Allen; Resource Asset Management, Inc.; and National Work-Out Specialists, Inc., hereinafter collectively referred to as the "Aiding and Abetting Breach of Fiduciary Duty Defendants."

514.    As alleged above, each of the Aiding and Abetting Breach of Fiduciary Duty Defendants knowingly participated in, and provided substantial assistance and encouragement to, at least one breach of fiduciary duty owed by at least one of the Breach of Fiduciary Duty defendants to National Heritage.

515.    As a direct and proximate result of each of the Aiding and Abetting Breach of Fiduciary Defendant's knowing participation in a breach of fiduciary duty to National Heritage, National Heritage sustained damages as alleged above.

## COUNT XIII - CONVERSION

516. The Commissioner realleges and reincorporates paragraphs 1-428 above as it fully set forth herein.

517. This Count XIII is directed against defendants Michael Blutrich; David Davies; Patrick Smythe; Joseph Rouadi; Gerald Decker; Capital Comparisons, Inc.; Schooner Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.; Celeb Capital, Inc.; Heathmead Development Corporation; Schecter, Ltd.; Perth Commercial Properties, Inc.; Webb Associates, Inc.; Crown Regional Properties, Inc.; Maxsam Entertainment, Inc.; Harrin Platzner; Platzner International Group, Ltd.; Alan Hirsch; Henry Grassi; LPDA Acquisition Corp.; Banstar, Inc.; Cromwell Building, Inc.; Perfe Corporation; New Contenders, Inc.; Actual Funding Company, Inc.; Anshlu, Inc.; Lyle Pfeffer; Deborah Aronow; Joseph Aronow; Nulenda, Inc.; National Finders Corp.; Scores Entertainment, Inc.; National Mortgage Corp.; Charles Contreras; Future Diversified Projects, Inc.; Michael Oberlander; T.T.T. Capital Corp.; L. Pfeffer Corp.; Keith Pound; Jan Schneiderman; South Star Management Co., Inc.; Jan Starr a/k/a Jan Stark; Sholam Weiss; Solomon Obstfeld; Eugene Grin; N.E.S. Consulting Corp.; Ha-Lo Investment Associates, Inc.; Regency Financial Group, Inc.; Somerset Properties, Inc.; Momentum Energy Resources Corporation; Cornerstone Oil and Gas Inc.; National Housing Exchange, Inc.; APX Mortgage Services, Inc.; APX Mortgage Services, Inc.; Robert Gorski; Nadine Gorski a/k/a Nadine Allen; and National Work-Out Specialists, Inc., hereinafter collectively referred to as the "Conversion Defendants."

518.    As alleged above, each of the Conversion Defendants unlawfully exercised dominion over or interfered with specifically identifiable funds owned by National Heritage.

519.    This Count XIII does not seek recovery against Michael Blutrich and Patrick Smythe for conversions alleged in Count IV of the lawsuit pending in United States District Court for the Middle District of Florida, entitled <u>Donna Lee H. Williams, as Insurance Commissioner of the State of Delaware and as Receiver for National Heritage Life Insurance Company in Liquidation v. Patrick Smythe, et al.</u>, Case No. 95-910-CIV-OR-22.  Further, this Count XIII does not seek recovery against Lyle Pfeffer and Future Diversified Projects, Inc. for conversions alleged in Count XI of the lawsuit pending in the United States District Court for the Southern District of New York, entitled <u>Donna Lee H. Williams, Insurance Commissioner of the State of Delaware, as Receiver for National Heritage Life Insurance Company in Liquidation v. LPDA Acquisition Corp., et al.</u>, Case No. 96 CIV 3079.  Finally, this Count XIII does not seek recovery against Resource Asset Management, Inc. for conversions alleged in Count V of the lawsuit pending in the United States District Court for the Northern District of Illinois entitled <u>Donna Lee H. Williams, Insurance Commissioner of the State of Delaware, as Receiver for National Heritage Life Insurance Company in Liquidation v. National Housing Exchange Inc., et al.</u>, Case No. 95 C 4243.

## <u>COUNT XIV - AIDING AND ABETTING CONVERSION</u>

520.    The Commissioner realleges and reincorporates paragraphs 1-428 above as it fully set forth herein.

521.    This Count XIV is directed against defendants Michael Blutrich; David Davies; Patrick Smythe; Joseph Rouadi; Gerald Decker; Capital Comparisons, Inc.; Schooner Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.; Celeb Capital, Inc.; Heathmead Development Corporation; Perth Commercial Properties, Inc.; Crown Regional Properties, Inc.; Harrin Platzner; Platzner International Group, Ltd.; Alan Hirsch; Thomas Martin; Martin Real Estate Appraisers, Inc.; Henry Grassi; LPDA Acquisition Corp.; Lyle Pfeffer; Deborah Aronow; Joseph Aronow; Nulenda, Inc.; National Finders Corp.; Irving Bilzinsky; Mark Yackow; Charles Contreras; Future Diversified Projects, Inc.; Michael Oberlander; T.T.T. Capital Corp.; L. Pfeffer Corp.; Keith Pound; Jan Schneiderman; South Star Management Co., Inc.; Jan Starr a/k/a Jan Stark; Sholam Weiss; Solomon Obstfeld; Eugene Grin; Samuel Rothman; Global Equities & Realty, Inc.; N.E.S. Consulting Corp.; John Spear; Dean Kaltsas; FDPI Holding, Inc.; Ha-Lo Investment Associates, Inc.; National Housing Exchange Inc.; APX Mortgage Services, Inc.; Robert Gorski; Nadine Gorski a/k/a Nadine Allen; Resource Asset Management, Inc.; and National Work-out Specialists, Inc., hereinafter collectively referred to as the "Aiding and Abetting Conversion Defendants."

522.    As alleged above, each of the Aiding and Abetting Conversion Defendants knowingly aided and abetted the unlawful exercise of dominion over or interference with specifically identifiable funds owned by National Heritage.

523.    This Count XIV does not seek recovery against Michael Blutrich and Patrick Smythe for acts of aiding and abetting conversion alleged in Count V of the lawsuit pending in United States District Court for the Middle District of Florida, entitled

<u>Donna Lee H. Williams, Insurance Commissioner of the State of Delaware, as Receiver</u>

<u>for National Heritage Life Insurance Company in Liquidation v. Patrick Smythe, et al.,</u>

Case No. 95-910-CIV-OR-22.

## COUNT XV - FRAUDULENT CONVEYANCE

524.    The Commissioner realleges and reincorporates paragraphs 1-428

above as it fully set forth herein.

525.    This Count XV is directed against defendants Michael Blutrich;

David Davies; Patrick Smythe; Joseph Rouadi; Gerald Decker; Capital Comparisons,

Inc.; Schooner Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.;

Celeb Capital, Inc.; Heathmead Development Corporation; Schecter, Ltd.; Perth

Commercial Properties, Inc.; Webb Associates, Inc.; Crown Regional Properties, Inc.;

Maxsam Entertainment, Inc.; Harrin Platzner; Platzner International Group, Ltd.; Alan

Hirsch; Henry Grassi; LPDA Acquisition Corp.; Banstar, Inc.; Cromwell Building, Inc.;

Perfe Corporation; New Contenders, Inc.; Actual Funding Company, Inc.; Anshlu, Inc.;

Lyle Pfeffer; Deborah Aronow; Joseph Aronow; Nulenda, Inc.; National Finders Corp.;

Scores Entertainment, Inc.; National Mortgage Corp.; Charles Contreras; Future

Diversified Projects, Inc.; Michael Oberlander; T.T.T. Capital Corp.; L. Pfeffer Corp.;

Keith Pound; Jan Schneiderman; South Star Management Co., Inc.; Jan Starr a/k/a Jan

Stark; Sholam Weiss; Solomon Obstfeld; Eugene Grin; N.E.S. Consulting Corp.; Ha-Lo

Investment Associates, Inc.;  Regency Financial Group, Inc.; Somerset Properties, Inc.;

Momentum Energy Resources Corporation; Cornerstone Oil and Gas Inc.; National

Housing Exchange, Inc.; APX Mortgage Services, Inc.; APX Mortgage Services, Inc.;

Robert Gorski; Nadine Gorski a/k/a Nadine Allen; Resource Asset Management, Inc.; and National Work-out Specialists, Inc., hereinafter collectively referred to as the "Fraudulent Conveyance Defendants."

526.   As alleged above, each of the Fraudulent Conveyance Defendants received assets diverted from National Heritage which rightfully belong to National Heritage.

527.   Each of the transfers of assets to each of the Fraudulent Conveyance Defendants alleged above was without fair consideration.

528.   By reason of each of the transfers of assets to each of the Fraudulent Conveyance Defendants alleged above, National Heritage did not retain sufficient funds or property to pay its creditors.

529.   At the time of each of the transfers of assets to each of the Fraudulent Conveyance Defendants alleged above, National Heritage was insolvent or was rendered insolvent thereby.

530.   The aforesaid transfers operated to delay, hinder and defraud the creditors of National Heritage and as such constitute fraudulent conveyances which are void.

531.   As a direct and proximate result of the transfers to each of the Fraudulent Conveyance Defendants alleged above, National Heritage suffered damages in at least the amount of those transfers, plus interest.

532.   This Count XV does not seek recovery against Michael Blutrich, Deborah Aronow, Lyle Pfeffer, LPDA Acquisition Corp., National Mortgage Corp. and

Future Diversified Projects, Inc. for fraudulent conveyances alleged in Counts II, V, VII

and X of the lawsuit pending in the United States District Court for the Southern District

of New York, entitled <u>Donna Lee H. Williams, Insurance Commissioner of the State of</u>

<u>Delaware, as Receiver for National Heritage Life Insurance Company in Liquidation v.</u>

<u>LPDA Acquisition Corp., et al.</u>, Case No. 96 CIV 3079.

## <u>COUNT XVI - UNJUST ENRICHMENT</u>

533.    The Commissioner realleges and reincorporates paragraphs 1-428

above as it fully set forth herein.

534.    This Count XVI is directed against defendants Michael Blutrich;

David Davies; Patrick Smythe; Joseph Rouadi; Capital Comparisons, Inc.; Schooner

Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.; Celeb Capital, Inc.;

Heathmead Development Corporation; Schecter, Ltd.; Perth Commercial Properties, Inc.;

Webb Associates, Inc.; Crown Regional Properties, Inc.; Maxsam Entertainment, Inc.;

Harrin Platzner; Platzner International Group, Ltd.; Alan Hirsch; Henry Grassi; LPDA

Acquisition Corp.; Banstar, Inc.; Cromwell Building, Inc.; Perfe Corporation; New

Contenders, Inc.; Actual Funding Company, Inc.; Anshlu, Inc.; Lyle Pfeffer; Deborah

Aronow; Joseph Aronow; Nulenda, Inc.; National Finders Corp.; Scores Entertainment,

Inc.; National Mortgage Corp.; Future Diversified Projects, Inc.; Michael Oberlander;

T.T.T. Capital Corp.; L. Pfeffer Corp.; Keith Pound; Jan Schneiderman; South Star

Management Co., Inc.; Sholam Weiss; N.E.S. Consulting Corp.; Ha-Lo Investment

Associates, Inc.; Regency Financial Group, Inc.; Somerset Properties, Inc.; Momentum

Energy Resources Corp.; Cornerstone Oil and Gas Inc.; APX Mortgage Services, Inc.;

Resource Asset Management, Inc.; and National Work-out Specialists, Inc., hereinafter collectively referred to as the "Unjust Enrichment Defendants."

535.    By receiving and retaining improperly obtained and directed assets, all as alleged above, each of the Unjust Enrichment Defendants has unjustly retained a benefit to the detriment of National Heritage.  Each of the Unjust Enrichment Defendant's retention of such benefit violates fundamental principles of justice, equity and good conscience.

536.    As a direct and proximate result of each of the Unjust Enrichment Defendant's unjust retention of the monies transferred to it as alleged above, National Heritage has suffered damages in at least the amount of these transfers, plus interest.

537.    This Count XVI does not seek recovery against Michael Blutrich, Deborah Aronow, Lyle Pfeffer, LPDA Acquisition Corp., National Mortgage Corp. and Future Diversified Projects, Inc. for acts of unjust enrichment alleged in Counts III, VI and VIII of the lawsuit pending in the United States District Court for the Southern District of New York, entitled <u>Donna Lee H. Williams, Insurance Commissioner of the State of Delaware, as Receiver for National Heritage Life Insurance Company in Liquidation v. LPDA Acquisition Corp., et al.</u>, Case No. 96 CIV 3079.  Neither does this Count XVI seek recovery against Michael Blutrich based on any error, omission or negligent act committed by Blutrich in the performance of legal or notary services.

## COUNT XVII - MONEY HAD AND RECEIVED

538.    The Commissioner realleges and reincorporates paragraphs 1-428 above as it fully set forth herein.

-199-

539. This Count XVII is directed against defendants Michael Blutrich; David Davies; Patrick Smythe; Joseph Rouadi; Capital Comparisons, Inc.; Schooner Trust; Scientific Waste Systems, Inc.; Skylark Communications, Inc.; Celeb Capital, Inc.; Heathmead Development Corporation; Schecter, Ltd.; Perth Commercial Properties, Inc.; Webb Associates, Inc.; Crown Regional Properties, Inc.; Maxsam Entertainment, Inc.; Harrin Platzner; Platzner International Group, Ltd.; Alan Hirsch; Henry Grassi; LPDA Acquisition Corp.; Banstar, Inc.; Cromwell Building, Inc.; Perfe Corporation; New Contenders, Inc.; Actual Funding Company, Inc.; Anshlu, Inc.; Lyle Pfeffer; Deborah Aronow; Joseph Aronow; Nulenda, Inc.; National Finders Corp.; Scores Entertainment, Inc.; National Mortgage Corp.; Future Diversified Projects, Inc.; Michael Oberlander; T.T.T. Capital Corp.; L. Pfeffer Corp.; Keith Pound; Jan Schneiderman; South Star Management Co., Inc.; Sholam Weiss; N.E.S. Consulting Corp.; Ha-Lo Investment Associates, Inc.; Regency Financial Group, Inc.; Somerset Properties, Inc.; Momentum Energy Resources Corp.; Cornerstone Oil and Gas Inc.; APX Mortgage Services, Inc.; Resource Asset Management, Inc.; and National Work-Out Specialists, Inc., hereinafter collectively referred to as the "Money Had and Received Defendants."

540. As alleged above, each of the Money Had and Received Defendants benefitted from the receipt of money rightfully belonging to National Heritage.

541. Under principles of equity and good conscience, each of the Money Had and Received Defendant's should not be permitted to keep the money transferred to it, directly or indirectly, from National Heritage as alleged above.

542.     This Count XVII does not seek recovery against Michael Blutrich based on any error, omission, or negligent act committed by Blutrich in the performance of legal or notary services.

WHEREFORE, Donna Lee H. Williams, Insurance Commissioner of the State of Delaware, as Receiver of National Heritage Life Insurance Company in Liquidation, demands a jury trial on all issues properly tried to a jury and requests the entry of judgment against defendants:

a.   Awarding compensatory damages in an amount to make National Heritage whole with damages under Counts I through VIII to be trebled as provided by 18 U.S.C. § 1964(c);

b.      Awarding punitive damages for Counts IX and X;

c.      Voiding all transfers of funds or other assets from National Heritage to any one or more of defendants;

        d.     Awarding the Commissioner the full costs of this action, including reasonable attorneys' fees, as provided by 18 U.S.C. § 1964(c) and otherwise; and

        e.     Awarding plaintiffs such other relief as the nature of the case may require and as the Court may deem just.

Respectfully submitted,

DONNA LEE H. WILLIAMS,
INSURANCE COMMISSIONER OF THE
STATE OF DELAWARE, AS RECEIVER
OF NATIONAL HERITAGE LIFE
INSURANCE COMPANY IN
LIQUIDATION

By: _____

Steven S. Scholes
Michael S. Schachter
Lara M. Levitan
McDermott, Will & Emery
227 West Monroe Street
Chicago, Illinois 60606
Tel: (312) 372-2000
Fax:   (312) 984-7700

Thomas K. Equels
Florida Bar No. 304735
Holzman, Krinzman, Equels & Furia
16 West Pine Street
Orlando, Florida 32801
Tel: (407) 839-0095
Fax: (407) 839-2050

\45372\012\DRAFT.002

## CERTIFICATE OF SERVICE

I, Michael S. Schachter, an attorney, certify that on April 15, 1998, I will cause a copy of the foregoing First Amended Complaint to be served upon all individuals listed below by placing a copy in the U.S. mail, postage pre-paid, before the hour of 5:00 p.m.:

Christopher M. Kise, Esq.
1060 Barnett Plaza
101 East Kennedy Boulevard
Tampa, FL 33602

Patrick Smythe
7735 Bethel Road
P.O. Box 3018
Cummings, GA  30028

Mr. and Mrs. Robert Gorski
APX Mortgage Services, Inc.
754 Wedgewood Drive
Crystal Lake, IL 60014

Daniel L. Abrams, Esq.
Shereff, Friedman, Hoffman & Goodman
919 Third Avenue
New York, NY  10022-9998

Charles B. Lembcke
Datz, Jacobson, Lembcke & Garfinkel, P.A.
2902 Independent Square
Jacksonville, FL  32202

John Hamilton, Esq.
Foley & Lardner
111 North Orange Avenue - Suite 1800
Orlando, FL 32801

Wilfred Friedman, Esq.
The Bar Building
36 West 44th Street
New York, NY  10036

Douglas C. Spears, Esq.
Peter C. Vilmos, Esq.
Adams & Spears, P.A.
940 Highland Avenue
P.O. Box 3627
Orlando, FL  32802

Jonathan Bachrach, Esq.
1370 Avenue of the Americas
New York, NY  10019

Thomas Martin
274 Route 303
West Nyack, NY 10994

Peter Tomback, Esq.
37 Church Lane
Scarsdale, NY 10583-2909

Jed Berman, Esq.
Infantino & Berman
180 South Knowles
Winter Park, Florida  33789

Matt G. Firestone, Esq.
Matt G. Firestone, P.A.
14 East Washington Street - Suite 306
Orlando, FL  32801

David Davies
Inmate No. 09105-045
Federal Correctional Institute
P. O. Box 5000
Yazoo City, MS  39194

Clyde W. Smith, Jr.
Somerset Properties, Inc.
8836 Larston
Houston, TX  77055

Henry Grassi
7309 Phellos Port
Raleight, NC  27615

Harry Reidler
70 Grand Avenue – Suite 100
River Edge, NJ  07661